United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMEVICE, INC.,<br>            Plaintiff,<br>    v.<br>NINTENDO CO., LTD., et al.,<br>            Defendants. | Case No. 18-cv-01942-RS<br><br>**ORDER CONSTRUING CLAIMS** |

## I. INTRODUCTION

Plaintiff and Counter-Defendant Gamevice, Inc. ("Gamevice") is a designer and manufacturer of attachable handheld controllers for use with mobile phones and tablets. Defendant and Counter-Claimant Nintendo of America, Inc. ("Nintendo") similarly develops gaming technology, including video game controllers and consoles. In March 2018, Gamevice filed suit against Nintendo for alleged infringement of two of Gamevice's patents. In response, Nintendo moved to stay Gamevice's infringement claims, and filed an answer and counterclaim. The motion to stay Gamevice's claims was granted. Nintendo's counterclaims against Gamevice, however, were allowed to proceed.

Nintendo accuses Gamevice of selling accessories for smart phones and tablets that infringe U.S. Patent Nos. 7,193,165 ("the '165 patent"), 8,702,514 ("the '514 patent"), and, 9,700,806 ("the '806 patent"). The '165 patent claims, among other things, a shoulder button for a game controller. The '514 patent claims a combination of a game controller and attachable display device. Finally, the '806 patent claims a game controller that connects to a separate "electronic

device" and provides additional controls for that device. The parties now seek construction of twelve terms from Nintendo's patents, pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).

## II. LEGAL STANDARD

Claim construction is a question of law to be determined by the Court. *Markman*, 52 F.3d at 979. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should be construed in a manner "that stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.* (quoting *Renishaw*, 158 F.3d at 1250).

The first step in claim construction is to look to the language of the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13. The ordinary and customary meaning of a claim term must take into account the context of the claim's overall language. *See id.* at 1314 ("[T]he use of a term within the claim provides a firm basis for construing the term."). Additionally, the use of the term in other claims may provide guidance regarding its proper construction. *Id.*

A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis."). In limited circumstances, the specification may be used to narrow the meaning of a claim term that

otherwise would appear to be susceptible to a broader reading. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). For example, "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.* Courts may not, however, impose limitations that are not supported by the language of the claim. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998); *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (quotation omitted) (explaining that, while "claims are to be interpreted in light of the specification . . . it does not follow that limitations from the specification may be read into the claims."); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("It is the *claims* that measure the invention.") (emphasis in original).

A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office ("PTO") regarding the scope of the invention. *See Markman*, 52 F.3d at 980. Courts may also consider extrinsic evidence, such as expert testimony, dictionaries, or technical treatises, especially if such sources are "helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980). Ultimately, while extrinsic evidence may aid the claim construction analysis, it cannot be used to contradict the plain and ordinary meaning of a claim term as defined within the intrinsic record. *Id.* at 1322-23.

### III. DISCUSSION

#### A. The '165 Patent

The '165 patent claims, among other things, a shoulder button for a game controller. The parties request construction of six terms related to this invention.

*1. "housing*

The term "housing" appears in almost all of the claims in the '165 patent. Nintendo contends this term does not require construction. In the alternative, Nintendo proposes the term be

construed to mean "component that covers or protects." Gamevice, for its part, proposes the term be construed as "a rigid casing that encloses and protects an electrical and/or mechanical mechanism."

The term "housing" shall be construed to mean a "component that covers or protects." Although Gamevice argues construction of this term should include the word "rigid," there is no reference to rigidity in the patent itself. Furthermore, the fact that one of the embodiments in the specification describes housing made of a "thin sheet of metal" does not justify limiting the scope of the term to rigid structures. The extrinsic evidence, on balance, also weighs against limiting "housing" to "rigid" coverings. While some dictionary definitions of the term "housing" include references to rigidity, others do not. Nintendo's expert also testified that gaming consoles use both rigid and non-rigid housing to protect the exterior of gaming devices. Accordingly, Nintendo's proposed construction of "housing" to mean a "component that covers or protects" is adopted.

