# EXHIBIT "B"

LTL ATTORNEYS LLP
Enoch H. Liang (SBN 212324)
enoch.liang@ltlattorneys.com
Michael J. Song (SBN 243675)
michael.song@ltlattorneys.com
Vincent M. Pollmeier (SBN 210684)
vincent.pollmeier@ltlattorneys.com
Prashanth Chennakesavan (Bar No. 284022)
prashanth.chennakesavan @ltlattorneys.com
300 South Grand Ave., 14th Floor
Los Angeles, CA 90071
Phone: (213) 612-8900
Facsimile: (213) 612-3773

Attorneys for Plaintiff and Counter-Defendant
GAMEVICE, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GAMEVICE, INC.<br><br>        Plaintiff,<br><br>    v.<br><br>NINTENDO CO., LTD, and NINTENDO OF AMERICA, INC.,<br><br>        Defendants.<br><br>─────────────────────────<br><br>NINTENDO OF AMERICA, INC.<br><br>        Counter-claimant,<br><br>    v.<br><br>GAMEVICE, INC.<br><br>        Counter-defendant. | Case No. 3:18-cv-1942-RS<br><br>**GAMEVICE NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 7,193,165; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  April 23, 2020<br>Time:  1:30 p.m.<br>Place:  Courtroom 3, 17th Floor<br>Judge:  Hon. Richard Seeborg |

1

**TABLE OF CONTENTS**

2  MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

3  I.    INTRODUCTION ............................................................................................1

4  II.   ISSUES TO BE DECIDED..............................................................................1

5  III.  STATEMENT OF UNDISPUTED FACTS .....................................................1

6

7    A.  Asserted Patent and Asserted Claims.......................................................1

8    B.  Court's Claim Constructions .....................................................................4

9    C.  Nintendo's Invalidity Expert Admits that Claims 1 and 8 Are

10       "Nonsensical" If Read to Require Rotation About the "Other End" Where
         the Pivot Portion Is ..................................................................................4

11   D.  The Sega Saturn Controller ......................................................................6

12

13       1.  Nintendo's "Yaw" Axis Claim Construction Arguments..............................8

14       2.  Nintendo's "Rotation" Claim Construction Arguments ...............................10

15       3.  Nintendo's "Elastic Body" Claim Construction Arguments .......................11

16   E.  Hamada ...................................................................................................12

17       1.  Hamada's Filing Date and Nintendo's Claims of Prior Invention...............12

18
         2.  Hamada's Disclosure.........................................................................13
19
         3.  Nintendo's Claim Construction Arguments....................................................15
20

21  IV.    THE ASSERTED CLAIMS OF THE '165 PATENT ARE INVALID

22         UNDER 35 U.S.C §112 AND/OR 101 ......................................................16

23  V.    THE ASSERTED CLAIMS ARE INVALID AS ANTICIPATED BY THE
          SEGA SATURN CONTROLLER .............................................................18
24

25    A.  Nintendo Cannot Defeat Summary Judgment By Proffering New Claim
          Constructions ..........................................................................................19
26

27    B.  Nintendo's Claim Constructions Import Limitations and are Not Supported
          by the Intrinsic Record ...........................................................................20

28

VI.      THE ASSERTED CLAIMS ARE INVALID AS ANTICIPATED BY
HAMADA.................................................................................................23

  A.  Hamada is Prior Art Under Former 35 U.S.C. § 102(e)....................................23

  B.  Nintendo Cannot Defeat Summary Judgment By Proffering New and
      Improper Claim Constructions .............................................................24

VII.     CONCLUSION ..........................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## **TABLE OF AUTHORITIES**

2

**Cases**

3

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,

4

299 F.3d 1336 (Fed. Cir. 2002) ...................................................................17

5

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*,

516 F.3d 1361 (Fed. Cir. 2008) ...................................................................18

6

7

*C.R. Bard, Inc. v. United States Surgical Corp.*,

388 F.3d 858 (Fed. Cir. 2004) .....................................................................25

8

9

*Datamize, LLC v. Plumtree Software, Inc.*,

 415 F.3d 1342 (Fed. Cir. 2005) ..................................................................25

10

11

*Emi Grp. North Am. v. Cypress Semiconductor Corp.*,

268 F.3d 1342 (Fed. Cir. 2001) ...................................................................18

12

13

*Honeywell Int'l, Inc. v. ITC*,

341 F.3d 1332 (Fed. Cir. 2003) ...................................................................18

14

15

*Intamin, Ltd. V. Magnetar Techs., Corp.*,

483 F.3d 1328 (Fed. Cir. 2007) ...................................................................16

16

*Markman v. Westview Instruments*,

17

517 U.S. 370, 372, 116 S. Ct. 1384 (1996) ................................................19

18

*MediaTek, Inc. v. Freescale Semiconductor, Inc.*,

2014 WL 971765 (N.D. Cal. 2014) ......................................................20, 24

19

20

*Moleculon Research Corp. v. C.A., Inc.*,

793 F.2d 1261 (Fed. Cir. 1986) ...................................................................19

21

22

*Nautilus, Inc. v. Biosig Instruments, Inc.*,

572 U.S. 898, 910, 134 S. Ct. 2120 (2014) ................................................17

23

24

*Pfaff v. Wells Elecs*,

525 U.S. 55, 57, 119 S. Ct. 304 (1998) .................................................18, 19

25

26

*Raytheon Co. v. Roper Corp.*,

724 F.2d 951 (Fed. Cir. 1983) .....................................................................18

27

*Rexnord Corp. v. Laitram Corp.*,

28

274 F.3d 1336 (Fed. Cir. 2001) ...................................................................16

*TaurusIP, LLC v. DaimlerChrysler Corp.*,
726 F.3d 1306 (Fed. Cir. 2013) .................................................................................18, 23

*The Regents of the University of California v. Micro Therapeutics, Inc.*,
2007 WL 229412 (N.D. Cal. 2007) ..........................................................................19, 25

*UCB, Inc. v. Watson Labs. Inc.*,
927 F.3d 1272, 1289 n.13 (Fed. Cir. 2019) ....................................................................17

**Statutes**

35 U.S.C. § 102(b) ...........................................................................................................25

35 U.S.C. § 102(e) ...........................................................................................................25

35 U.S.C. § 102(e)(2)........................................................................................................23

35 U.S.C. § 112...........................................................................................................17, 18

35 U.S.C. §§ 101..........................................................................................................18, 25

35 U.S.C. §§ 112 ................................................................................................................1

Section 102(b) ...................................................................................................................18

**Rules**

*Fed. R. Evid.* 702 .......................................................................................................19, 25

1

2

**<u>NOTICE OF MOTION AND MOTION</u>**

3    PLEASE TAKE NOTICE that on April 23, 2020, at 1:30 pm, or as soon as the matter may be

4  heard thereafter, in the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA

5  94102, Courtroom 3 – 17th Floor, before the Honorable Richard Seeborg, Plaintiff and Counter-

6  Defendant Gamevice, Inc. ("Gamevice") will move for summary judgment that claims 1 and 8 of

7  U.S. Patent No. 7,193,165 are invalid under (1) 35 U.S.C § 101 for lack of utility, (2) 35 U.S.C. §

8  112, paragraph 1 for lack of enablement, (3) 35 U.S.C. § 112, paragraph 2 for indefiniteness and

9  failure to claim that which the applicant regards as his invention, (4) 35 U.S.C. § 102(b) for

10 anticipation, and (5) 35 U.S.C. § 102(e) for anticipation.

11    This motion is supported by the attached Memorandum of Points and Authorities, the

12 Declaration of Michael Song, the Declaration of Michael Ribero, the Declaration of Steven Visser,

13 all pleadings and papers which are of record and are on file in this case, and on such other oral and

14 documentary evidence as may be presented at the hearing of this motion.

