Grant E. Kinsel, Bar No. 172407
GKinsel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067
Telephone: 310.788.9900
Facsimile: 310.788.3399

Attorneys for NINTENDO OF AMERICA INC. and
NINTENDO CO., LTD.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMEVICE, INC., | Case No. 3:18-cv-1942-RS |
| *Plaintiff*, | |
| *v.* | NINTENDO'S NOTICE OF MOTION AND MOTION FOR RULE 11 SANCTIONS |
| NINTENDO CO., LTD., and NINTENDO OF AMERICA INC., | Date: May 5, 2022 |
| *Defendants* | Time: 1:30 p.m. |
| | Place: Crt #3 |
| | Hon. R. Seeborg |

1

## TABLE OF CONTENTS

2   NOTICE OF MOTION ............................................................................. 1

3   MEMORANDUM OF POINTS AND AUTHORITIES.............................. 1

4   INTRODUCTION.................................................................................... 1

5   FACTS .................................................................................................... 3

6   1.   The parties and the accused product ...................................... 3

7        1.1.   Nintendo and the Nintendo Switch ............................ 3

8        1.2.   Gamevice .................................................................... 5

9        1.3.   Gamevice's patents describe and claim
                  something fundamentally different from the
10                Nintendo Switch. ....................................................... 6

11  2.   Gamevice's litigation campaign against Nintendo. ................ 7

12       2.1.   The 1111 Investigation resulted in a stipulated
                  finding of noninfringement, and an affirmance
13                by the Federal Circuit................................................. 8

14       2.2.   The 1197 Investigation resulted in a total
                  repudiation of Gamevice's infringement and
15                validity theories........................................................ 11

16       2.3.   Nintendo's challenges in the PTAB........................... 16

17  ARGUMENT .......................................................................................... 16

18  1.   Rule 11 requires lawyers and their clients to stop-and-
         think before filing—or continuing to pursue—a case........... 16
19

20  2.   Gamevice has no objectively reasonable basis to believe
         that this time will be different. ........................................... 19

21  3.   Gamevice does not have an objectively reasonable basis
         to believe that it can flip claim constructions for the
22       '713 and '498 patents. ......................................................... 23

23  CONCLUSION........................................................................................ 25

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

CASES

3

4

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,*
      616 F.3d 1249 (Fed. Cir. 2010) ............................................................12

5

6

*HTC Corp. v. Cellular Commc'ns Equip., LLC,*
      701 Fed. App'x 978 (Fed. Cir. 2017) (unpublished) ...........................12

7

*iLor, LLC v. Google, Inc.,*
      631 F.3d 1372 (Fed.Cir.2011) .....................................................17, 22

8

9

*Innovation Sciences, LLC v. Amazon.com, Inc.,*
      842 Fed. Appx. 555 (Fed. Cir. 2021) (unpublished) ...........................22

10

11

*Intamin Ltd. v. Magnetar Techs., Corp.,*
      483 F.3d 1328 (Fed. Cir. 2007) ............................................................16

12

*Kilopass Tech., Inc. v. Sidesense Corp.,*
      738 F.3d 1302 (Fed. Cir. 2013) ....................................................16, 17

13

14

*Linex Technologies, Inc. v. Hewlett-Packard Co.,*
      No. C 13-159 CW, 2014 WL 4616847 (N.D. Cal., Sept.
      15, 2014)..................................................................18, 19, 20, 21

15

16

*Q–Pharma, Inc. v. Andrew Jergens Co.,*
      360 F.3d 1295 (Fed. Cir. 2004) ............................................................17

17

18

*Raylon, LLC v. Complus Data Innovations, Inc.,*
      700 F.3d 1361 (Fed. Cir. 2012) ....................................................16, 17

19

20

*Solomon Technologies, Inc. v. Toyota Motor Corp.,*
      No. 8:05-CV-1702-T-MAP, 2010 WL 715243 (M.D. Fla.
      Jan. 26, 2010)....................................................................................21

21

22

*Taurus IP, LLC v. DaimlerChrysler Corp.,*
      726 F.3d 1306 (Fed. Cir. 2013) ............................................................18

23

24

*Texas Instruments Inc. v. Cypress Semiconductor Corp.,*
      90 F.3d 1558 (Fed. Cir. 1996) ..............................................................22

25

*Townsend v. Holman Consulting Corp.,*
      929 F.2d 1358 (9th Cir. 1990) (*en banc*) ............................................16

26

STATUTES

27

35 U.S.C. § 112(f) ......................................................................8, 9, 10, 23

28

35 U.S.C. § 285 ...................................................................2, 18, 19

OTHER AUTHORITIES

Fed. R. Civ. P. 11 .................................................................. passim

Fed. R. Civ. P. 11(b) ...............................................................16

Fed. R. Civ. P. 11(c) ...............................................................17

Fed. R. Civ. Proc. 11(b)(2) .....................................................16

Fed. R. Civ. Proc. 11(b)(3) .....................................................16

# NOTICE OF MOTION

Please take notice that on May 5, 2022, at 1:30 p.m., or as soon there-after as the matter may be heard in Courtroom 3 of the United States District Court for the Northern District of California, Nintendo of America Inc. and Nintendo Co., Ltd ("Nintendo") will, and hereby do, move this Court for an order imposing sanctions on Gamevice and its attorneys pursuant to Federal Rule of Civil Procedure 11. Nintendo respectfully requests that if the Court agrees that Rule 11 sanctions are warranted, that the Court set a further brief-ing schedule for the parties to brief issues associated with (1) the amount of appropriate fees, and (2) the allocation of those fees between Gamevice (and any individual at Gamevice), Gamevice's Finnegan attorneys, and any other third party responsible for the fees.