### 2. *"an upper side surface of said housing"*

The term "an upper side surface of said housing" appears in claims 1 and 8 of the '165 patent. Gamevice argues this term is indefinite, unless the term "housing" is construed to include only rigid structures. This is because a person of ordinary skill in the art would not be able to identify the "upper side surface" of an amorphous housing structure. Nintendo responds that the term is not indefinite and, further, does not require construction because it uses ordinary terms that can be easily understood by laypersons.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Thus, the definiteness requirement "mandates clarity, while recognizing that absolute precision is unattainable." *Id.* at 910. In evaluating indefiniteness, the term "an upper side surface of said housing" must be read in light of the specification. Here, the specification provides Figure 3 (below) and describes item 20 in that figure as the "upper side surface" of the housing.

Patent '165 at 6:27-53.



Neither a layperson or a person of ordinary skill in the art is likely to have difficulty understanding what the "upper side surface" means in the context of the '165 patent. While Gamevice is correct that, depending upon the shape of the controller, there may be some ambiguity as to whether a particular surface qualifies as "an upper side surface," the Supreme Court has recognized that "absolute precision is unattainable." *Nautilus*, 572 U.S. at 910. Accordingly, the term "an upper side surface of said housing" is neither indefinite nor in need of construction.

    3. *"said center of a main surface of said housing"*

The term "said center of a main surface of said housing" appears in dependent claims 4 and 11 of the '165 patent. Nintendo maintains this term does not require construction. To the extent construction is necessary, Nintendo proposes the term be construed to mean "a horizontal center of the surface of said housing that faces the user when said housing is held upright as in, for example, Figure 17." Gamevice contends the term is indefinite.

The term "said center of a main surface of said housing" is indefinite because it lacks an antecedent basis. Claims 1 and 8—the independent claims upon which claims 4 and 11 rely respectively—make no reference to a "center *of a main surface*." Instead claims 1 and 8 refer to a "center *of said housing in a horizontal direction*." Patent '165 at 19:46-48, 20:24-26 (emphasis added). This creates ambiguity as to whether "said center of a main surface of said housing" refers

to the horizontal center of the *housing* or the horizontal center of the *main surface*. This ambiguity could be resolved by at least three plausible modifications to the language of the claims. First, the subject term could be modified to read "said center of ~~a main surface of~~ said housing," thus clarifying that the "center" identified in independent claims 1 and 8 and dependent claims 4 and 11 is the horizontal center of the *housing*. Alternatively, this term could be modified to read: "~~said~~ **a** center of a main surface of said housing," thereby decoupling claims 1 and 8 from claims 4 and 11. Finally, the language of independent claims 1 and 8 could be modified to refer to a "center of **a main surface of** said housing in a horizontal direction," thus establishing that the "center" referenced in claims 1, 8, 4, and 11 is the horizontal center of the *main surface* of the device.

That multiple feasible clarifications are available for the ambiguity in the term "said center of a main surface of said housing" ultimately renders the term indefinite. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1358 (Fed. Cir. 2003) ("Since we cannot know what correction is necessarily appropriate or how the claim should be interpreted, we must hold [the claim] invalid for indefiniteness."); *Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, 681 F. App'x 898, 904 (Fed. Cir. 2017) (affirming claims were indefinite because patentee's proposed correction is "subject to reasonable debate" and "other possible corrections appear to be feasible").

*4. "elastic body"*

The term "elastic body," appears in claims 1, 3, 8, and 10 of the '165 patent. Gamevice proposes this term be construed to mean "a coil spring, leaf spring, rubber, or the like that is abutted against or secured to the keytop." Nintendo contends the term does not require construction but, in the alternative, proposes the term be construed to mean a "spring, including but not limited to, leaf spring, coil spring or other component that can be pressed or pulled but returns to its former shape when released." The crux of the dispute concerns whether the "elastic body" must be a separate component from the keytop.