15

16 Dated:  March 13, 2020                              Respectfully submitted,

17                                                     LTL ATTORNEYS LLP

18                                          By:    */s/ Michael J. Song*

19                                                 Michael J. Song, Bar No. 243675
                                                   michael.song@ltlattorneys.com
20                                                 300 S. Grand Ave., Floor 14
                                                   Los Angeles CA 90071
21                                                 Telephone: (213) 612-8900
                                                   Facsimile: (213) 612-3773
22

23                                                 Attorneys for Plaintiff and Counter-Defendant
                                                   Gamevice, Inc.
24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3

Gamevice moves for summary judgment that claims 1 and 8 ("Asserted Claims") of U.S.

4

Patent No. 7,193,165 ("'165 Patent") are invalid under 35 U.S.C. §§ 112 and/or 101, and § 102.  As

5

explained below, summary judgment is appropriate because any purported disputes can be resolved

6

as a matter of law.  Indeed, most of the disputes relate to claim construction, which is an issue of law.

7

Because there are no genuine issues of material fact in dispute, the Court should grant summary

8

judgment that the Asserted Claims of the '165 Patent are invalid.

9

**II.     ISSUES TO BE DECIDED**

10

| Claims | Invalidity Bases |
|---|---|
| 1 and 8 | 35 U.S.C. § 112, ¶ 2(indefiniteness and failure to claim that which the applicant regards as his invention) and 35 U.S.C. § 101 (lack of utility) |
| 1 and 8 | Anticipated by Sega Saturn Controller ("Sega Saturn") |
| 1 and 8 | Anticipated by U.S. Patent No. 7,625,286 ("Hamada") |

11

12

13

14

15

**III.     STATEMENT OF UNDISPUTED FACTS**

16

**A.     Asserted Patent and Asserted Claims**

17

The '165 Patent is titled "Operation Device for Game Machine and Hand-Held Game

18

Machine."  The application for the '165 Patent (Appl. No. 11/368,679) was filed on March 7, 2006

19

and claims foreign priority to Japanese Patent Application No. 2005-143219, which was filed on May

20

16, 2005.[1]   Nintendo asserts that Gamevice infringes claims 1 and 8 of the '165 Patent.[2]

21

Independent claim 1  and independent claim 8 are identical except for their preamble.  Claim

22

1 recites "An operation device for game machine" and claim 8 recites "A hand-held game machine."[3]

23

Independent claim 1 is reproduced below:

24

25

26

---

[1] '165 Patent (Ex. A).  All exhibits cited herein are attached to the declaration of Michael Song.

27

[2] Nintendo's Amended L.P.R. 3-1 Disclosures (Sept. 26, 2019) (Ex. B); Kitchen Infringement Report, Vol. 1 at 18-19 (Ex. C).

28

[3] '165 Patent at 19:44-62, 20:22-40 (Ex. A)

1. An operation device for game machine, comprising:

a housing; and

a pair of operating means placed at symmetrical positions with respect to a center of said housing in a horizontal direction on an upper side surface of said housing, wherein

each of said operating means includes

a keytop,

a *switch portion* provided at a position corresponding to one end of said keytop nearer to said center,

a *pivot portion* provided at **_an other end_** of said keytop, and

an *elastic body* for elastically pushing said keytop toward a state that said switch portion is not actuated, wherein

when said keytop is depressed against an elastic force provided by said elastic body, **_said other end_** of said keytop is rotated about said pivot portion to actuate said switch portion.[4]

Figure 13 of the '165 Patent is an embodiment of the left "operating means" of claims 1 and 8 in a non-actuated state:[5]



An "acting portion 96L" is formed on "one end of the keytop 90L."[6]  "The acting portion 96L and the switch contact 100L function as a switch portion."[7]  FIG. 13 shows the "acting portion"

---

[4] '165 Patent at 19:44-62 (Ex. A) (emphasis added).
[5] Visser Invalidity Report at ¶ 89 (Ex. D).
[6] Visser Invalidity Report at ¶ 90 (Ex. D), citing '165 Patent at 11:45-46 (Ex. A).
[7] Visser Invalidity Report at ¶ 90 (Ex. D), citing '165 Patent at 11:49-50 (Ex. A).

somewhat away from the free end or the keytop, and in claims 1 and 8 and elsewhere in the specification, it states that the " switch portion [is] provided at a **position *corresponding* to <u>one end nearer to the center</u>** out of the ends of the keytop."[8]  "[A]t a position corresponding to one end that becomes an inner end (nearer to the center of the housing in the horizontal direction) of the keytop (90L), an acting portion (96L) functioning as a switch portion is formed ...."[9]  Thus, when the end of the keytop 90L that is closer to the center of 10 along a horizontal axis is depressed, the switch portion comprising 96L and switch contact 100L are actuated, even though those components are not themselves at the end of the keytop nearer the center.[10]

The "operating means 32L includes the keytop (90L; FIG. 13-FIG. 15), and at a position corresponding to **one end** that becomes an inner end (nearer to the center of the housing in the horizontal direction) **of the keytop 90L**, an acting portion 96L functioning as a switch portion is formed ...."[11]  "[A]t the **other end** and on the ***opposite*** side to **the one end**, the pivot portion (92L, 94L) is formed."[12]  "Accordingly, the keytop 90L becomes rotatable around the pivot portion."[13]  The actuated or "depressed state" of the left switch 32L is shown in FIG. 14:[14]



---

[8] Visser Invalidity Report at ¶ 90 (Ex. D), citing '165 Patent at 3:54-56. (Ex. A (emphasis added).

[9] Visser Invalidity Report at ¶ 90 (Ex. D), citing '165 Patent at 2:25-19 (Ex. A).

[10] Visser Invalidity Report at ¶ 90 (Ex. D).

[11] Visser Invalidity Report at ¶ 93 (Ex. D), citing '165 Patent at 2:14-19 (Ex. A) (emphasis added).

[12] '165 Patent at 2:19-20 (Ex. A).

[13] Visser Invalidity Report at ¶ 93 (Ex. D), citing '165 Patent at 2:20-21 (Ex. A) (emphasis added).

[14] Visser Invalidity Report at ¶ 93 (Ex. D) (annotated version of FIG. 14 of '165 Patent (Ex. A)).

**B.     Court's Claim Constructions**

The Court's constructions of claim terms which are relevant to this motion are as follows[15]:

| Claim Term | Court's Construction |
|---|---|
| "elastic body" | "a coil spring, leaf spring, rubber, or like component that can be pressed or pulled but returns to its former shape when released" |
| "pivot portion" | "a component or assembly with a fixed point around which the keytop rotates" |
| "switch portion" | "an electrical switch and a part that acts on the electrical switch" |

**C.     Nintendo's Invalidity Expert Admits that Claims 1 and 8 Are "Nonsensical" If Read to Require Rotation About the "Other End" Where the Pivot Portion Is**

As indicated above, claims 1 and 8 each recite "a switch portion provided at a position corresponding to *one end* of said keytop nearer to said center" of said housing and "a pivot portion provided at *an other end* of said keytop."[16] Each claim further recites "when said keytop is depressed against an elastic force provided by said elastic body **said <u>other</u> end** of said keytop is rotated about said pivot portion."[17]  Throughout the specification of the '165 Patent, the phrase "one end" is used to refer to the end of the keytop nearer the center of the housing and the phrase "other end" is used to refer to the end at which the pivot portion (*e.g.*, pin 92L) is located.[18]  Similarly, the "elastic body" is repeatedly described as being "on **the <u>other</u> end**" of the keytop which is *farther from the center* of the housing.[19]  The specification also repeatedly refers to "the **<u>other</u> end**" as being the end of the keytop that "is rotated about said pivot portion" when the keytop is depressed.[20]  Thus, when mapping the specification and the claims to the figures of the '165 Patent, the "one end" and "other end" are as follows:[21]

---

[15] Order Construing Claims (Dkt. 83) at 3-9 ("CC Order").