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Gamevice claims that the Nintendo Switch infringes its patents. This case represents the third time Gamevice has made that assertion. The two times prior—both before the International Trade Commission (the "ITC" or "Commission")—the Commission rejected Gamevice's claims. But the Com-mission did not reject Gamevice's two previous cases as a result of legal error, or based on some narrow, Commission-specific grounds. Instead, both cases represented complete repudiations of Gamevice's theories. For instance, in the first case before the Commission, the Commission told Gamevice that the Nintendo Switch could not infringe its patents as a matter of law. That de-termination was based on claim constructions entered by the ALJ, affirmed by the full Commission, and then later affirmed by the Federal Circuit. In the second case, the Commission told Gamevice that the Nintendo Switch does not infringe because it is missing most of the elements required by the asserted claims, and moreover, that the asserted claims are invalid on multiple

grounds. This repudiation was so complete, wide-ranging, and overwhelming that Gamevice abandoned its appeal to the Federal Circuit before briefing, effectively conceding that it had no hope to win a reversal.

Gamevice presents this Court with the same infringement theories that the Commission has rejected twice. Yet, Gamevice does not—because it cannot—justify relitigating before this Court on the pretense that there has been some change in law or fact that makes its theories viable here when they were not viable before the Commission or Federal Circuit. Instead, Gamevice's apparent justification for relitigating its claims for the third time, exclusively rests on the naked assertion that Commission determinations are not, technically, *res judicata* in a subsequent district court case. Resting on this thin reed alone, Gamevice believes that it is entitled to accuse the same technology for a third time with impunity. Gamevice and its Finnegan[1] lawyers are wrong.

For Rule 11 (and 35 U.S.C. § 285) purposes, it does not matter whether Commission findings are or are not *res judicata*. What matters, instead, is whether Gamevice can articulate an objectively reasonable basis for proceeding despite objective evidence—namely, two adverse rulings by the Commission and one by the Federal Circuit—that Gamevice's theories are wrong both in law and in fact. Put differently, to avoid sanctions, Gamevice cannot merely regurgitate its previously rejected theories, and blindly hope for a better result. Instead, Gamevice must articulate an objectively reasonable basis for *why* it believes this case is different from the other two—*why*, for instance, this Court will flip claim constructions that have been affirmed by the Federal Circuit and enter new, favorable-to-Gamevice constructions that both the Federal Circuit and the Commission have already rejected. Or

---

[1] Two other law firms have withdrawn from representing Gamevice. Nintendo does not seek sanctions against these firms that, consistent with their Rule 11 obligations, withdrew from this case.

*why* Gamevice believes that all of the limitations that the Commission found missing (virtually all of the limitations of the patents) are, in fact, present.

In the absence of some objectively reasonable basis for proceeding, Rule 11 sanctions are both appropriate and necessary. If Gamevice, thus, fails to articulate an objectively reasonable basis for proceeding—something beyond the facile observation that it is technically legally permissible to do so— then the Court should find that Gamevice's filing of its amended complaint and continued pursuit of its infringement allegations does not satisfy the standards of Rule 11. Should the Court so find, Nintendo requests that the Court set a separate briefing schedule for the parties to address the amount of fees and the parties responsible for them.

## FACTS

### 1.    The parties and the accused product

#### 1.1.    Nintendo and the Nintendo Switch

Nintendo Co., Ltd. ("NCL") is based in Kyoto, Japan and has been designing and selling video games and video-game systems for decades. Nintendo of America Inc. ("NOA") is based in Redmond, Washington and sells Nintendo products in the United States. NCL and NOA are collectively referred to as "Nintendo."

The accused product is the Nintendo Switch video-game system, and for a subset of claims, an accessory used with the system called the "Joy-Con Grip." Nintendo designed the Nintendo Switch and the Joy-Con Grip in late 2014 or early 2015, and in March 2017—several months before the issue date of the earliest asserted patent—began selling the systems in the U.S.

The accused Nintendo Switch is like nothing described in Gamevice's patents. That much is apparent simply by looking at the two. Below on the left, is an image of the Nintendo Switch, and on the right, is Figure 31 from the asserted patents. As shown below, Gamevice's patents are about a clamp-

on accessory for a conventional smartphone or tablet. The Nintendo Switch is nothing like that.



The Nintendo Switch is a full fledge video-game system with an innovative design. The system includes two controllers, called "Joy-Con"—one for the left side and one for the right side of the console. Each Joy-Con includes a rail that fits into a matching rail on either side of the console, allowing the Joy-Con to be freely and independently attached to, and removed from, the console by sliding them up or down on the rail (right).



The ability to freely, easily, and individually remove Joy-Con controllers allows for unique ways to play this integrated video-game system. For instance, a player can actively control a game by freely swinging or moving around with one Joy-Con in each hand. And two players can simultaneously play together, each with his or her own Joy-Con. Both Joy-Con can be removed, and the console can be docked to allow for gameplay on a television set, or the Nintendo Switch can be played in handheld mode with both Joy-Con attached to the console using the rails. Game play in the three modes of the Nintendo Switch—TV, tabletop, and handheld—are shown below.



TV Mode        Tabletop Mode        Handheld Mode



The Joy-Con Grip (right) is a separate product from the console.[2] A Joy-Con Grip is included in the box with a Nintendo Switch console sold at retail. Joy-Con Grip have rails like the Nintendo Switch console that allow Joy-Con to be slid onto and off of each side of the Joy-Con Grip.