The term "elastic body" shall be construed to mean "a coil spring, leaf spring, rubber, or like component that can be pressed or pulled but returns to its former shape when released." The elastic body need not be a completely separate component from the keytop. First, the claim

language does not state that the elastic body must be by physically separate. Although the court in *Becton, Dickinson & Co. v. Tyco Healthcare Grp.* reasoned that, where "a claim lists elements separately, the clear implication" is that those elements are distinct components, that case is distinguishable. 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quotation omitted). There, the claim listed four elements: "1) a needle, 2) a guard that rides on the needle, 3) a hinged arm attached to the guard, and 4) a spring means 'connected to' the hinged arm." *Id.* The Federal Circuit noted that, "[i]f the hinged arm and the spring means are one and the same, then the hinged arm must be 'connected to' itself and must 'extend between' itself and a mounting means, a physical impossibility." *Id.* at 1255. In other words, a construction which would permit the two components to be a single unitary structure would render the asserted claim "facially nonsensical." *Id.* Furthermore, the specification contained "no suggestion that the hinged arm" and spring means could be part of a unitary structure. *Id.* at 1254.

Here, the claims refer to "an elastic body for elastically pushing said keytop toward a state that said switch portion is not actuated, wherein when said keytop is depressed against an elastic force provided by said elastic body, said other end of said keytop is rotated about said pivot portion to actuate said switch portion." Patent '165 at 19:56-62. In other words, all that is required is that the "elastic body" "push[es]" the keytop to a state where it is not actuated and that the keytop may be depressed "against" the elastic force of this elastic body. The specification further explains that the term "elastic body" includes not only coil springs, but also leaf springs or rubbers. Patent '165 at 11:62-63. An example of a leaf spring is depicted in Figure 19 of the specification (below).



Although Figure 19 depicts a leaf spring in conjunction with a "start switch" as opposed to

a "shoulder button," it still provides a clear depiction of how a leaf spring would act in conjunction with a keytop. As explained in the specification, the keytops depicted in Figure 19 are "normally pushed by the action of the leaf spring portions 28$c$ and 30$c$ in the direction shown by the arrow C." Patent '165 at 16:64-65. When the keytops are depressed by the user, however, they lower "against the elastic force of the leaf spring portions 28$c$ and 30$c$." Patent '165 at 16:67-17:1. This discussion of how the leaf spring in Figure 19 interacts with the keytop mirrors the description of the "elastic body" set forth in the claims. Therefore, unlike in *Becton*, allowing the "elastic body" to be part of a unitary component which includes a distinct "keytop" portion does not render the claim nonsensical and is supported by the specification. Accordingly, the term "elastic body" will be construed to mean "a coil spring, leaf spring, rubber, or like component that can be pressed or pulled but returns to its former shape when released."

     5. *"pivot portion"*

The term "pivot portion" appears in independent claims 1 and 8 and dependent claims 2 and 9. The independent claims refer to the term generally, whereas the dependent claims recite a specific construction of the "pivot portion." For example, claim 1 simply refers to a "pivot portion provided at an other end of said keytop," whereas claim 2 describes "a pivot portion [] constructed by a pin and a bearing." Patent '165 at 19:54, 19:64-65. Gamevice proposes the term "pivot portion" be construed as "a pin and bearing or other assembly with a fixed point around which the keytop rotates." Nintendo maintains that no construction is necessary but, in the alternative, proposes the term be construed to mean "the point around which the keytop rotates."

As Gamevice acknowledges, the term "pivot portion" is not limited to the pin and bearing type assembly discussed in the specification, therefore there is no need to include this configuration in the construction of the term. Contrary to Nintendo's position, however, the term "pivot portion" clearly refers to a physical component, not merely an abstract point in space. Accordingly, the term "pivot portion" shall be construed to mean "a component or assembly with a fixed point around which the keytop rotates."