[16] '165 Patent at 19:52-55 and 20:30-32 (Ex. A) (emphasis added).

[17] '165 Patent at 19:59-62 and 20:37-40 (Ex. A) (emphasis added).

[18] '165 Patent at 1:64-67; 3:54-57; 11:37-41; 13:45-46 (Ex. A).

[19] '165 Patent at 4:1-2; 12:67-13:5; 20:4-7 (Ex. A) (emphasis added).

[20] '165 Patent at 2:2-5 and 26-29; 3:59-61 (Ex. A) (emphasis added).

[21] '165 Patent at FIG. 13-14 (with annotations) (Ex. A).

Despite the language of the claims and its correspondence to the specification, Nintendo's infringement and validity experts each based their opinions on whether the end of the keytop *closest to the center* of the housing "is rotated about the pivot portion."  Nintendo's infringement expert, Garry Kitchen ("Kitchen"), described his application of the claim language as follows:

> There is an important distinction to be made regarding this analysis. The relevant claim language does not require that the entire keytop rotate about said pivot portion; rather, it clearly states that the ***other end of the keytop* (<u>opposite the pivot end</u>) must *rotate about said pivot portion***.
> * * *
> Therefore, **the claim's reference to the "other end" of the keytop "actuat[ing] said switch portion" clearly refers to the end of the keytop at which the switch portion is provided**. That end of the keytop, which is opposite the pivot portion, is the end that rotates about the pivot portion.[22]

Nintendo's invalidity expert, Gregory Welch ("Welch"), similarly interpreted and applied the claim language to the prior art:

> A person of ordinary skill in the art, reading the '165 Patent claim language "other end of said keytop is ***rotated about said pivot portion*** to actuate said switch portion" would understand that **the end of the keytop associated with the switch portion orbits about a pivot point at the opposite end of the keytop**, i.e. that the keytop rotates in a yaw-like fashion as I describe above. [23]

When asked at deposition whether he understood "said other end" in the phrase "said other end of said keytop is rotated" to refer to "an other end" in the phrase "a pivot portion is provided at an other end of said keytop," Welch said, "That's not the way I would read it" and he criticized the questioner for "zeroing in on the words" of the claims.[24]  He then said that it "wouldn't make sense"

---

[22] Kitchen Vol. I at ¶ 184 (Ex. C) (emphasis added).  *See also* Kitchen Tr., Vol. I at 66:17-57:2 (Ex. E).

[23] Welch Vol. I at ¶ 203 (Ex. I) (emphasis added).

[24] Welch Tr. at 204:14-205:1 (Ex. F).

if "said other end" did in fact refer back to "an other end" because it would mean "the keytop rotates about itself at the pivot portion."[25]  Welch then went further and said that if the claims were so interpreted, "I'm not sure what it would mean" and that "it seems nonsensical to me."[26]  He also admitted that "[i]f that were literally to be interpreted that way, I don't understand how it would comport with what's taught in the patent."[27]

### D.   The Sega Saturn Controller

Nintendo asserts that the Gamevice controllers accused of infringing the '165 Patent ("'165 Accused Products") are each an operation device for a game machine."[28]  However, Nintendo has also asserted that each of the '165 Accused Products is ***standing alone*** a "game machine."[29]  Thus, it contends that claim 8 covers controllers that cannot themselves play games.

It is undisputed that beginning in May 1995, some ten years before the earliest claimed priority date of the '164 Patent, Sega began selling a gaming system known as the "Sega Saturn I System" in the United States.[30]  The system included a "Sega Saturn Control Panel", Model No. MK-80100, that was also sold separately in the same time frame.[31] The Sega Saturn Control Panel, Model No. MK-80100 will be referred to as the "Sega Saturn Controller" for ease reference herein.  Pictures of the Sega Saturn Controller annotated to show the position of left and right buttons about the centerline are shown below:[32]



[25] Welch Tr. at 204:23-205:1 (Ex. F).

[26] Welch Tr. at 206:1-16 (Ex. F).

[27] Welch Tr. at 206:1-16 (Ex. F).

[28] Kitchen Report, Vol. I at ¶ 65 (Ex. C).

[29] Kitchen Report, Vol. I at ¶ 263 (heading i) and ¶¶ 273, 283 (heading i)(Ex. C).

[30] Declaration of Michael A. Ribero (August 8, 2019) ("Ribero Decl.") and Exhibits A-M (Ex. G); Nintendo's Second Supplemental Responses to Gamevice's Second Set of Interrogatories, Nos. 14-15, dated October 18, 2019 at 10-11 ("Nintendo 2nd Resp. to Rogs 14-15") (Ex. H).

[31] Ribero Decl. at ¶ 2 (Ex. G).

[32] Visser Invalidity Report at ¶¶ 288-289 (Ex. D).

1    The following picture is a close-up of the Sega Saturn Controller with the housing removed

2  as viewed from the rear of the device.  Thus, the left button appears on the right.[33]



11    To use the upper side surface switches, the user presses down on the keytop, causing the button

12  to rotate about the axis of rotation.  The rotation causes the protrusion on the underside of the button

13  to engage the push button and push it into the switch body which in turn causes the switch to close.

14  When the actuating force is removed from the keytop, the push button is urged against the protrusion

15  by an elastic body in the switch button housing, causing the button to return to its natural, relaxed

16  state.  Pressing the button inward from the user-facing side of the button also rotates the button in a

17  similar manner to actuate the switch.[34]

18    The switch assembly includes push button, a coil spring and a set of contacts.  The coil spring

19  pushes the pushbutton back after activation:[35]



---

[33] Visser Invalidity Report at ¶ 290 (Ex. D).

[34] Visser Invalidity Report at ¶ 291 (Ex. D).

[35] Visser Invalidity Report at ¶ 292 (Ex. D).

The Sega Saturn Controller (below) keytops include a shaft at the end opposite the end near where the switch is located.  This shaft sits in a bearing such that when the keytop is actuated, the shaft rotates within the bearing, causing a protrusion on the keytop to actuate the switch.[36]



Nintendo does not challenge the basic structure of the keytop, switch mechanism, bearing, or shaft.  The only limitations of claims 1 and 8 that Nintendo purports to dispute are (1) a "a pivot portion provided at an other end of said keytop," (2) "an elastic body for elastically pushing said keytop toward a state that said switch portion is not actuated," and (3) "said other end of said keytop is rotated about said pivot portion to actuate said switch portion."[37]  However, these "disputes" are not factual and do not concern how the Sega Saturn Controller is structured and functions.  Instead, Nintendo construes these limitations to require: (1) keytops that rotate about a specific axis called the "yaw" axis, (2) that the word "rotated" excludes "spinning rotation" and includes only "orbiting rotation," (3) that the end of the keytops *opposite* the pivot portion rotate about the pivot portion, and (4) an elastic body that (a) is separate from the switch assembly, (b) is in direct physical contact with the keytop, (c) exhibits a linear, continuous, and smooth response, and (d) which applies an "elastic force" against the keytop when the keytop is not actuated.[38]

### 1.    Nintendo's "Yaw" Axis Claim Construction Arguments

Welch describes three axes of rotation relative to the '165 Patent embodiments: a yaw axis, a

---

[36] Visser Invalidity Report at ¶¶ 297 (Ex. D).

[37] Welch Report, Vol. I at ¶¶ 195-229 (Ex. I); Welch Vol. I at 110 (heading a), 115 (heading b), and 129 (heading c); Nintendo's 2nd Resp. to Rogs 14-15 at 10-11 (Ex. H).