### 1.2.   Gamevice

In 2017 when Gamevice first accused Nintendo of infringement, Gamevice sold a product called the "Gamevice." The Gamevice was a clamp-on accessory for iPhones and iPads (and other similar smartphones and tablets). Gamevice's iPhone accessory clamped onto a standard iPhone to add game controls for gameplay and could be removed for typical operation of the iPhone when no longer needed.

But Gamevice was no innovator. Gamevice came late to the crowded smartphone-controller-accessory market with a conventional take on conventional technology. The evidence in the ITC investigations (described below) established that Gamevice's product was not materially different from the

---

[2] Gamevice also accused a different product called the "Joy-Con Power Grip," but the parties agreed that the Joy-Con Power Grip and the Joy-Con Grip were the same as it pertained to the asserted patents. Below, "Joy-Con Grip" is used for both products, unless context dictates otherwise.

many other products that existed long before (and after) the Gamevice. For instance, right is an image showing the PhoneJoy (from 2012) and the Moga (from 2013), each of which were in the market long before Gamevice (2015).



### 1.3. Gamevice's patents describe and claim something fundamentally different from the Nintendo Switch.

Gamevice asserts three patents—U.S. Patent Nos. 9,808,713 (the "'713 patent") (Kinsel Decl. Ex. 1), 9,855,498 (the "'498 patent") (Kinsel Decl. Ex. 2), and 10,391,393 (the "'393 patent") (Kinsel Decl. Ex. 3). The patents share the same specification, claim priority to the same seminal patent, and include many of the same claim terms. A partial family tree for the patents is to the right.



All three patents describe one—but only one—supposed invention: An accessory, like the Gamevice product, that can be clamped onto a smartphone or tablet for gameplay and then removed to return the smartphone or tablet to normal use. The claims recite this supposed invention as a combination of two things: (1) A controller; and (2) what the patents call a "computing device"—a conventional smartphone or tablet.

The first part of the patents' combination—the controller—is made up of what the patents call "modules" (where the joysticks and buttons are) tethered together by a central structure called the "structural bridge." The patents describe different configurations for the controller—sometimes it is U-shaped (Figures 1–5, 8–12), sometimes it includes "confinement structures" that

squeeze the smartphone or tablet (Figures 14-25), and other times it is made up of modules with a "tensioning mechanism" that allows the controller to fit different sized smartphones or tablets (Figures 26–44). But in all cases—in every embodiment, in every figure, and as de-



FIG. 31

scribed in every claim—the two modules of the controller are forever and for all times tethered together by a physical structural bridge. Figure 31 (right) is illustrative, and like the other figures of the patent, show the "structural bridge" (element 422) as a part of the controller, tethering the left and right modules together.

The second part of the combination is what the patents call the "computing device." The specification does not disclose a new type of computing device. Nor does the specification suggest that the inventors contemplated some specialized definition of "computing device" that would capture merely disconnected components of a smartphone or tablet. Instead, the specification is explicit that the inventors were using the term "computing device" in its plain and ordinary way, as meaning a smartphone, tablet, notebook computer, or other portable computing device. This is shown in every figure in the patents that shows a computing device, including, for instance, Figure 30 (right, elements 418 and 406 showing two different sized iPhones).



FIG. 30

2.  **Gamevice's litigation campaign against Nintendo.**

In 2017, Gamevice kicked off its now five-year long litigation campaign against Nintendo by filing a first complaint for patent infringement in

the Central District of California. That complaint asserted that the Nintendo Switch infringed U.S. Patent No. 9,126,119 (the "'119 patent")—this is the seminal patent to which the patents asserted here claim priority. After filing its complaint, Gamevice demanded that Nintendo meet with Gamevice. Nintendo agreed. At the meeting that followed, Nintendo informed Gamevice that its infringement allegations were frivolous and that the Nintendo Switch did not—and, in fact, could not—infringe the '119 patent since it lacked critical elements, including the structural bridge required by every claim. Shortly after the meeting, Gamevice dismissed its Central District of California case.

Soon after dismissing its Central District case, Gamevice filed this case and then two follow-on complaints in the ITC—the first in 2018, and the second in 2020. Nintendo, for its part, filed petitions with the Patent Trial and Appeals Board (the "PTAB") for *Inter Partes* Reviews ("IPR") of the seminal '119 patent, and later, one of the patents asserted here, the '393 patent. Each action—Gamevice's two cases in the ITC and the IPRs—is discussed in more detail below.

### 2.1. The 1111 Investigation[3] resulted in a stipulated finding of non-infringement, and an affirmance by the Federal Circuit.

Gamevice filed its first ITC complaint in March 2018, asserting that the Nintendo Switch and the Joy-Con Grip infringed claims of the '713 and '498 patents. Gamevice asserts both patents here.

The '713 and '498 patents describe the same purported invention outlined above—that is, a controller with two modules tethered together by a structural bridge that could clamp onto a separate smartphone or tablet computing device. These patents also claimed specific ways by which the

---

[3] *In the Matter of Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof*, Inv. No. 337-TA-1111, referred to as the "1111 Investigation."

controller could hold the computing device in place—via "fastening mecha-nisms," *see e.g.*, '713 patent, Claim 1 ("fastening mechanisms secure the first confinement structure to a first side of the structural bridge … ), and a "re-tention member," *see e.g.*, '498 patent, Claim 16 (" … the retention member interacts with the fastening detent. … "). Constructions for "fastening mech-anisms" and "retention member" proved decisive in the 1111 Investigation, precluding Gamevice's infringement claims.