     6. *"switch portion"*

The term "switch portion" appears in independent claims 1 and 8. Gamevice proposes this term be construed to mean "a combination of a switch contact and a protrusion formed on the lower end surface of the keytop that engages the switch contact." Nintendo contends that no construction is necessary. In the alternative, Nintendo proposes the term "switch portion" be construed as "an electrical switch and a part that acts on the electrical switch." The crux of the dispute relates to whether the "switch portion" must include "a protrusion" formed on the base of the keytop. The claim language does not suggest any such requirement. Moreover, the fact that the preferred embodiment in the specification includes such a protrusion, without more, does not suggest such a limitation. Ultimately, it is highly implausible that a person of ordinary skill in the art would think the only way to create the "switch portion" described in claims 1 and 8 would be to include a protrusion on the keytop. Accordingly, the term "switch portion" shall be construed to mean "an electrical switch and a part that acts on the electrical switch."

### B. The '514 Patent

The '514 patent claims a controller system that combines a display device with a second handheld device that is removably connected to the display device. The parties seek construction of three terms from this patent.

*1. "bar-shaped first grip portion" / "bar-shaped second grip portion"*

The two terms at issue appear in independent claims 1 and 10 and dependent claim 2 of the '514 patent. Gamevice proposes this term be construed to mean "a pillar-like structure that can be held by one hand as shown in, for example, FIGS. 15-19." Nintendo responds that no construction is necessary. In the alternative, Nintendo proposes these terms be construed to mean "bar-like or pillar-like portion capable of being held."

The terms "bar-shaped first grip portion" / "bar-shaped second grip portion" shall be construed to mean a "pillar-like portion capable of being held." On its own, the meaning and scope of the term "bar-shaped grip" is somewhat ambiguous. Nintendo, however, clarified the meaning of this term by describing the term "bar-like" as synonymous with "pillar-like." Patent '514 at 30:3-6 (describing the grips as having "a bar-like (pillar-like) shape"). In so doing, Nintendo acted

as its own lexicographer. *Vitronics*, 90 F.3d at 1582 ("[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history"). All of the embodiments in the specification are consistent with this construction.

Nintendo argues the reference to a "pillar-like" shape is just one example of "bar-shaped grip." Indeed, in Nintendo's view, the term "bar-shaped" shape encompasses a flat space bar shaped protrusion that runs along the surface of a device, a pillar-like column that extends away from the device, or any other grip that is in some fashion "bar-like." A person of ordinary skill in the art reviewing the '514 patent, however, would not be on notice that the terms "bar-shaped first grip portion" / "bar-shaped second grip portion" were meant to have such a broad scope. Accordingly, these terms shall be construed to mean "pillar-like portion capable of being held."

### 2. *"generally plate-shaped housing"*

The term "generally plate-shaped housing" appears in claims 1 and 13 of the '514 patent. Gamevice proposes this term be construed to mean "a rectangular, tablet-like shape." Nintendo maintains that no construction is necessary. In the alternative, Gamevice proposes the term be construed to mean a "horizontally-elongated rectangular shape." The parties agree that "generally plate-shaped housing" refers to a rectangular shape but disagree about whether such housing must have a "tablet-like shape." The term "generally plate-shaped housing" shall be construed to mean a "horizontally-elongated flat rectangular shape."

The specification describes the housing in question as having "a horizontally-elongated rectangular plate shape" and states that the display can be described as "a tablet-type information processing device." Patent '514 at 16:34-37. Although Nintendo objects to the inclusion of the term "tablet-like" in the construction of the claim, the company acknowledged at the *Markman* hearing that "plate-shaped housing" must be relatively flat. By using the term "flat" rather than "table-like," however, the adopted construction makes clear that "generally plate-shaped housing" need not necessarily be the same *size* as a tablet.

### 3. *"a support portion configured to . . ."*

The term "a support portion configured to" appears in independent claim 1 of the '514 patent. The claim specifically refers to "a support portion configured to detachably support the device so that a screen of the display section is in a generally vertical direction when the first grip portion is in a vertical direction." Patent '514 at 66:52-55. The sole dispute between the parties with respect to this term relates to whether it qualifies as a means-plus-function limitation that is subject to construction under 35 U.S.C. § 112(6).