[38] Welch Report, Vol. I at ¶¶ 95, 98, 196, 200-203, 212, 214, 218 and 220 (Ex. I)

1   pitch axis, and a roll axis.  Welch depicts these axes by annotating '165 Patent FIGS. 13 and 18:[39]



8   Welch asserts that "[t]he '165 Patent is directed to an operating means which has a . . . keytop

9   that rotates around the outer pivot (in a yaw-like fashion as described above), and therefore, that "a

10  pivot that rotates in a pitch-like fashion, as disclosed by Sega" does not meet the "pivot portion"

11  limitation of the Asserted Claims.[40]  Neither the claims nor any portion of the specification use the

12  terms "yaw," "pitch", or "roll."[41]  Nor does Welch provide any support for his use of these terms.[42]

13  It is undisputed that each Sega Saturn Controller keytop has a discrete shaft at the end away

14  from the switch and that the shafts at that location engage discrete bearings.  Each keytop also a

15  second discrete shaft and bearing at the end of the keytop near the center of the housing. [43]  Nintendo's

16  Welch shows both shafts, which he calls pivots, on each keytop in his report.  As his photograph

17  indicates, the shafts are not connected and project in opposite directions relative to one another:[44]



[39] Welch Report, Vol. I at ¶ 196 (Ex. I).

[40] Welch Report, Vol. I at ¶ 200 (Ex. I); Welch Tr. at 234:25-235:15 (Ex. F) (referring to the Date reference, which is similar to the Sega Saturn). *See* Welch Report, Vol. I at ¶ 196 (referring back to the Date reference in connection with the Sega Saturn Controller) (Ex. I).

[41] The '165 Patent (Ex. A).

[42] Welch Report, Vol. I at ¶ 196 (Ex. I).

[43] Visser Report at ¶ 397 (Ex. D).

[44] Welch Report, Vol. I at ¶ 198 (with additional annotations) (Ex. I).

1    Despite this structure, Welch contends that "the pivot" is not located at **either** end of the

2    keytop because the keytop has a "transverse longitudinal button configuration."[45]  However, while

3    the axis of rotation (a line in space) may extend between both shafts of each keytop, each keytops two

4    shafts are discrete and separate from one another.[46]

5                    **2.      Nintendo's "Rotation" Claim Construction Arguments**

6         In further support of his "yaw" axis limitation, Welch offers a definition of "the term 'rotation'

7    as it applies to the movement of a physical body."  Relying on a Wikipedia article for rotation, Welch

8    asserts that "the '165 Patent claims. . . all require the elongated keytop to rotate **about the external**

9    **point of rotation that is** the pivot point" and that "spinning rotation of an elongated keytop **upon**

10   **itself**" does not satisfy the claims.[47]  In support of this construction, Welch points to the Wikipedia'

11   Article's reference to a body that rotates about its own center of mass as one that is said to rotate

12   "upon" itself and its reference to a body that rotates about an external point as one that rotates "about"

13   the external point.

14        As discussed in Section C (above), from this newly proffered extrinsic evidence concerning

15   the meaning of "rotate", Welch then asserts that the '165 Patent claims require the *end of the keytop*

16   *at which the switch portion is located* to "rotate about the pivot portion."[48]  However, Welch makes

17   no attempt to reconcile this assertion with the operation of the embodiments of the '165 Patent.[49]  It

18   is undisputed that the '165 Patent describes a "pin 92L" as a "pivot portion" and states that "the keytop

19   90L—and not merely one end thereof—"becomes rotatable around the pivot portion,"[50] meaning

20   that the end of the keytop at which the pivot portion is located does in fact exhibit "spinning rotation"

21   about pin 92L.

22

23

_____

24   [45] Welch Report, Vol. I at ¶ 198 (Ex. I).

     [46] Welch Report, Vol. I at ¶ 198 (Ex. I).

25   [47] Welch Report, Vol. I at ¶ 203 (Ex. I) (emphasis in original).

26   [48] Welch Report, Vol. I at ¶ 203 (Ex. I).

     [48] Welch Tr. at 204:14-205:1 (Ex. F).

27   [49] Welch Report, Vol. I at ¶¶ 202-203 (Ex. I).

28   [50] '165 Patent at 2:20-21 (Ex. A); Visser Report, Vol. I at ¶ 93 (Ex. I).  *See also* Nintendo's Opening
     Claim Construction Brief, dated April 26, 2019 (Dkt. 63) at 3.

### 3.    Nintendo's "Elastic Body" Claim Construction Arguments

It is undisputed that the Sega Saturn Controller has a switch assembly that includes a coil spring[51] and that a "coil spring" is one of the types of "elastic bodies" enumerated in the Court's claim construction.  Nor is it disputed that when the switch button is depressed, the coil spring returns the button to its unactuated position.[52]  However, Welch asserts that the Sega Saturn Controller coil spring is not an "elastic body" because it "is not an *independent element* for elastically pushing the *keytop* as *required by the claim*."[53]  The basis for his "independent element" requirement is that "nowhere does the '165 Patent disclose an elastic body as an internal component of a switch portion."[54]

He further asserts that the "coil spring" cannot be the claimed "elastic body" because "it does not even come into contact with the keytop."[55]  He asserts that such direct contact between he elastic body and keytop is required because in "the '165 Patent, the coil spring (Figures 13-15) or leaf spring (Figure 19) supply an elastic force directly to the keytop."[56]

Welch then discusses whether the "entire switch mechanism" of the Sega Saturn Controller Switch Assembly is an "elastic body" within the scope of the Asserted Claims.  He first asserts that the claimed "elastic body" must "have the standard characteristics of a spring" because "[t]hroughout the '165 Patent the given exemplar for the elastic body is some form of a spring."[57]  While acknowledging that "rubber" is a permissible type of "elastic body" he nevertheless insists that the term is limited to those elastic bodies having the standard characteristics of a spring.  He then goes onto assert that "an 'elastic body that provides an 'elastic force' ... mean[s] a generally continuous, linear, and monotonic force with respect to the distance traveled."[58]

Nowhere, does the '165 Patent refer to a continuous, linear, and/or monotonic force with

---

[51] Visser Report, Vol. I at ¶ 399 (Ex. D); Welch Report, Vol. I at ¶ 213 (Ex. XX); Welch Tr. at 248:24-249:12 (Ex. XX).

[52] Visser Report, Vol. I at ¶ 399 (Ex. D).

[53] Welch Report, Vol. I at ¶ 214 (Ex. I); *see also* Nintendo 2nd Resp. to Rogs 14-15 (Ex. H) at 10-11.

[54] Welch Report, Vol. I at ¶ 88 (Ex. I); *see also* Welch Report, Vol. I at ¶ 207 (Ex. I) (Hamada).

[55] Welch Report, Vol. I at ¶ 213 (Ex. I).

[56] Welch Report, Vol. I at ¶ 218 (Ex. I).

[57] Welch Report, Vol. I at ¶ 89 (Ex. I).

[58] Welch Report, Vol. I at ¶¶ 95 and 212 (Ex. I); Welch Tr. at 229:10-230:1 (Ex. F).