Before the ITC, Nintendo contended that the claim terms "fastening mechanisms" and "retention member" were means-plus-function terms sub-ject to construction under 35 U.S.C. § 112(f). For the "fastening mecha-nisms" claim term, Nintendo contended that the corresponding structure was a soft draw latch disclosed in the specification. For the claim term "retention member," Nintendo contended that the specification failed to disclose ade-quate corresponding structure, and thus, claims reciting the term were indef-inite. Gamevice opposed these means-plus-function constructions, arguing that section 112(f) did not apply to either "fastening mechanisms" or "reten-tion member."

Following claim-construction briefing and a full-day hearing, the ALJ entered his claim-construction order. The order rejected Gamevice's proposed constructions and found that both "fastening mechanisms" and "retention member" were means-plus-function terms as Nintendo had argued. Kinsel Decl. Ex. 4 at 33–44 ("fastening mechanisms"), 71–81 ("retention member"). The ALJ further agreed with Nintendo that the disclosed structure for the "fastening mechanisms" was a soft-draw latch, and thus, entered a construc-tion limiting "fastening mechanisms" to soft draw latches and their equiva-lents. *Id.* at 43–44.[4] As to "retention member," while the ALJ found that

---

[4] "Fastening mechanism" (singular) was recited in Claim 10 of the '713 patent and Claim 21 of the '498 patent as performing a different function

Nintendo was correct that 112(f) applied, he determined that there was adequate disclosed structure for performing the recited retention-member function. *Id.* at 81.

The ALJ's means-plus-function constructions gutted Gamevice's infringement claims against Nintendo, as even Gamevice was forced to admit. Indeed, Gamevice stipulated that the Nintendo Switch and Joy-Con Grip, "do not include either 'fastening mechanisms' or a 'retention member' or their equivalents under the ALJ's constructions," Kinsel Decl. Ex. 5 at Ex. A at ¶ 11, and further that Gamevice was "unable to establish that any of the Accused Products satisfy the 'fastening mechanisms' or 'retention member' limitations literally or under the doctrine of equivalents when those terms are construed as set forth" by the ALJ, *id.* at ¶ 12. Based on Gamevice's stipulations, the ALJ entered a Summary Determination of Non-Infringement, and entered an Initial Determination of No Violation. Kinsel Decl. Ex. 6.

Gamevice appealed the constructions of "fastening mechanisms" and "retention member" first to the full Commission, and then to the Federal Circuit—and lost at both levels. The Commission rejected Gamevice's arguments, affirmed the ALJ's determination, and entered a Final Determination of No Violation.[5] Kinsel Decl. Ex. 7 at 11–20 ("fastening mechanisms"), 27–43 ("retention member"). As for the Federal Circuit, Gamevice argued that the Commission erred by affirming the ALJ's means-plus-function

than in the other claims of the patents. For Claims 10 and 21, Nintendo contended that the specification failed to disclose adequate structure and that the claims were indefinite. The ALJ found Claim 10 indefinite for lack of corresponding structure, Kinsel Decl. Ex. 4 at 43–44, and the parties stipulated to apply that holding to Claim 21, Kinsel Decl. Ex. 5, Ex A at ¶ 8.

[5] The Commission slightly modified the required structure for "retention member," found that Claim 10 of the '713 patent was invalid as indefinite, and held that Gamevice could not establish the domestic industry requirement.

constructions. Before the Federal Circuit, Gamevice argued that neither "fastening mechanisms" nor "retention member" were subject to construction under 35 U.S.C. § 112(f), and requested that the Federal Circuit return the case to the Commission for entry of what Gamevice considered proper constructions. The Federal Circuit rejected Gamevice's argument out of hand. In fact, the Federal Circuit entered a Rule 36 summary affirmance of the Commission's constructions without finding it necessary to address Gamevice's arguments. Kinsel Decl. Ex. 8. The Federal Circuit's judgment is final, and the 1111 Investigation is now closed.

### 2.2.  The 1197 Investigation[6] resulted in a total repudiation of Gamevice's infringement and validity theories.

Gamevice was not satisfied that it had its full day in court in the 1111 Investigation. So, Gamevice set out to try again. But this second time, Gamevice asserted a patent—the '393 patent, which Gamevice also asserts here—that it had specially prosecuted to avoid the problems in the 1111 Investigation by excising claim references to "fastening mechanisms."[7] But removing these references did not change the basic fact that the invention described in the patent is fundamentally different from the Nintendo Switch, which is precisely what the ALJ—and later the full Commission—ultimately found in the second investigation.

Gamevice's infringement allegations for the key limitations were the same for the overlapping limitations in the two investigations. Those

---

[6] *In the Matter of Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof II*, Inv. No. 337-TA-1197 (the "1197 Investigation").

[7] In fact, Gamevice filed the application that became the '393 patent on December 21, 2018—one day after stipulating to Nintendo's noninfringement of the '713 and '498 patents.

allegations remain the same here. Both the ALJ and the full Commission rejected essentially all of Gamevice's allegations.

For instance, for the the key "structural bridge" element, Gamevice pointed to (and continues to point to) a component buried deep inside of the Nintendo Switch console—called the "upper frame." But the upper fame does not tether Joy-Con together like the structural bridges shown in the patents tether modules together. Instead, the upper frame is a functional component inside the Nintendo Switch console itself. In fact, it was undisputed throughout the investigations that the Nintendo Switch console would not function without the upper frame. Below, on the left, is an image of an upper frame that has been extracted from inside of a console, and on the right, is an illustration of where inside the console the upper frame can be found.