The first step in assessing a purported means-plus-function limitation is to determine whether the word "means" appears in the claim. The absence of the word "means" to describe a limitation creates a rebuttable presumption that Section 112(6) does not apply. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). The party seeking application of Section 112(6) bears the burden of showing the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (quotation omitted). The essential inquiry is whether a person of ordinary skill in the art would have understood the terms of the claim to have a sufficiently definite structural (as opposed to functional) meaning. *Id.* The disputed term need not be limited to a single structure "as long as the class of structures is identifiable by a person of ordinary skill in the art." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed. Cir. 2004). This analysis is conducted using traditional claim construction principles. *Zeroclick*, 891 F.3d 1007.

The term "support" has been accepted as a structural term by other courts. *See e.g.*, *Fargo Elecs., Inc. v. Iris Ltd., Inc*., No. 04-1017 JRT/FLN, 2005 WL 3241851, at *11 (D. Minn. Nov. 30, 2005), *aff'd*, 287 F. App'x 96 (Fed. Cir. 2008) (holding that the term "support" was not a means-plus-function limitation); *see also GoPro, Inc. v. 360Heros, Inc.*, 16-cv-01944-SI, 2017 WL 2617906, at *4 (N.D. Cal. June 16, 2017) (construing the term "support" to mean a "structure that holds or positions something," albeit without any reference to Section 112(6)). In *Fargo Electronics*, the term "support" was defined as either a "bore[]" or an "aperture[]" in some of the claims but was used without any recitation of structure in others. 2005 WL 3241851, at *11. The court concluded that, although the term "support" was arguably too broad, it was not a means-plus

function limitation. *Id.* (explaining that a term that has "a reasonably well understood meaning in the art" is not a means-plus-function limitation).

Nintendo's expert testified that the term "support" has been used in the gaming industry for decades and "generally include[s] a member or other component on the first device that holds the second device in place." Kitchen Decl. ¶ 78. The term "a support portion configured to," as used in the '514 patent, also includes certain physical limitations. In particular, this "support portion" must be physically detachable and must hold the display device in a particular direction relative to the other parts of the invention. These are not merely functional limitations; they denote a physical structure that positions one device relative to another. *Fargo Electronics*, 2005 WL 3241851, at *11 (recognizing that "the fact that the disputed term is derived from the function performed does not necessarily indicate that it fails to indicate a structure."). Accordingly, the term "a support portion configured to," as used in the '514 patent, is not a means-plus-function limitation. Neither party requests independent construction of this term. Accordingly, seeing as the Section 112(6) dispute has been resolved, there is no need to construe this term further.

**C. The '806 Patent**

The '806 patent describes a combination of two devices: a game controller that connects to and holds a separate electronic device. The parties request construction of three terms from this patent.

*1. "such that the main surface of the electronic device is visible to the user while the user grasps the gaming device" (and similar phrases)*

The aforementioned phrase, and similar related phrases listed in the parties' Joint Claim Construction and Prehearing Statement (collectively, "Main Surface Limitations"), appear in independent claims 1, 16, and 20, and dependent claims 17, 18, and 24. For example, claim 1 refers to "a support configured to detachably hold at least two sides of the electronic device located on opposite sides of the main surface of the electronic device *such that the main surface of the electronic device is visible* to the user while the user grasps the gaming device." Patent '806 at 26:1-5 (emphasis added). The parties' primary dispute relates to whether these phrases should be

construed to mean that "all portions" of the main surface can be seen by the user.