1  respect to distance traveled as being a defining characteristic of an "elastic body."[59]  Welch's

2  construction is extrapolated from the use of the words "elastic" and "spring" in the '165 Patent and

3  an unsupported reference to "Hooke's Law"—which he admits at best applies only to "most

4  springs"[60]—and despite his acknowledgment that "[t]here are certainly nonlinear springs."[61]  He also

5  refers to a variety of unsupported "transfer functions" which he asserts define the force versus distance

6  traveled behavior of the claimed "elastic bodies."[62]

7      While the Asserted Claims recite that the claimed elastic body is "for elastically pushing said

8  keytop **toward a state** that said switch portion is not actuated,"[63] Welch contends that the Asserted

9  Claims require an elastic body which *actually applies a force directly to the keytop* when the keytop

10  is in a non-actuated state.[64]

11      E.      **Hamada**

12              1.      **Hamada's Filing Date and Nintendo's Claims of Prior Invention**

13      Hamada, U.S. Patent No. 7,625,286, is entitled "electronic device and a game controller" and

14  has a filing date of May 4, 2005,[65] which is prior to the '165 Patent's claimed foreign priority date of

15  May 16, 2005.[66]  Nintendo asserted that it could prove a prior date of conception and reduction to

16  practice date of April 19, 2005.[67]  This Court barred Nintendo from relying on documents that were

17  not disclosed in its L.P.R. 3-2 disclosures to establish a date of conception and reduction to practice.[68]

18  The only document that Nintendo did identify in those disclosures was NIN_GV_NDCA0002952 –

19

20

---

21  [59] The '165 Patent (Ex. A).

    [60] Welch Report, Vol. I at ¶¶ 89-91 and 93 (Ex. I).

22  [61] Welch Tr. at 230:14-24 (Ex. F).

23  [62] Welch Report, Vol. I at ¶ 97 (Ex. I).

    [63] The '165 Patent at 19:56-58 (Ex. A) (emphasis added).

24  [64] Welch Report, Vol. I at ¶ 220 (Ex. I); *See also*, Welch Report. Vol. I at ¶ 98 ("Therefore, unlike
    what is required by the asserted claims, near the end of the keytop's travel, as it continues to be
25  depressed, the membrane no longer "elastically push[es] the keytop toward a neutral state").

26  [65] Hamada (Ex. J).

    [66] The '165 Patent (Ex. A).

27  [67] Nintendo Amended L.P.R. 3-1 Disclosures at 9 (Sept. 26, 2019) (Ex. B).

28  [68] Order Granting in Part and Denying in Part Gamevice's Motion to Strike Interrogatory Responses
    at 5-6 (Dkt. No. 82).

1  NIN_GV_NDCA0002972. [69]  While one figure showing the front of the device includes the terms "L

2  button" and an "R button", the document says they are on a "side surface" and none of the internal

3  structure of the buttons is described or depicted.[70]  Mr. Visser opined that the document does not

4  support the claims of the '165 Patent, and Welch did not evaluate Nintendo's prior invention claim

5  and expressly declined to opine on whether Hamada qualifies as prior art.[71]

6              **2.    Hamada's Disclosure**

7              FIG. 1 of Hamada (below left) depicts an "electronic device 100" that may "function[] as a

8  game machine."[72]  The Hamada device 100 includes a housing, called a "casing 10" with a hollow

9  body that has an upper part 10a, an intermediate part 10b, and a lower part 10c as shown in FIGS. 2-

10 4.[73]    FIG. 7 of Hamada (below right) shows the device 100 in a user's hand:[74]

11



12

13

14

15

16

17

18

19             FIGS. 9A-10C, and FIGS. 11A-12C show two examples of the left button 46L with the right

20 button 46R being horizontally symmetrical and having the same structure.[75]  In the second example,

21 FIG. 11B shows left button 46L in a released or non-actuated state.

22

23  [69] Nintendo Amended L.P.R. 3-2 Disclosures at 1 (Sept. 17, 2018) (Ex. K).

24  [70] Translation of OXY Body Assembly Specifications for Game Boy MICRO, dated April 19, 2005
    ("Game Boy MICRO Spec") at NIN_GV_NDCA002957-8 (Ex. L) [**UNDER SEAL**]

25  [71] Welch Report, Vol. I at ¶ 70 (Ex. I).

26  [72] Visser Invalidity Report at ¶ 266 (Ex. D), citing Hamada at 2:55-57 and FIG. 1 (Ex. J).

27  [73] Visser Invalidity Report at ¶ 266 (Ex. D), citing Hamada at 2:42-43 and FIG. 1 (with annotations)
    (Ex. J).

28  [74] Visser Invalidity Report at ¶¶ 266-267 (Ex. D), citing Hamada, FIG. 7 (with annotations) (Ex. J).
    [75] Visser Invalidity Report at ¶ 270 (Ex. D), citing Hamada at 9:57-60; 11:17-20 (Ex. J).



FIG. 12B shows "an appearance where the user presses the right of the button body 110, that is, the end of the button body 110 closer to the center of casing 110."[76]  The seizing member 128, which is described as a "rod-like member 128" comes into contact with the inner side 132 of the casing to serve as a "supporting point."[77]  Hamada expressly states that "[t]he button body 110 slightly **pivots about the supporting point** in a direction indicated with an open arrow in FIG. 12B to press down the deformation member 112."[78]  This causes the leg 113 portion of deformable member 112 to deform and the conductive member 115 to electrically connect the switch contacts 114.[79]  The deformable member 112 is shown in a released, non-actuated state (FIG. 8A) and a depressed, actuated state (FIG. 8B) as follows:[80]



Hamada describes what happens when the button body 110 is released as follows: "When the user takes the finger off the button body (not shown), the **elasticity of the leg 113** puts the body

---

[76] Visser Invalidity Report at ¶ 272 (Ex. D), citing Hamada at 12:4-6 (Ex. J).

[77] Visser Invalidity Report at ¶ 272 (Ex. D), citing Hamada at 12:8-9 (Ex. J).

[78] Visser Invalidity Report at ¶ 272 (Ex. D) (emphasis added), citing Hamada at 12:9-12 (Ex. J) (emphasis added).

[79] Visser Invalidity Report at ¶¶ 268, 272 (Ex.D)

[80] Visser Invalidity Report at ¶¶ 268-269 (Ex. D), citing Hamada at 7:37-60 aand FIGS. 8A and 8B (with annotations) (Ex. J).

MSJ: Invalidity of '165 Patent
Case No. 18-cv-1942-RS

1  back to its original position as shown in FIG. 8A."[81]

2  ### 3. Nintendo's Claim Construction Arguments

3      The foregoing aspects of Hamada are not in dispute.  Nintendo does not dispute that

4  Hamada meets the preambles of claims 1 and 8 or that it includes a "pair of operating means" with

5  keytops and the claimed positioning relative to a housing and an upper side surface thereof.[82]

6      Nintendo purports to dispute whether Hamada's switch portion is in the claimed location,

7  whether Hamada's "flexible leg 113" is an "elastic body" as claimed, and whether the Hamada has

8  the claimed "pivot portion."[83] However, these "disputes" do not concern what Hamada actually

9  discloses, but rather, the construction of the Asserted Claims.

10      While Nintendo purports to dispute whether Hamada has a "switch portion provided at a

11  position corresponding to one end of the keytop nearer said center," Welch concedes that in FIG.

12  12B of Hamada, the part of the switch portion that is actuated lies closer to the end of the keytop

13  that is neater the center of the device than to the "other end" of the keytop.  The following annotated

14  version of FIG. 12B is from Welch's report:[84]



21      Nor does Welch dispute that in FIG. 12B, the keytop is depressed near its end that is closer to

22  the center and that depression at that location actuates Hamada's switch.[85]   Notwithstanding the

---

[81] Visser Invalidity Report at ¶ 269 (Ex. D), citing Hamada at 7:37-60 (Ex. J) (emphasis added).

[82] Visser Invalidity Report at ¶¶312 -315 (Ex. D).

[83] Welch Report, Vol. I at 43 (heading a), 50 (heading b), and 54 (heading c) (Ex. I).

[84] Welch Report, Vol. I at ¶ 79 (Ex. I); *see also*, Visser Invalidity Report at ¶ 318 (Ex. D).

[85] Welch Report, Vol. I at ¶ (Ex. I).