**Upper Frame**                    **Upper frame within console**

Gamevice's position on structural bridge—that the structural bridge could be part of the console itself—had downstream consequences for other limitations, including Gamevice's position on the "computing device" limitation. This is so because the patents exclusively recite the "structural bridge" and "computing device" as separate elements of the recited combination. *See e.g.*, '393 Patent, Claim 1 ("A combination comprising: a computing device; [and] … a rigid structural bridge … ). When elements are

separately recited like this, it is the "clear implication" that they are "distinct components of the patented invention." *See e.g., Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254–55 (Fed. Cir. 2010) (interal quotation marks and alternation in original omitted); *see also HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017) (non-precedential). As a result, since Gamevice pointed to a component of the console as the supposed structural bridge, Gamevice could not point to the console itself as the "computing device"—the structural bridge and computing device have to be separate.

So, to conjure the required two separate elements, Gamevice completely disassembled the console and sorted the disassembled pieces into two different piles: One pile of disassembled parts Gamevice said was the computing device, while the other pile of disassembled parts Gamevice said was not the computing device. For instance, Gamevice contended that the parts shown to the right were a "computing device" within the meaning of the claims, while the left-over components of the console were *not* a computing device. Gamevice was never able to explain why some parts were in one pile but not the other—for example, the supposed computing device pile included inert pieces like the black plastic back cover (right), while the not-computing-device pile included functionally necessary components like the upper frame, battery, and on/off button.



The 1197 Investigation proceeded to final hearing. Several months later, the ALJ issued a nearly 500-page Initial Determination finding no infringement and that all claims asserted against Nintendo (except claim 12) were invalid as obvious. Kinsel Decl. Ex. 9. While the ALJ adopted several of

Gamevice's own constructions, he rejected Gamevice's infringement theories, and in particular, Gamevice's central theory of the "structural bridge" and "computing device" limitations.

For the "structural bridge" limitation, the ALJ found that while Gamevice pointed to an internal component of the console, "[o]ne of ordinary skill in the art would understand that [a structural bridge] in view of the specification could only include a component that is part of the input device [that is, the controller] and is not part of or integrated with the computing device." Kinsel Decl. Ex. 10 at 133–34. The ALJ distinguished the console's upper frame that Gamevice contended was the structural bridge from every other structural bridge shown in the specification: "Unlike all the structural bridges shown in the specification, the upper frame is part of the Nintendo Switch console itself." Id. at 134. As for the "computing device" limitation, the ALJ rejected Gamevice's contention that this limitation could be met by a random assortment of parts: "The administrative law judge finds that one of ordinary skill in the art would not understand a 'computing device' to be a selection of parts, as Gamevice asserts. Gamevice's interpretation is in conflict with the plain language of the claim." Id. at 114 (citations omitted).

Gamevice's loss was not limited only to these key deficiencies. Kinsel Decl. Ex. 10 is a table summarizing the ALJ's findings on noninfringement for asserted independent Claims 1, 8, and 12. What is immediately obvious from the table is that Gamevice lost, not only on the central "structural bridge" and "computing device" elements, but on every other contested limitation, and in most cases, on multiple grounds. Claim 1, for example, includes thirteen separate limitations. Of those, the ALJ found that the Nintendo Switch did not meet nine. Id., elements 1.2, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.11, 1.13. The four limitations the ALJ found present in the Nintendo Switch were limitations—including the preamble "a combination comprising"—that

1   the ALJ said were uncontested. *Id.*, elements 1.1, 1.9, 1.10, 1.12. The same

2   is true of Claim 8, where the only limitation the ALJ found to be present was

3   the uncontested preamble requiring a "combination." *Id.*, elements 8.2, 8.3,

4   8.4, 8.5. For Claim 12—which was the claim Gamevice asserted against the

5   Joy-Con Grip—the ALJ found multiple grounds on which the Joy-Con Grip

6   did not infringe. *Id.*, elements 12.6, 12.7.

7       The ALJ not only comprehensively rejected Gamevice's infringement

8   theory, he also found that all of the claims asserted against Nintendo (except

9   Claim 12) were invalid as obvious in view of both product and written prior

10   art, and that several were also invalid as indefinite. Kinsel Decl. Ex. 11 sum-

11   marizes the ALJ's invalidity findings. As to Claim 12, while the ALJ found

12   that claim survived Nintendo's invalidity challenge, he so found because he

13   properly adopted a means-plus-function construction, Kinsel Decl. Ex. 10 at

14   41–57, requiring structures Nintendo did not contend could be found in the

15   prior art, but which also eliminated the accused product.

16       Gamevice appealed the ALJ's Initial Determination to the full Com-

17   mission. Gamevice argued that the ALJ made a number of errors—including

18   in his findings regarding the "structural bridge" and "computing device" lim-

19   itations—that resulted in his noninfringement and invalidity findings. But the

20   full Commission disagreed. The Commission summarily adopted the ALJ's

21   Initial Determination as the Final Determination of the Commission without

22   modification of the noninfringement or invalidity findings, and saw no need

23   to bother even addressing Gamevice's arguments. Kinsel Decl. Ex. 12.

24   Gamevice initially appealed the ITC's Final Determination to the Federal Cir-

25   cuit, but later dismissed its appeal before briefing, thereby allowing the Final

26   Determination to become final and non-appealable.

27

28

1

### 2.3.   Nintendo's challenges in the PTAB.

2

Nintendo challenged two of Gamevice's patents—the '119 patent (the

3 seminal patent) and the '393 patent (asserted in the 1197 Investigation and

4 again here)—in the PTAB.