These phrases shall be construed to mean "such that all portions of the main surface of the electronic device can be seen by the user while the user grasps the gaming device." Claim 24 of the '806 patent, which is dependent on claim 1 by way of claims 2 and 3, describes a support "configured to detachably hold the electronic device *such that at least a portion of the main surface* of the electronic device that is visible to the user is located between the first directional input device and the second directional input device." Patent '806 at 28:31-34. The fact that claim 24 refers to "at least a portion of the main surface" being visible suggests the unqualified reference to the "main surface of the electronic device" in the Main Surface Limitations means *all portions* of that surface must be visible. The embodiments described in the specification are consistent with such an interpretation. Accordingly, the Main Surface Limitations are construed to mean "such that all portions of the main surface of the electronic device can be seen by the user while the user grasps the gaming device."

### 2. *"a first shoulder" / "the first shoulder" / "a second shoulder"*

The terms "a first shoulder" / "the first shoulder" / "a second shoulder" appear in claims 13 and 20-22 of the '806 patent. Gamevice contends these terms are indefinite. Nintendo responds that the terms are not indefinite and that no construction is necessary. In the alternative, Nintendo recommends construing these terms to mean a "position at the top of the gaming device, when the gaming device is held upright, that is accessible to the index or middle finger." The aforementioned terms are not indefinite and will be construed in accordance with Nintendo's alternate recommendation.

Nintendo's expert testified that shoulder buttons are ubiquitous in the gaming industry, and that a person of skill in the art would understand the meaning of this term. Kitchen Decl. ¶ 89, 90 (testifying that the term "shoulder" has been an industry standard term since before the time of invention, and that the term "denotes the part of the controller or system located on the top of the controller or system that is accessible by the index or middle fingers of the user"). Recent Gamevice accessories have also included "shoulder buttons" and current and former Gamevice

CASE NO. 18-cv-01942-RS
13

employees had no difficulty providing a similar definition for the term.

Although recent use of the term "shoulder" and "shoulder button" does not necessarily show the term was well understood *at the time of invention*, Nintendo's expert testified that this term was in fact in common use in the industry at that time. Therefore, because the meaning of the term "shoulder" would be clear to a person skilled in the art at the time invention, the subject terms are not indefinite. The terms "a first shoulder" / "the first shoulder" / "a second shoulder" are, accordingly, construed to mean a "position at the top of the gaming device, when the gaming device is held upright, that is accessible to the index or middle finger."

### 3. "a support configured to . . ."

The term "a support configured to" appears in independent claims 1, 16, and 20. For example, claim 1 refers to "a support configured to detachably hold at least two sides of the electronic device located on opposite sides of the main surface of the electronic device such that the main surface of the electronic device is visible to the user while the user grasps the gaming device." Patent '806 a 26:1-5. Claims 16 and 20 similarly refer to a support which must hold at least two sides of the electronic device located on opposite sides of the main surface. The primary dispute between the parties is whether the phrase "a support configured to" is a means-plus-function limitation subject to construction under 35 U.S.C. § 112(6).

As explained in Part III.B.3, *supra*, the first step in assessing a purported means-plus-function limitation is to determine whether the word "means" appears in the claim. The absence of the word "means" to describe a limitation creates a rebuttable presumption that Section 112(6) does not apply. *Zeroclick*, 891 F.3d at 1007. The party seeking application of Section 112(6) bears the burden of showing the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* (quotation omitted).

The term "support configured to," as used in the '806 patent, is not a means-plus function limitation. The claim language describes this term as a detachable part which attaches to the left and right-hand sides of the game controller and physically holds the electronic device in place by gripping the two sides of the electronic device. This is not merely a functional description—rather

it provides specific physical features of the "support," such as where the support attaches to, or grips, the various devices. Neither party requests independent construction of this term. Accordingly, because the dispute regarding Section 112(6) has been resolved, there is no need for further construction of this term.

### IV. CONCLUSION

The disputed claim terms of the patents-in-suit are construed as set forth above. A further Case Management Conference shall be held on September 5, 2019 at 10:00am. The parties shall file a Joint Case Management Statement at least one week prior to the Conference.

**IT IS SO ORDERED**.

Dated: August 2, 2019

_____
RICHARD SEEBORG
United States District Judge