1   foregoing, Welch asserts that in the Asserted Claims *all components of the claimed switch portion*

2   *must be closer to the end of the keytop that is nearer the center of the housing.*[86]

3   It is undisputed that Hamada expressly states that in FIG. 12B the "button body 110 **slightly**

4   **pivots about** the supporting point" at which the "rod-like member 127 . . . comes into contact with

5   the inner side 132 of the casing."[87]   However, Welch asserts that a button body such as Hamada's

6   which is **capable of** rotation about a pivot portion and translation cannot satisfy the Asserted Claims

7   because it is allegedly not "***designed to rotate*** about a specific pivot portion."[88]   However, at

8   deposition he admitted that FIG. 15 of the '165 Patent shows an embodiment of the claimed keytop

9   translating.[89]

10   Finally, Nintendo raises the same "elastic body" claim construction issues described above

11   with respect to the Sega Saturn Controller, asserting that the claimed "elastic body" (1) cannot be part

12   of the switch portion, (2) must have the "standard characteristics of a spring," (3) must provide a

13   generally "continuous, linear, and monotonic force with respect to distance traveled, and (4) must

14   apply a force directly to the keytop, including when the switch portion is not actuated.[90]

15
16   **IV.   THE ASSERTED CLAIMS OF THE '165 PATENT ARE INVALID**
       **UNDER 35 U.S.C §112 AND/OR 101**

17   Both Asserted Claims of the '165 Patent require that "said other end of said keytop is rotated

18   about a pivot portion" when the keytop is depressed.  "The use of the word 'said' in a claim refers to

19   an earlier use of the term in the claim."  *Intamin, Ltd. V. Magnetar Techs., Corp.*, 483 F.3d 1328,

20   1333 (Fed. Cir. 2007).  Moreover, "a claim term should be construed consistently with its appearance

21   in other places in the same claim or in other claims of the same patent."  *Rexnord Corp. v. Laitram*

22   *Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  Thus, under established claim construction principles

23   the phrase "said other end' refers back to "an other end of said keytop" in the claims.   Indeed,

24

25   [86] Welch Report, Vol. I at ¶ 74 (Ex. I).

26   [87] Visser Invalidity Report at ¶ 320 (Ex. D), citing Hamada at 12:4-12 (Ex. J); Welch Report, Vol. I
      at ¶ 86 (Ex. I).

27   [88] Welch Report, Vol. I at ¶ 86 (Ex. I)

28   [89] Welch Tr. 215:12-216:2 (Ex. F); '165 Patent at FIG. 15 and 12:39-62 (Ex. A).
      [90] Welch Report, Vol. I at ¶¶ 88, 89, 95, and 98 (Ex. I).

1    throughout the entire specification of the '165 Patent, "said other end" is used to refer to the end of

2    the keytop at which the pivot portion is located, not the "one end" closer to the center of the housing

3    and to which the switch portion's position corresponds.

4         Welch's opinion is predicated on an interpretation of "said other end of said keytop is rotated

5    about a pivot portion" which cannot be reconciled with the foregoing claim construction principles,

6    and he admitted that he would not understand what the claims meant if they were interpreted

7    according to those principles. Section II.C. (above). The Supreme Court has held that the definiteness

8    requirement of 35 U.S.C. § 112, ¶ 2[91] "require[s] that a patent's claims, viewed in light of the

9    specification and prosecution history, inform those skilled in the art about the scope of the invention

10   with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910, 134 S. Ct.

11   2120, 2129 (2014). Welch asserts that he is a person of ordinary skill in the art[92] and concedes that

12   when they are properly interpreted, the claims do not inform him about the scope of the invention

13   with reasonable certainty. Section II.C. (above).

14        Welch further admitted that when properly interpreted, the claims would not comport with

15   what is taught in the '165 Patent. Section II.C. (above). Patent claims encompassing subject matter

16   other than that "which the applicant regards as his invention" are invalid under 35 U.S.C. § 112, ¶ 2.

17   *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002). There, the Federal

18   Circuit held that "[w]here it would be apparent to one of skill in the art, based on the specification,

19   that the invention set forth in a claim is not what the patentee regarded as his invention, we must hold

20   that claim invalid under § 112, paragraph 2." *Id*. at 1349. Given Welch's admission that the Asserted

21   Claims do not comport with what is taught in the specification, they are also invalid for failing to

22   claim that which the applicant regards as his invention.

23        In addition, the Asserted Claims are invalid for lack of utility under 35 U.S.C. § 101 and lack

24   of enablement under 35 U.S.C. § 112, ¶ 1. "A claimed invention having an inoperable or impossible

25   claim limitation may lack utility under 35 U.S.C. § 101 and certainly lacks an enabling disclosure

26

27   [91] The pre-America Invents Act version of the Patent Statute applies to the '165 Patent because its
     filing date is in 2006. *UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1289 n.13 (Fed. Cir. 2019).
28   [92] Welch Report, Vol. 1 at ¶ 43 (Ex. I).

under 35 U.S.C. § 112."[93]  In *Emi Grp.* the Federal Circuit denied a motion for a new trial and for judgment as a matter of law after a jury verdict of invalidity due to impossibility.[94]  Each asserted claim recited a "vapor explosion mechanism," and the Federal Circuit held that if the mechanism were inoperative, "then the claims themselves recite a method or apparatus that does not work," and they are invalid.[95]  Based on Welch's admissions, the Asserted Claims are invalid under 35 U.S.C. §§ 101 and 112, paras. 1 and 2.

## V.   THE ASSERTED CLAIMS ARE INVALID AS ANTICIPATED BY THE SEGA SATURN CONTROLLER

"Section 102(b) of the Patent Act of 1952 provides that no person is entitled to patent an 'invention' that has been 'on sale' more than one year before filing a patent application."[96]   "[T]he on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale."[97]  "Second, the invention must be ready for patenting" (*Id.*), which can be proven "by proof of reduction to practice before the critical date."[98]  "When the asserted basis of invalidity is an on-sale bar, the court should determine whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention."[99]  "Although anticipation is a question of fact, a district court may, on summary judgment, invalidate a patent claim as anticipated by a prior art reference if the patentee does not identify a genuine issue of material fact to avoid summary judgment."[100]   The date referenced in Section 102(b)

---

[93] *Emi Grp. North Am. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1348, 2001 (Fed. Cir. 2001).
[94] *Id.* at 1344.
[95] *Id.* at 1349; *see also*, *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1341 (Fed. Cir. 2003) (holding that a claim construction that renders an invention inoperable "would render the claim invalid for lack of enablement");  *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956-957 (Fed. Cir. 1983) (affirming invalidity judgment based on lack of utility and lack of enablement where claims recited "a means for continuing convection during autoignition" where "convection did not in fact occur" in the commercial embodiment of the invention).
[96] *Pfaff v. Wells Elecs*, 525 U.S. 55, 57, 119 S. Ct. 304, 307 (1998).
[97] *Id.* at *67.
[98] *Id.* at 67.
[99] *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008).
[100] *TaurusIP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1324 (Fed. Cir. 2013).

1    which is one year before the filing of the a U.S. patent application is referred to as the "critical date."[101]

2           Michael Ribero's declaration establishes that the Sega Saturn Controller was actually sold in

3    the United States prior to March 7, 2005.[102]   As discussed in Section II.D, above, Nintendo has not

4    disputed that the Sega Saturn Controller includes "a housing," and a pair of operating means placed

5    at symmetrical positions with respect to a center of said housing in a horizontal direction on an upper

6    side surface of said housing".   Nor has Nintendo disputed that the Sega Saturn Controller includes "a

7    switch portion provided at a position provided at one end of the said keytop nearer to said center."