5

As discussed above, the asserted patents purport to claim priority to

6 the '119 patent, and in 2017, Gamevice asserted—and then withdrew—alle-

7 gations of infringement concerning the '119 patent. Nintendo filed two peti-

8 tions to the PTAB seeking institution of IPRs challenging virtually all claims

9 of the '119 patent. The PTAB instituted the IPRs, and in 2020, issued Final

10 Written Decisions finding that all challenged claims were unpatentable. Kin-

11 sel Decl. Ex. 13, 14. Some of the prior art that the PTAB found rendered the

12 challenged claims of the '119 patent unpatentable, was also applied in the

13 1197 Investigation to find the asserted claims of the '393 patent invalid.

14

After Gamevice filed its complaint in the ITC asserting the '393 patent,

15 Nintendo filed an additional IPR petition in the PTAB, this time challenging

16 the '393 patent. The PTAB declined to institute the IPR, however, because

17 Gamevice represented that the ITC could resolve the invalidity questions

18 more efficiently than the PTAB. As Gamevice put it, "it is the ITC, not the

19 PTAB, that is better situated to resolve the parties' dispute with respect to the

20 asserted invalidity grounds." Kinsel Decl. Ex. 15, at 16. By asserting the '393

21 patent here, Gamevice has demonstrated that its representations to the PTAB

22 that the ITC could efficiently "resolve the parties' [invalidity] dispute" were

23 false.

24

### ARGUMENT

25 **1.**   **Rule 11 requires lawyers and their clients to stop-and-think before fil-**

26 **ing—or continuing to pursue—a case.**

27

Federal Rule of Civil Procedure 11 imposes on lawyers and their cli-

28 ents a duty to certify the non-frivolousness of the party's legal and factual

positions. The required certification for the legal contentions is that the "claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. Proc. 11(b)(2). The factual-contentions certification is that the contentions must "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. Proc. 11(b)(3). Rule 11 "requires litigants to 'stop-and-think' before initially making legal or factual contentions," and the rule is intended to "emphasize[] the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable." Fed. R. Civ. Proc. 11 advisory committee note to 1993 amendments, 149 F.R.D. 401, 584–85.

When making a Rule 11 determination in patent cases, courts apply the law of the regional circuit. *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1367 (Fed. Cir. 2012). In the Ninth Circuit, Rule 11(b) sanctions may be imposed when pleadings, papers, and the like are presented for an improper purpose or when they include frivolous legal or factual contentions. *See*, *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1338 (Fed. Cir. 2007) (citing *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (*en banc*)). A frivolous argument is one that is "legally or factually baseless" under an objective standard. *Kilopass Tech., Inc. v. Sidesense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir. 2013); *Raylon, LLC*, 700 F.3d at 1368. While relevant, a showing of bad faith is unnecessary for the imposition of Rule 11 sanctions. *Kilopass Tech., Inc.*, 738 F.3d at 1313. Under Rule 11(c), a district court may impose sanctions on a party, its attorneys—or both. Fed. R. Civ. Proc. 11(c).

In the context of patent-infringement actions, an objectively reasonable inquiry under Rule 11 requires that an attorney (1) perform a

nonfrivolous claim-construction analysis, and (2) apply it as part of a reasonable infringement analysis. *Q–Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1301– 02 (Fed. Cir. 2004). While "[r]easonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous," *Raylon, LLC*, 700 F.3d at 1368, a claim construction position becomes frivolous—and so objectively unreasonable—when "no reasonable litigant could believe it would succeed." *iLor, LLC v. Google, Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011). Should a claim-construction position meet this threshold, the claim construction is frivolous, and Rule 11 mandates sanctions. *Id.*

With respect to a reasonable infringement analysis, an attorney must show that "a good faith, informed comparison of the claims of a patent against the accused subject matter" took place. *Q–Pharma*, 360 F.3d at 1302. "[T]he presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11." *Id.*[8]

As to both claim construction and infringement contentions, Rule 11 imposes a continuing duty on an attorney to assess changed circumstances and whether a position that was not previously frivolous has become frivolous, for example, as a result of claim construction or other rulings. "[A] party cannot assert baseless infringement claims and must continually assess the soundness of pending infringement claims, especially after an adverse claim

---

[8] As discussed below, Nintendo contends that Gamevice and its lawyers failed to conduct a reasonable inquiry into the basis for believing why this case could succeed when the identical litigation before the ITC failed. In addition, Nintendo understands that Gamevice has secured litigation funding. Nintendo intends to take discovery into whether Gamevice's litigation funders undertook the appropriate pre-filing diligence, and will request that the Court permit supplemental briefing on this issue should briefing be warranted.

construction." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1328 (Fed. Cir. 2013).

### 2.      Gamevice has no objectively reasonable basis to believe that this time will be different.

As Gamevice's First Amended Complaint makes clear, Gamevice is pursuing the same infringement theory before this Court that the ITC has rejected twice. But continuing to pursue claims in a district court after the same claims have been demonstrated to be meritless in the ITC is sanctionable, as Gamevice's Finnegan lawyers should know since they were sanctioned (35 U.S.C. § 285) for this conduct in *Linex Techs., Inc. v. Hewlett-Packard Co.*, No. C-13-159 CW, 2014 WL 4616847 (N.D. Cal. Sept. 15, 2014).