8         **A.**     **Nintendo Cannot Defeat Summary Judgment By Proffering New Claim**

9                    **Constructions**

10          Welch's opinion is replete with new claim constructions upon which he relies to defend the

11    validity of the '165 Patent.  *See* Section II.D.1 (above).  However, such claim constructions do not

12    give rise to factual disputes on summary judgment because "the construction of a patent, including

13    terms of art within its claim, is exclusively within the province of the court."[103]   Expert opinions must

14    be admissible to defeat summary judgment, and opinions that seek to argue legal issues to the jury

15    can hardly be said to "help the trier of fact to understand the evidence or to determine a fact in issue"

16    under *Fed. R. Evid.* 702.  Thus, in the analogous infringement context, this district has held that

17    "[a]fter the Court has issued its Claim Construction Order, an expert giving opinion testimony with

18    respect to infringement must apply the Court's claim construction."[104]   In *Regents* because an expert

19    failed to apply the Court's claim construction, when evaluating a summary judgment motion the Court

20    refused to consider the expert's opinion on whether the accused products practiced a "predetermined

21    time period" limitation in claims directed to the occlusion of vascular cavities for treating brain

22    aneurysms.[105]   Here as well, Welch's opinions must apply the Court's claim constructions. Yet, they

23

24
_____

25    [101] *Pfaff*, 525 U.S. at 57.

[102] Ex. G at ¶ 1.

26    [103] *Markman v. Westview Instruments*, 517 U.S. 370, 372, 116 S. Ct. 1384, 1387 (1996).

27    [104] *The Regents of the University of California v. Micro Therapeutics, Inc.,* 2007 WL 229412 at *3 (N.D. Cal. 2007).

28    [105] *Id.* at *2-3 (citing *Moleculon Research Corp. v. C.A., Inc.,* 793 F.2d 1261, 1270 (Fed. Cir. 1986) (citations omitted)).

1   do not and instead seek to modify those constructions significantly.

2           Nintendo has been on notice of Gamevice's reliance on the Sega Saturn Controller since at

3   least November 1, 2018.[106]  Thus, if its defense of the Asserted Claims relied on such claim

4   constructions, it was incumbent upon Nintendo to seek them during claim construction proceedings.

5   Instead, it chose to wait until expert reports.  As discussed in Section II.D.1, to avoid the invalidation

6   of Nintendo's claims, Welch seeks to limit the Asserted Claims to require (1)  keytops that rotate

7   about a specific axis called the "yaw" axis, (2) that the word "rotated" excludes "spinning rotation"

8   and includes only "orbiting rotation," (3) that the end of the keytops *opposite* the pivot portion end

9   rotates about the pivot portion, and (4) an elastic body that (a) is separate from the switch assembly,

10  (b) is in direct physical contact with the keytop, (c) exhibits a linear, continuous, and smooth response,

11  and (d) which applies an "elastic force" against the keytop when the keytop is not actuated.  In

12  proffering Welch's opinions, Nintendo seeks to have Welch invade the province of the Court and

13  prejudice Gamevice by denying it the opportunity to address these constructions in accordance with

14  the claim construction process dictated by the Patent Local Rules.

15          At trial, courts in this district have allowed experts to "introduce evidence as to the plain and

16  ordinary meaning of terms not construed by the Court" but *only* "so long as the evidence **does not**

17  **amount to arguing claim construction to the jury**."[107]  While *MediaTek* concerned a motion to

18  strike, it's reasoning is directly relevant in that Nintendo seeks to proffer new claim constructions

19  under the guise of a validity opinion, and ultimately, to present those constructions to the jury if its

20  claims survive summary judgment.  Such opinions should be disregarded in considering this motion.

21      **B.    Nintendo's Claim Constructions Import Limitations and are Not Supported**

22              **by the Intrinsic Record**

23          Nintendo cannot reasonably contend that its new claim constructions are mere explications of

24  the "plain and ordinary meaning" of terms.  For example, with respect to its attempt to limit the

25  keytops to rotation about the "yaw" axis, Nintendo relies on Welch's assertions that gaming device

26

27  [106] Gamevice's L.R.3-3; 3-4 Invalidity Contentions at 7 (Ex. M).

28  [107] *MediaTek, Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765 at *4 (N.D. Cal. 2014)
    (emphasis added).

axes are referred to as "yaw, "pitch," and "roll"-- terms that appear nowhere in the specification -- and he relies on the specification to limit the claims to rotation about what he would call the "yaw" axis.   Section II.D.1 (above).  To further support the opinion, he relies on extrinsic evidence (Wikipedia) and its use of the word "rotates" with the words "about" and "upon" to assert that the '165 claims exclude "spinning rotation" and are limited to "*orbital rotation*".  Section II.D.2 (above)**.** Despite the actual language of the claims, Welch further relies on that extrinsic evidence to argue that the phrase "said other end of said keytop is rotated" refers to the end of the keytop closer to the center of the housing and to which the switch position corresponds, not the end at which the pivot portion is located.  Section II.C (above).

Notably, Welch makes no effort to reconcile his construction of "said other end of said keytop is rotated" with the '165 Patent specification.  Nor could he because it is manifestly clear that in FIGS. 13-14, the end of the keytop at which the pivot portion is located *rotates around the pivot* because it uses a pin and bearing structure. After asserting that during claim construction "Gamevice [sought] to import limitations from the specification to narrow the claims and manufacture non-infringement arguments,"  Nintendo's Opening Claim Construction Brief (Dkt 63) at 1, Nintendo commits that very sin to "manufacture validity arguments".[108]

Nintendo's attempt to load up "elastic body" with a myriad of new requirements is even more egregious.  The Court construed "elastic body."  According to Nintendo, the terms that the court construed "are common terms used in their common and ordinary way, needing no interpretation for a jury to understand."[109]  Nintendo told the Court that an "'elastic body' can be virtually ***any type of spring-like*** **device** known in the art that provides elastic force that resists the user pressing the button and pushes the keytop back into place when the user presses the button."[110]  Now, however, Nintendo seeks to limit "elastic body" to an elastic body that (a) is separate from the switch assembly, (b) is in direct physical contact with the keytop, (c) exhibits a linear, continuous, and smooth response, and (d) which applies an "elastic force" against the keytop when the keytop is not actuated.

---

[108] Nintendo's Opening Claim Construction Brief (Dkt 63) at 1.
[109] *Id.*
[110] *Id.* at 10.

1    The Court's construction effectively defines "elastic" as capable of being "pressed or pulled

2  but returns to its former shape when released."[111]  The construction expressly includes "rubber" in

3  addition to coil springs, leaf springs, "or the like."  Yet, Nintendo now says that an elastic body must

4  have the characteristics of a linear spring that follows "Hooke's Law."  Section II.D.3 (above).  From

5  that unsupported assertion, Welch further asserts that the '165 Patent coil spring would exhibit a

6  "linear, continuous, and smooth response" despite the fact that the patent says no such thing.[112]  Not

7  only does Nintendo seek to "import limitations", it seeks to import limitations that are not even in the

8  patent.

9    Nintendo's contention that an elastic body must exert an elastic force *directly on the keytop* is

10  a naked attempt to limit the claims to the disclosed embodiments.  Claims 1 and 8 say the elastic body

11  is ***for pushing*** said keytop toward a state that said switch portion is not actuated.  There is no reference

12  to "abutting engagement" between the spring and the keytop or any other language that implies direct

13  contact.  Nor does the limitation at all support Nintendo's assertion that the elastic body must apply

14  an "elastic force" against the keytop when it is not actuated.  The claims say that the elastic body is

15  for pushing said keytop ***toward a state*** that said switch position is not actuated, which is merely

16  specifying the direction of the force and is not at all the same as saying that a force is applied against

17  the keytop when the switch is not actuated.  Nintendo has raised no factual disputes, but rather, only

18  new claim constructions with respect to the anticipation of claims 1 and 8 by the Sega Saturn

19  Controller.

20    The only difference between claims 1 and 8 is that their preambles respectively recite "an

21  operation device for a game machine" and a "hand-held game machine."  However, Nintendo did not

22  distinguish between claims 1 and 8 in asserting that the claims are valid over the Sega Saturn

23  Controller, and its proffered infringement expert accused game controllers that are not capable of

24  themselves playing games of infringing claim 8, thus effectively admitting that the preamble of claim

25  8 is not limiting.[113]

26

---

27  [111] Order Construing Claims, dated August 2, 2019 (Dkt. 83) at 6.