In *Linex*, Linex first filed a complaint for infringement against various defendants in the Eastern District of Texas. The Texas court entered a construction of a key term—"spread spectrum signals"—as requiring a particular type of distributed signal. Almost immediately after the court entered the construction, Linex settled with the defendants. Later, after obtaining a reissuance from the PTO, Linex filed a complaint in the ITC. In the run-up to the ITC hearing, the Office of Unfair Import Investigations ("Staff")[9] filed a brief in which Staff took the position that "spread spectrum signals" in the asserted patent should be construed essentially the same way as the Eastern District of Texas had construed it. In view of that construction, Staff did "not expect the evidence to show infringement of the asserted claims." *Id.* at 2. Before the final hearing, Linex dismissed its ITC complaint and turned to its complaint before Judge Wilken in the Northern District of California. Judge Wilken agreed with both the Eastern District of Texas and Staff, entered essentially

---

[9] In certain investigations in the ITC, Staff appears as an independent party to represent the public interest. Staff did not appear in the 1111 Investigation, but did appear in the second investigation, the 1197 Investigation.

the same construction for "spread spectrum signals," and then entered judg-

ment for the defendants. The defendants moved for fees under 35

U.S.C. § 285, which Judge Wilken granted.

Judge Wilken focused on Linex's pursuit of the case for the third time,

despite "indications of substantive weakness." *Id.* at *2. The defendants con-

tended that the case was objectively baseless because two other fora had pre-

viously decided against Linex, and Judge Wilken agreed. Judge Wilken found

that "[e]ven though neither forum's determination was binding on [the]

Court's determination as *res judicata*, Linex was not free to pursue another

case targeting the same technology with impunity. Patent litigation is a bur-

densome venture for all parties involved. Thus, plaintiffs must conduct care-

ful investigation before bringing suit." *Id.* at *3. Given the previous results

before the Eastern District of Texas and the ITC, "Linex should have known

that its spread spectrum claims would not succeed…." *Id.* Relevant here,

Judge Wilken found that even if Linex could arguably have not known that

its claims were frivolous when filed, the previous results put Linex on notice.

"If Linex did not know initially that its spread spectrum cases could not be

stretched to cover [the accused] technology, it should have known after it

litigated those claims in Texas and in the ITC. Linex urged two fora to adopt

its overbroad definition of 'spread spectrum signals,' to no avail." *Id.* at *4.

Like in *Linex*, Gamevice proceeds before this Court with the same case

that it presented to the ITC despite "indications of substantive weakness," *id.*

at *2. Indeed, this case is a far stronger candidate for sanctions than *Linex*

because the "indications of substantive weakness" are much stronger here

than in *Linex*. Here, just as in *Linex*, Staff warned Gamevice that its infringe-

ment theories were weak and likely to lose, but unlike in *Linex* where Staff's

concern related to one contested limitation, here Staff warned Gamevice that

it would be unlikely to prove virtually any claim limitation. More

1   importantly, unlike in *Linex* where Linex dismissed its ITC complaint before

2   a final determination by the ITC, here Gamevice has (1) Staff's unequivocal

3   statement that the Nintendo Switch did not infringe, (2) an Initial Determi-

4   nation from the ALJ confirming the same and that the asserted claims are

5   invalid, and (3) a Final Determination from the full Commission, affirming

6   the ALJ. Surely, if it was objectively baseless for Linex to proceed in view of

7   a single disputed claim construction—merely recommended by Staff—it is

8   objectively baseless for Gamevice to proceed in view of a final and wholesale

9   repudiation of virtually all aspects of its infringement theory by Staff, the ALJ,

10   and the full Commission.[10]

11      Gamevice's fundamental problem is it has to rely on the same factual

12   and legal contentions that the ITC and Federal Circuit have repeatedly re-

13   jected, effectively precluding Gamevice from having an objectively reasonable

14   basis for proceeding. For instance, there are no new facts about the Nintendo

15   Switch that give Gamevice an objectively reasonably basis to believe that this

16   case will come out differently than the ITC investigations. Indeed, Gamevice

17   seems to recognize this as Gamevice's First Amended Complaint recites the

18   same infringement theories rejected by the ITC (and the Federal Circuit), and

19   Gamevice has asked that discovery be stayed. Gamevice needs no new dis-

20   covery because there is nothing new to discover about the Nintendo Switch

21   that could be relevant to the asserted patents. Thus, this is not a case where

22   some new component of the accused product changes the noninfringement

23

24      [10] There is an additional parallel between *Linex* and this case. In *Linex,*
25   after the Texas court entered the adverse claim construction, Linex went back
     to the PTO to seek a reissuance in which Linex deleted the critical limitation
26   from the claims. Gamevice did the same thing here. One day after stipulating
     that it could not prove the "fastening mechanisms" limitation, Gamevice filed
27   the application that ripened into the '393 patent. The '393 patent application
28   did not recite "fastening mechanisms" in any of the proposed claims.

landscape. Instead, this is a case where Gamevice merely hopes that a do-over will yield better results with no objectively reasonable factual basis for those hopes.

Like in *Linex*, where Linex repeatedly pressed for constructions that had been rejected in other fora, Gamevice will press infringement claims that have already been rejected. For instance, just as it did before the ITC, Gamevice will claim that the upper frame is the required structural bridge, and that a pile of left-over parts is the required computing device. But as the ITC has already found, neither the claims nor the specifications support Gamevice's infringement theory. As the ITC has already found, the specifications "only disclose[] the structural bridge as separate from the computing device," and "exclusively describe[] a structural bridge as separate from, and external to, the computing device." Kinsel Decl. Ex. 10 at 133–34. And as the ITC has already found, "one of ordinary skill in the art would not understand a 'computing device' to be a selection of parts, as Gamevice asserts," and "Gamevice's interpretation is in conflict with the plain language of the claim." *Id.* at 114. Thus, nothing has changed—there are no new facts or new law—to morph Gamevice's core infringement theories from theories unsupported by the claims, specifications, or understanding of skilled artisans, into objectively reasonable theories. To paraphrase Judge Wilken in *Linex*, if Gamevice "did not know initially" that its claims "could not be stretched to cover" the Nintendo Switch, "it should have known after it litigated those claims" twice before the ITC. *Linex Techs., Inc.*, 2014 WL 4616847 at *4. Gamevice, thus, is not free to "pursue another case targeting the same technology with impunity," *id.* at *3, and should be held responsible for fees under Rule 11.