28  [112] '165 Patent (Ex. A).

[113] '165 Patent at 19:43 and 20:22 (Ex. A); Kitchen Report, Vol. I at ¶ 263 (heading i) and ¶¶ 273,

1   **VI.   THE ASSERTED CLAIMS ARE INVALID AS ANTICIPATED BY**
2   **HAMADA**

3   **A.   Hamada is Prior Art Under Former 35 U.S.C. § 102(e)**

4   "Former 35 U.S.C. § 102(e)(2) provides grounds for invalidating the claims of an issued patent

5   if '[t]he invention was described in . . . a patent granted on an application for patent by another filed

6   in the United States before the invention by the applicant for patent . . . .'" *TaurusIP, LLC v.*

7   *DaimlerChrysler Corp.*, 726 F.3d 1306, 1322 (Fed. Cir. 2013).  "In other words, the claims of a patent

8   are invalid if they read on the invention disclosed in a different U.S. patent application that was filed

9   before, but issued after, the filing date of the inventor's patent." *Id.* Hamada was filed on May 4,

10  2005, prior to the '165 Patent's foreign priority date of May 16, 2005. Therefore, to remove Hamada

11  as prior art, Nintendo must either prove (1) conception and reduction to practice before Hamada's

12  filing date or (2) a conception before Hamad's filing date and reduction to practice after that filing

13  date. *Id.* at 1323.

14  The issue of conception is a legal conclusion based on underlying factual findings.  *Id.* at

15  1322.  Because Hamada is *prima facie* prior art, "the burden of *production* shifts to [Nintendo] to

16  produce sufficient rebuttal evidence to prove entitlement to an earlier invention date." *Id.*  Moreover,

17  even if Nintendo proffers inventor testimony to support its prior invention claims, "[i]t is well-

18  established that  . . . [it] must proffer evidence corroborating that testimony." *Id.* at 1324.  Further, "a

19  conception must encompass all limitations of the claimed invention." *Id.* at 1323 (citations omitted).

20  In *TaurusIP* the Federal Circuit held that the sole corroborating document relied upon by the patent

21  owner did not show "all limitations recited in" the Asserted Claims "as necessary to demonstrate

22  conception" and concluded that "no reasonable juror could find that Taurus had proven an earlier date

23  of invention" for the patent-in-suit.  *Id.* at 1323.  ==Here too, the only evidence of conception fails to==

24  ==disclose numerous claim limitations, including the "switch portion" and its location, the "pivot==

25  ==portion" and its location, and the "elastic body".  Translated Gameboy MICRO Spec. (Ex. L).==

26

27

28

_____

283 (heading i) (Ex. C).

**B.**     **Nintendo Cannot Defeat Summary Judgment By Proffering New and Improper Claim Constructions**

There is no dispute about how Hamada is configured and operates.  Instead, Welch proffers new claim construction positions that do not give rise to factual disputes. He first contends that **every component** of the switch portion *must physically lie closer* to the end of the keytop nearer to where the switch is located.  Section II.E.3 (above).  This is not an explication of the "plain and ordinary meaning" of a claim term, but rather, is the addition of a further limitation that is contrary to the language of the claims.  *MediaTek, Inc. v. Freescale Semiconductor, Inc.*, 2014 WL 971765 at *4 (N.D. Cal. 2014) (emphasis added).  Claims 1 and 8 recite a "switch portion provided *at a position corresponding* to one end of the keytop nearer the center." Ex. A.  They do not say the switch portion is closer to the end of the keytop nearer the center, much less that *the entire switch portion* must be so located, as Welch contends.  In contrast, the claims do recite that the "pivot portion" is "provided *at an other end* of said keytop."  The use of "corresponding" for the switch portion indicates that there must be some relationship between where the switch is located and the end of the keytop nearer the center.  When compared to the "pivot portion" limitation, the word "corresponding" makes clear that the intent was not to require the switch portion to actually be at the end of the keytop nearer the housing center.  It is undisputed that FIG. 12B of Hamada shows the end of the keytop nearer the center being pressed and that Hamada's switch is located so as to be actuated when that end of the keytop is pressed.  Thus, the switch position corresponds to the end of the keytop nearer the housing center.  Nothing in the intrinsic record mandates that the switch be located where Welch says it is required to be located.

It is similarly undisputed that Hamada expressly states that its button body 110 "slightly pivots" about the supporting point at which rod-like member 127 contacts the inner side 132 of the casing. Section II.E.2 (above).  Welch admits that the button is "capable of rotating."  Section II.E.3 (above).   However, he contends that the claims exclude buttons that translate and are limited to buttons "designed to rotate."  *Id.*  First, this is yet another new claim construction.  Second, the claims say "when the keytop is depressed against *an elastic force* . . . said other end of said keytop is rotated."  They do not say *every* or all keytop depressions must lead to rotation.  Nor do they exclude keytops

that can translate as long as they can be depressed against "an elastic force" and rotate as claimed. Furthermore, in its embodiments, the '165 Patent bearings are specifically designed to allow translation of the end of the keytop where the pivot portion is located. *See* '165 Patent at 12:48-63 and FIG. 15 (Ex. A). A "construction that excludes a preferred embodiment is rarely, if ever, correct." *C.R. Bard, Inc. v. United States Surgical Corp*., 388 F.3d 858, 865 (Fed. Cir. 2004)(citations omitted). Moreover, Welch's "designed to rotate" construction makes the intent of the designer determinative of whether the claims are satisfied, which is completely subjective and unworkable. *See, cf. Datamize, LLC v. Plumtree Software, Inc.* 415 F.3d 1342, 1350 (Fed. Cir. 2005) ("The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention").

Welch raises the same "elastic body" claim construction arguments against Hamada that are raised against the Sega Saturn Controller. Section II.E.3 (above). Because they are new constructions that go well beyond the explication of the "plain and ordinary meaning" of claim terms as well as beyond the constructions that Nintendo sought from this Court, they do not constitute opinions that are helpful to the trier of fact under *Fed. R. Evid.* 702, and they should be disregarded in considering this motion. *The Regents of the University of California v. Micro Therapeutics, Inc.,* 2007 WL 229412 at *3 (N.D. Cal. 2007).

## VII. CONCLUSION

For the foregoing reasons, Gamevice requests the Court grant summary judgment that claims 1 and 8 of the '165 Patent are invalid (1) under 35 U.S.C. §§ 101 and 112, (2) under 35 U.S.C. § 102(b) as anticipated by the Sega Saturn Controller, and (3) under 35 U.S.C. § 102(e) as anticipated by Hamada.

Dated: March 13, 2020                                   LTL ATTORNEYS LLP

                                                        By:    */s/ Michael J. Song*

                                                               Michael J. Song, Bar No. 243675
                                                               michael.song@ltlattorneys.com
                                                               300 S. Grand Ave., Floor 14
                                                               Los Angeles CA 90071
                                                               Telephone: (213) 612-8900
                                                               Facsimile: (213) 612-3773

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Plaintiff and Counter-Defendant
Gamevice, Inc.

MSJ: Invalidity of '165 Patent
Case No. 18-cv-1942-RS