3.     **Gamevice does not have an objectively reasonable basis to believe that it can flip claim constructions for the '713 and '498 patents.**

The Federal Circuit's affirmance of the constructions of "fastening mechanisms" and "retention member" is a separate basis to find Gamevice's infringement claims concerning the '713 and '498 patents frivolous.

Gamevice stipulated that it cannot prove infringement of the '713 and '498 patents under the Federal Circuit affirmed constructions of "fastening mechanisms" and "retention member." Kinsel Decl. Ex. 5 at Ex. A. That stipulation was accepted by the ITC as the factual basis for the ITC's determination of noninfringement. Gamevice cannot, therefore, back out of that stipulation now. *Solomon Techs., Inc.*, No. 8:05-CV-1702-T-MAP, 2010 WL 715243, *3 (applying judicial estoppel to preclude a plaintiff from taking a different position on a claim construction issue than the plaintiff took in a prior ITC action). As a consequence, Gamevice has no option but to urge this Court to enter some other non-means-plus-function constructions for these terms that differs from the constructions affirmed by the Federal Circuit. But both the ITC and the Federal Circuit have confirmed that the means-plus-function constructions for "fastening mechanisms" and "retention member" are correct, and there has been no change in law to suggest that the constructions should come out differently now. "No reasonable litigant could believe it would succeed," *iLor, LLC v. Google, Inc.*, 631 F.3d 1378, in flipping constructions affirmed by the Federal Circuit.

This is true even though the ITC's constructions may not constitute formal *res judicata*. The Federal Circuit has warned that courts may not ignore rulings by the Federal Circuit—even when those rulings do not constitute formal *res judicata*. "TI also argues that by our denying preclusive effect to the ITC determinations and to our decisions in appeals from ITC decisions, district courts would be free to ignore our decisions. That is not correct.

1    District courts are not free to ignore holdings of this court that bear on cases

2    before them." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90

3    F.3d 1558, 1569 (Fed. Cir. 1996).

4            Nor does it matter that the Federal Circuit affirmed the ITC's con-

5    struction with a Rule 36 affirmance (without an opinion). There is no doubt

6    that the Federal Circuit affirmed the ITC's means-plus-function construc-

7    tions. The "history of [the] litigation and appeal in [cases affirmed without

8    opinion under Rule 36] ought to leave little doubt why the decision of the

9    lower tribunal was affirmed." *Innovation Sciences, LLC v. Amazon.com,*

10   *Inc.*, 842 Fed. Appx. 555, 558 (Fed. Cir. 2021) (unpublished). Such is the

11   case here, as the only issue before the Federal Circuit was whether the means-

12   plus-function constructions were correct. As Gamevice's Statement of Issues

13   described it, the two issues for the Federal Circuit to decide were: "1. Did the

14   Commission err in construing 'fastening mechanism' in claim 1 of the '498

15   patent as a means-plus-function limitation … ?[ ¶ ] 2. Did the Commission

16   err in construing 'retention member' in claim 16 of the '498 patent as a

17   means-plus-function limitation…?" Kinsel Decl. Ex. 8 at 2. There is little

18   doubt that the Federal Circuit approved of—and affirmed—these construc-

19   tions since, if it did not, the Federal Circuit would have either entered new

20   constructions for the terms or sent the matter back for the ITC to do so.

21   Indeed, that is exactly the relief Gamevice requested, *id*. at 63, which the Fed-

22   eral Circuit rejected.

23           Whether insisting that "fastening mechanisms" and "retention mem-

24   ber" should not be construed under 35 U.S.C. § 112(f) was frivolous to begin

25   with, there can be little doubt that in view of the Federal Circuit's affirmance

26   of these constructions, continuing to insist on a non-means-plus-function con-

27   struction for those terms is now objectively unreasonable and sanctionable

28   under Rule 11.

1

## CONCLUSION

2      Gamevice and its lawyers should have known since 2017 that its in-

3   fringement allegations against Nintendo are frivolous. Those allegations have

4   only gotten worse with time, and now have been demonstrated to be merit-

5   less. Gamevice and its lawyers have no objectively reasonable basis to believe

6   that a different result will obtain this time around, and therefore, attorney

7   fees under Rule 11 are warranted. Nintendo respectfully requests that if the

8   Court agrees that fees are warranted, the Court enter a separate briefing

9   schedule concerning the amount of those fees and the proper allocation of the

10   fees to the party or parties responsible for them.

11

12   Dated: March 30, 2022            PERKINS COIE, LLP

13

14                                    By: /s/ *Grant E. Kinsel*
                                          _____
15                                        Grant E. Kinsel, Bar No. 172407
                                          GKinsel@perkinscoie.com
16

17                                    Attorneys for NINTENDO OF
                                      AMERICA INC., and NINTENDO
18                                    CO., LTD.

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on March 30, 2022, I electronically filed the

3  foregoing document with the Clerk of the Court using the CM/ECF system,

4  which will send notification of such filing to all counsel of record for the

5  parties.

6

7                                    _/s/ Grant E. Kinsel_
                                     Grant E. Kinsel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
18-cv-1942-RS