Grant E. Kinsel, Bar No. 172407
GKinsel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067
Telephone: 310.788.9900
Facsimile: 310.788.3399

Attorneys for NINTENDO OF AMERICA INC. and
NINTENDO CO., LTD.
[Additional counsel listed on signature block]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMEVICE, INC., | Case No. 3:18-cv-1942-RS |
| *Plaintiff*, | |
| *v.* | NINTENDO'S CLAIM CONSTRUCTION BRIEF |
| NINTENDO CO., LTD., and NINTENDO OF AMERICA INC., | Date: October 21, 2022<br>Time: 10:00 a.m.<br>Place: Crt #3<br>Hon. R. Seeborg |
| *Defendants* | |

# TABLE OF CONTENTS

I.    BACKGROUND AND RELEVANT TECHNOLOGY................... 1

    1.    The parties................................................................ 1

    2.    The Asserted Patents.............................................. 2

    3.    Prior litigation. ...................................................... 3

II.    MEANS-PLUS-FUNCTION TERMS................................. 3

    1.    "fastening mechanisms" ('713 patent, Claims 1, 16;
       '498 patent, Claim 1)............................................. 3

        1.1.    The Federal Circuit's affirmance is given a strong
            presumption of correctness, from which this
            Court may deviate only with compelling reasons. ......... 3

        1.2.    Gamevice cannot demonstrate unusually
            compelling circumstances. ................................ 4

    2.    "retention mechanism" ('393 Patent, Claim 12)................... 7

        2.1.    "retention mechanism" is not the name of a
            structure or class of structures known in the art. ........... 8

        2.2.    The claims do not recite structure for the
            "retention mechanism." ................................... 9

        2.3.    The proper function is the function recited in the
            claims, and the specification provides no
            corresponding structure for performing that
            function. ................................................. 10

    3.    "confinement structures" / "pair of confinement
       structures" ('713 patent, Claims 1, 16, 17; '498 patent,
       Claim 1; '393 patent, Claim 1)............................... 11

        3.1.    "Confinement structures" is not the name of a
            structure or class of structures known in the art. ......... 11

        3.2.    Element 316 is the corresponding structure. ............... 13

        3.3.    Gamevice's construction is incorrect............................ 13

III.    NON-MEANS-PLUS-FUNCTION TERMS .................................. 14

    4.    "computing device" ('713 patent, Claims 1–4, 6–8,
       17–19; '498 patent, Claims 1, 2; '393 patent, Claims
       1–4, 6–7). ........................................................ 14

    5.    "structural bridge" ('713 patent, Claims 1, 2, 4, 8, 16,
       18, 19; '498 patent, Claims 1, 2; '393 patent, Claims 1,
       2, 4, 7, 12)........................................................ 18

6.    "communication link" ('713 patent, Claims 1, 6–7, 16; '498 patent, Claim 1; '393 patent, Claims 1, 6)................... 21

7.    "promotes," "communication," "electrical communication" / "electronic communication" ('713 patent, Claim 1, 16; '498 patent, Claim 1; '393 patent, Claim 1). .......................................................... 22

8.    passageway ('713 patent, Claims 1, 16; '498 patent, Claim 1; '393 patent, Claim 1)........................................... 25

Claim Construction Brief
18-cv-1942-RS

# TABLE OF AUTHORITIES

CASES

*3M Innovative Props. Co. v. Tredegar Corp.,*
    725 F.3d 1315 (Fed. Cir. 2013) ....................................................18, 20

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.,*
    830 F.3d 1341 (Fed. Cir. 2016) ............................................................11

*Alloc, Inc. v. Norman D. Lifton Co.,*
    No. 03 Civ. 4419 (PAC), 2007 WL 2089303 (S.D.N.Y.
    July 18, 2007)........................................................................................3

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.,*
    288 F. App'x 697 (Fed. Cir. 2008)........................................................8

*Asyst Techs., Inc. v. Empak, Inc.,*
    268 F.3d 1364 (Fed. Cir. 2001) ..........................................................10

*Blackbird Tech. LLC v. ELB Elecs.,*
    No. 15-cv-56 (RGA), 2016 WL 7451622 (D. Del. Dec. 28,
    2016), *rev'd on other grounds*, 895 F.3d 1374 (Fed. Cir.
    2018)......................................................................................................4

*Diebold Nixdorf, Inc. v. ITC,*
    899 F.3d 1291 (Fed. Cir. 2018) ..........................................................11

*Flexsys Am. LP v. Kumho Tire U.S.A., Inc.,*
    695 F.Supp.2d 609 (N.D. Ohio 2010) ...................................................3

*Halliburton Energy Servs., Inc. v. M-I LLC,*
    514 F.3d 1244 (Fed. Cir. 2008) ..........................................................13

*Laitram Corp. v. Rexnord, Inc.,*
    939 F.2d 1533 (Fed. Cir. 1991) ..........................................................12

*Media Rights Techs., Inc. v. Cap. One Fin. Corp.,*
    800 F.3d 1366 (Fed. Cir. 2015) ...........................................5, 8, 10, 12

*MTD Prods. Inc. v. Iancu,*
    933 F.3d 1336 (Fed. Cir. 2019) ...................................................6, 7, 11

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...........................................14

*Solomon Techs. Inc. v. Toyota Motor Corp.,*
    No. 8:05-cv-1702-T-MAP, 2010 WL 715243 (M.D. Fla.
    Jan 26, 2010).........................................................................................4

*Summit 6, LLC v. Samsung Elecs. Co.,*
    802 F.3d 1283 (Fed. Cir. 2015) ..............................................................17

*Texas Instruments v. Cypress Semiconductor Corp.,*
    90 F.3d 1558 (Fed. Cir. 1996) ................................................................3

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015) ...................................................... passim

*World Class Tech. Corp. v. Ormco Corp.,*
    769 F.3d 1120 (Fed. Cir. 2014) ...........................................................18

**STATUTES**

35 U.S.C. § 112(f) ..................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 36 .........................................................................3

## I.  BACKGROUND AND RELEVANT TECHNOLOGY

**1.  The parties.**

Nintendo designs, develops, and sells video-game systems and video games. The accused devices are the Nintendo Switch and the Joy-Con Grip (an accessory sold with the Nintendo Switch). As shown below, the Nintendo Switch is a video-game system with different modes of play.



TV Mode                Tabletop Mode                Handheld Mode

Gamevice makes an eponymous product that it insists practices numerous claims from the Asserted Patents. *See*, Initial Determination in 1197 Investigation ("ID"), 213 [Ex. 4].[1] In contrast with the Nintendo Switch, which is a video-game system with independent controllers (called "Joy-Con") that can be individually removed by sliding them up and down on a rail, the Gamevice is a one-piece, after-market accessory for smartphones or tablets. Like the devices shown in the Asserted Patents—but in contrast with the Nintendo Switch—the two sides of the Gamevice are tethered together by a central piece that the Asserted Patents call a "structural bridge." Like the embodiments shown in the Asserted Patents, the Gamevice clamps onto the sides of a conventional smartphone or tablet to add physical controls like joysticks or buttons for gameplay, and can be removed when no longer needed, returning the smartphone or tablet to normal operation. To the right, the Gamevice is shown next to Figs. 30, 31 from the Asserted Patents.

Gamevice            Asserted Patents

---

[1] All Exhibits attached to the Hawkins Decl.

1    **2.    The Asserted Patents.**

2        The Asserted Patents are continuations and continuations-in-part of a family of pa-

3    tents that describe one—but only one—thing: A game controller, like the Gamevice, that

4    has two modules tethered together by a structural bridge. The game controller can be

5    clamped to a conventional smartphone or tablet to add controls for gameplay and be re-

6    moved to return the smartphone or tablet back to normal operation. To work, the control-

7    ler must securely hold the smartphone or tablet and then be readily removable from it. The

8    specification discusses four ways to do this:

9        *U-Shaped controller:* The first disclosed way to combine a game controller and a

10   smartphone or tablet is with a U-shaped game controller where a tablet or smartphone

11   "nests" as shown in Figs. 1–5 and 8–13. '393 patent, 5:22–31 [Ex. 3].

12       *Retention member*: The second disclosed way to combine a game controller and a

13   smartphone or tablet is with the game controller shown in Figs. 14 and 15, where a "struc-

14   tural bridge 258, secur[es] the pair of control modules 252, one to the other." *Id.* at 8:31–

15   37. A retention member secures a control module to the structural bridge. *Id.* at 8:38–49.

16       *Communication port*: The third disclosed way to combine a game controller and a

17   smartphone or tablet is shown in Figs. 16–25. As shown in Fig. 16, a communication port

18   is made up of a structural bridge, a pair of confinement structures, and a fastening mecha-

19   nism. *Id.* at 9:33–38 (confinement structures), 9:54–59 (fastening mechanism), 9:60–67

20   (structural bridge). The fastening mechanism, such as the disclosed soft-draw latch, *id.* at

21   9:54–59, squeezes the two confinement structures onto the sides of the smartphone or tablet

22   to hold it in place. *Id.* at 10:8–20. Control modules attach to the confinement structures to

23   complete the game controller. *Id.* at 9:40–53.

24       *Adjustable*: The fourth disclosed way to combine a game controller and a

25   smartphone or tablet is with a game controller made up of control modules tethered to-

26   gether by a structural bridge that adjusts to fit different sized smartphones and tablets, as

27   shown in Figs. 26–44. *Id.* at 11:24-28, 11:44–51.

28

1    **3.    Prior litigation.**

2    Gamevice has been accusing Nintendo of infringing various of its patents since 2018,

3    including in two separate ITC investigations. In the investigations, the ITC determined that

4    the Nintendo Switch and Joy-Con Grip did not infringe the Asserted Patents and that vir-

5    tually all asserted claims are invalid. In so finding, the ITC construed several terms at issue

6    here, including "fastening mechanisms," which was affirmed by the Federal Circuit.

## II.    MEANS-PLUS-FUNCTION TERMS

8    **1.    "fastening mechanisms" ('713 patent, Claims 1, 16; '498 patent, Claim 1).**

9    "Fastening mechanisms" was construed by the ITC in the 1111 Investigation as a

10   means-plus-function term under 35 U.S.C. § 112(f) and limited the term to the disclosed

11   soft-draw latch (and equivalents).[2] 1111 Investigation Commission Opinion at 5 [Ex. 5].

12   The Federal Circuit affirmed the ITC's construction. Rule 36 Affirmance [Ex. 6]. Nintendo

13   proposes the construction entered by the ITC and affirmed by the Federal Circuit; Gamevice

14   proposes the construction the ITC rejected.

### 1.1.    The Federal Circuit's affirmance is given a strong presumption of correctness, from which this Court may deviate only with compelling reasons.

17   The Federal Circuit's affirmance makes the ITC's construction of "fastening mecha-

18   nisms" different from the other terms before the Court that have been construed by the

19   ITC. With terms construed by the ITC, but not affirmed by the Federal Circuit, the Court

20   "can attribute whatever persuasive value to the prior ITC decision … it considers justified."

21   *Texas Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996).

22   But for constructions affirmed by the Federal Circuit—like "fastening mechanisms"—while

23   those constructions are not preclusive, district courts are also "not free to ignore holdings

24   of [the Federal Circuit] that bear on cases before them." *Id.* In considering the weight to be

25   afforded decisions of the Federal Circuit on appeal from the ITC, district courts have found

26

27   [2] Fastening mechanisms 448 and 548 cannot be the structure of the "fastening mecha-
nisms" recited in the asserted claims because they perform a different function. Stein Decl.

28   ¶¶ 163-167 [Ex. 11].

that "[d]eviation from Federal Circuit findings should … be considered only under unusually compelling circumstances." *Alloc, Inc. v. Norman D. Lifton Co.*, No. 03 Civ. 4419 (PAC), 2007 WL 2089303, at *10 (S.D.N.Y. July 18, 2007); *see also Flexsys Am. LP v. Kumho Tire U.S.A., Inc.*, 695 F.Supp.2d 609, 617 (N.D. Ohio 2010) (holding a "strong presumption of correctness" attaches to the Federal Circuit's decision, "which may only be overcome by compelling reasons"). One district court described the space available for review of a Federal Circuit decision in an ITC appeal this way: "[T]he district court's window of review is effectively a narrow slit." *Solomon Techs. Inc. v. Toyota Motor Corp.*, No. 8:05-cv-1702-T-MAP, 2010 WL 715243, at *4 (M.D. Fla. Jan 26, 2010).

### 1.2. Gamevice cannot demonstrate unusually compelling circumstances.

Gamevice does not acknowledge—much less attempt to carry—its burden of demonstrating the unusually compelling circumstances necessary for this Court to diverge from the affirmed means-plus-function construction of "fastening mechanisms." Instead, Gamevice offers a handful of arguments—most of which the Federal Circuit considered and rejected. For instance, according to Gamevice, "fastening mechanisms" is a structural term (and hence § 112(f) does not apply) because the claims "identify the interconnectedness expected of the fastening mechanisms and the structures with which the fastening mechanisms must interface." GVCC, 13:25–27. But Gamevice made this exact same argument to the Federal Circuit. *Compare*, GVCC, 13:25–27 *with* Appeal Brief, 35–36 [Ex. 7]. Similarly, Gamevice repeats its arguments that "'fastening mechanism' and 'fastener' are often used interchangeably and have the same meaning," *compare* GVCC, 14:4–5 *with* Appeal Brief, 30–35 [Ex. 7], and that *Blackbird Tech*. supports its argument, *compare* GVCC, 14:16–22 *with* Appeal Brief, 35 [Ex. 7]. By affirming the ITC's § 112(f) construction—over each of these arguments—the Federal Circuit necessarily rejected Gamevice's arguments, and Gamevice offers no suggestion that the Federal Circuit erred in doing so.

Gamevice does not suggest error in the Federal Circuit's affirmance because there was no error. While the claims reciting "fastening mechanisms" do not use the word "means," and so "fastening mechanisms" was presumed not to be a means-plus-function

term, that presumption was rebutted because "fastening mechanisms" "fail[ed] to recite sufficiently definite structure or else recite[d] function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc* as to Part II.C.1) (internal quotation marks omitted). The Federal Circuit routinely finds that "mechanism"—as in "fastening *mechanism*"—does not typically recite sufficient structure to avoid § 112(f). As the Federal Circuit put it in *Media Rights Techs., Inc. v. Cap. One Fin. Corp.,* the court has "never found that the term 'mechanism'—without more—connotes an identifiable structure; certainly, merely adding the modifier ["fastening," in this case] to that term would not do so either." 800 F.3d 1366, 1373 (Fed. Cir. 2015). This is so because "[g]eneric terms such as '*mechanism*' … and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112[f]." *Williamson*, 792 F.3d at 1350 (citation omitted) (emphasis added). Thus, the Federal Circuit's affirmance of the ITC's construction was right in line with prevailing Federal Circuit authority, and Gamevice does not—because it cannot—suggest anything to the contrary.

The only arguably "new" material Gamevice offers is the opinion of its newest expert, Dr. Slocum. Dr. Slocum says that Gamevice's earlier expert was wrong about the meaning of "fastening mechanisms," and that "fastening mechanisms" does not simply mean anything that fastens. Slocum Decl. ¶ 54 [Ex. 8]. Instead, according to Dr. Slocum, "fastening mechanisms" means anything that "reversibly" and "repeatedly" fastens. Slocum Depo., 128:10–129:2 [Ex. 9]. But this is a distinction without a difference. In both cases, Gamevice's experts are admitting that "fastening mechanisms" is not the name of a structure or class of structures, but means anything that can fasten—in the case of Gamevice's first expert—or reversibly and repeatedly fasten—in the case of Dr. Slocum. Both positions are admissions that "fastening mechanisms" is a generic, nonce term subject to construction under § 112(f).

Gamevice also fails to muster persuasive evidence for the main thrust of Dr. Slocum's point: That "fastening mechanisms" is a term of art used to designate structure. For instance, despite being a prolific author with 174 patents, two full textbooks, and 143 papers in refereed journals to his credit, Dr. Slocum could not identify a *single* instance in which he used the term "fastening mechanism" in writing. *Id.* at 59:5–11.

The only "evidence" of the supposedly commonplace nature of "fastening mechanisms" comes, not from Dr. Slocum, but rather, from Gamevice's lawyers. In its brief, Gamevice discusses a number of patents that include the term "fastening mechanism." GVCC, 15:1–12.[3] None of these patents are in the intrinsic record, and Gamevice offers no evidence that the patents relate to the pertinent technology, much less that they would be relevant to the understanding of a skilled artisan. Indeed, the evidence is to the contrary since not even Dr. Slocum, Gamevice's own expert, had read, seen, or considered these patents, Slocum Depo., 29:7–14 [Ex. 9]—at least before Gamevice's lawyers sent them to him, conveniently highlighted to identify the "relevant" portions, *id.* at 31:1–18. Dr. Slocum's testimony about these patents, which is—at best—little more than *ipse dixit*, is deserving of minimal, if any, weight.

But more importantly, Gamevice's grab bag of patents misses the essential inquiry. The relevant question for the application of § 112(f) is not whether a particular term can be found in unrelated patents by searching the PTO database—given the more than 10,000,000 issued U.S. patents, most any combination of terms can likely be found. Instead, the relevant question for the application of § 112(f) is whether a term is used in the pertinent art by skilled artisans as the name of a particular structure or class of structures. As the Federal Circuit put it in *MTD Prods. Inc. v. Iancu,* the "critical question is whether the claim term is used in common parlance or by persons of skill in the pertinent art *to designate structure,* including either a particular structure or a class of structures." 933 F.3d 1336,

---

[3] Gamevice also references a textbook, GVCC, 15:10–12, but that textbook never uses the claim term "fastening mechanisms," and is, thus, irrelevant.

1341 (Fed. Cir. 2019) (internal quotation marks omitted) (emphasis added). Put differently, the relevant question is not: Can the term be found in any patent? Rather, the relevant question is whether skilled artisans use the term *as the name* for a particular structure or class of structures in the pertinent art. *Id.*

On their faces, Gamevice's extrinsic patents demonstrate—if anything—that different inventors use "fastening mechanisms" to mean very different things, and they decidedly do not use it as the name of a particular structures or class of structures. For instance, one inventor used the term as a descriptor for a door lock in the patent's title. *See*, Ex. 10 at 1. Another used the term with reference to a "bolt-nut fastening mechanism" for attaching a steering member to a body frame. *Id.* at 5. The "fastening mechanism" in this extrinsic patent is recited in detail in over 40 lines of text. *Id.* Still others used "fastening mechanism" functionally, *e.g.*, *id.* at 16 ("a fastening mechanism configured to fasten the cartridge holder to the drug delivery device…"), as the named inventors did in the Asserted Patents. Far from demonstrating that the term is used as the name of a particular structure as required by the Federal Circuit, Gamevice's extrinsic patents demonstrate the exact opposite—that "fastening mechanisms" means different things to different inventors, and is not the name of any particular structure known in the pertinent art. As a result, the extrinsic patents provide no basis to diverge from the Federal Circuit's affirmed construction of "fastening mechanisms," but are a very good reason to agree that it is correct.[4]

**2.    "retention mechanism" ('393 Patent, Claim 12)**

This term was construed by the ITC in the 1197 Investigation. *See* ID at 41-57 [Ex. 4]. The ITC agreed with Nintendo that "retention mechanism" is a means-plus-function term.[5] Gamevice does not propose a means-plus-function construction as an alternative to

---

[4] If the Court enters the ITC's affirmed construction of "fastening mechanisms," then the Court should also enter summary judgment of noninfringement with respect to the '713 and '498 patents as described in Nintendo's Motion for Summary Judgment. Dkt. 230 at 3-5.

[5] Gamevice initially appealed from the ITC's determination, but later withdrew its appeal.

1  its proposed construction and does not dispute—thereby conceding—Nintendo's position

2  that, if construed as a means-plus-function term, "retention mechanism" is indefinite for

3  lack of corresponding structure. Gamevice proposes the same construction the ITC rejected.

### 2.1.    "retention mechanism" is not the name of a structure or class of structures known in the art.

6  "Retention mechanism" is recited in Claims 12 and 19 of the '393 patent, and

7  Claims 10 and 11 of the '498 patent. Claim 12 of the '393 patent is asserted here. These

8  claims do not recite "means," and so, "retention mechanism" is presumed not to be subject

9  to § 112(f). That presumption is rebutted because "retention mechanism" "fails to recite

10  sufficiently definite structure or else recites function without reciting sufficient structure for

11  performing that function," *Williamson*, 792 F.3d at 1348 (internal quotation marks omit-

12  ted).

13  "Retention mechanism" is not a term of art; it is not the name of a structure or class

14  of structures known in the art. Stein Decl. ¶¶ 123-26 [Ex. 11]. Instead, "retention mecha-

15  nism" is simply a generic stand-in, no different than if the term were "retention means."

16  *Id.* ¶ 123. Like "fastening mechanism," "retention mechanism" includes the nonce term

17  "mechanism." *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 703–04

18  (Fed. Cir. 2008) (concluding that "retaining mechanisms" was a means-plus-function term);

19  *see also Williamson*, 792 F.3d at 1350; *Media Rights*, 800 F.3d at 1373. Consistent with

20  the finding in *Williamson* that "mechanism" is typically used as a generic stand-in for func-

21  tion, the named inventors used "mechanism" throughout the specification as a generic label

22  for any *thing* that would perform a particular function. For instance, the named inventors

23  discuss a "fastening *mechanism*," '393 patent, 9:54–59, a "retention *mechanism*," *id.* at

24  12:4–11, a "tensioning *mechanism*," *id.* at 12:40–47, and a "sizing *mechanism*," *id.* at

25  13:30–40. Each "mechanism" is distinguished, not by what it *is*, but rather, by what it

26  *does*—fastening, retaining, tensioning, or sizing. This is precisely what the Federal Circuit

27  had in mind when it said that "mechanism" is often tantamount to using "means." *Wil-*

28  *liamson*, 792 F.3d at 1350.

The only supposed "evidence" of the structural use of "retention mechanism" Gamevice offers is, again, a handful of extrinsic patents unearthed—not by a skilled artisan, but rather by Gamevice's lawyers. As was the case with "fastening mechanisms," these extrinsic patents demonstrate the opposite of what Gamevice intended to show, as each shows that "retention mechanism" is used as a generic stand-in to describe any structure that can perform a generic retaining function. *See*, *e.g.*, Ex. 10 at 20 ("a retention mechanism for retaining …"), 27 ("retention mechanism … configured to releasably retain…"). None of the extrinsic patents use "retention mechanism" to describe a particular physical structure, the way, say, "screwdriver" does. "Screwdriver" is the not the name of anything that can drive a screw, but rather, is the name of a particular structure known in the art— for example, a tool with a handle and a flattened, cross, or star-shaped tip. That is why, when a skilled artisan asks for a "screwdriver," she is not handed a hammer even though a hammer can be used to drive a screw. "Retention mechanism," by contrast to terms like "screwdriver," does not connote any specific structure as demonstrated by Gamevice's extrinsic patents, each of which shows a different structure performing a retaining function. This is the very definition of a nonce term that must be construed under § 112(f). *Williamson*, 792 F.3d at 1350.

### 2.2. The claims do not recite structure for the "retention mechanism."

Gamevice says the claims recite sufficient structure for "retention mechanism" to avoid § 112(f). Claim 12 recites the "retention mechanism" as follows: "said structural bridge still further comprising a retention mechanism, the retention mechanism providing at least a boss, an interaction of the spring member of the restraint with the boss of the retention mechanism couples the structural bridge to at least one of the first and the second electronic game control modules." According to Gamevice, the "boss" and the "interaction" of the "retention mechanism" with the "spring member" provide structure for "retention mechanism." GVCC, 12:6–10. But Gamevice is wrong because the boss and interaction with a spring member are merely optional features of a retention mechanism—not structural elements—as shown by the claims themselves.

Claim 12 recites "retention mechanism" as having a boss, but Claim 19 of the '393 patent, recites "retention mechanism" *without* a boss. A boss, therefore, cannot define the structure of a retention mechanism since some have them (Claim 12) and some do not (Claim 19). Similarly, the recited interaction with a spring member is a function—what does the retention mechanism do? It interacts—and is not a description of what the retention mechanism *is*—what does it look like, for instance? But even if the recited interaction was a structure, it cannot define a retention mechanism since the claims optionally recite it. So, while Claim 12 of the '393 patent requires the retention mechanism to "interact" with a "spring member," neither Claim 19 of the '393 patent nor Claim 10 of the '498 patent do. Claim 11 of the '498 patent is different still, reciting a retention mechanism that "cooper-ate[s]" with an "attachment support" instead of "interact[ing]" with a "spring member." So, neither the boss nor the interaction with a spring member can define the structure of a retention mechanism since both are, at best, optional features. *See Media Rights*, 800 F.3d at 1372 (finding that optional features do not provide structure to avoid § 112(f)).

### 2.3. The proper function is the function recited in the claims, and the specification provides no corresponding structure for performing that function.

Gamevice does not dispute, and so concedes, Nintendo's proposed function—"in-teracting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules."[6]

Nor does Gamevice dispute the lack of adequate corresponding structure for per-forming the recited function, rendering the claim indefinite. *Williamson*, 792 F.3d at 1352. Indeed, Gamevice's expert, Dr. Slocum, expresses no opinion at all on this topic. Gamevice does not, because it cannot, dispute this point, as the only retention mechanism described

---

[6] The Federal Circuit requires that the function be *explicitly* recited in the claims. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369–70 (Fed. Cir. 2001) ("[I]n construing a means-plus-function limitation [one must] identify the function explicitly recited in the claim."). The ITC's function of "securing the structural bridge to the control modules" is not explicitly recited in Claim 12, but Nintendo's proposed—and undisputed—function is.

in the specification is located—not in the structural bridge as required by Claim 12 ("… said structural bridge still further comprising a retention mechanism …")—but instead, in the control module, as shown in Figure 27. '393 patent, 12:4–12. Moreover, it is undisputed that even that discussion fails to link the "retention mechanism" to the recited function of interacting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules. Stein Decl. ¶ 135 [Ex. 11]. Thus, if the Court agrees with Nintendo that "retention mechanism" is subject to § 112(f), then the Court should find Claim 12 indefinite. *Williamson*, 792 F.3d at 1352.

3.    **"confinement structures" / "pair of confinement structures" ('713 patent, Claims 1, 16, 17; '498 patent, Claim 1; '393 patent, Claim 1).**

Nintendo proposes that "confinement structures" is a means-plus-function term governed by § 112(f). Gamevice disagrees, but does not propose an alternative means-plus-function construction, and does not dispute Nintendo's proposed function or structure. Instead, Gamevice proposes "components that keep other components in place."

3.1.    **"Confinement structures" is not the name of a structure or class of structures known in the art.**

While the claims reciting "confinement structures" do not use the term "means," the presumption against means-plus-function treatment is overcome because "confinement structures" is not "used in common parlance or by persons of skill in the pertinent art to designate structure, including either a particular structure or a class of structures," *MTD*, 933 F.3d at 1341 (internal quotation marks omitted).

The term "confinement structures" does not have a commonly understood meaning within the art. Stein Decl. ¶¶ 99, 106 [Ex. 11]. In fact, the patent prosecutor of the Asserted Patents (and named inventor of the '393 patent) admits that he had never heard of the term before and that he coined it in the context of the patent. Dooley Depo., 152:24–153:13 [Ex. 12]. Such coined terms are often means-plus-function terms, particularly where they are simply verbal constructs that do not designate sufficiently definite structure. *See, e.g.*, *MTD*, 933 F.3d at 1343–44; *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341,

1348 (Fed. Cir. 2016); *Diebold Nixdorf, Inc. v. ITC,* 899 F.3d 1291, 1302 (Fed. Cir. 2018). Here, the word "structure"—as in "confinement *structures*"—is not the name of a particular structure or class of structures known in the art; it is a generic stand-in for any *thing* performing the recited function, indistinguishable from other recognized nonce terms like "mechanism," "device," and "member."[7]

Gamevice says that because the claims recite connections between the confinement structures and other components, "confinement structures" must be structural. GVCC, 16:17–17:4. But that is incorrect. A connection between a nonstructural component and a structural component does not necessarily elucidate what the nonstructural component is. For instance, a claim that read "a doodad permanently connected to the chassis of the vehicle," does not elucidate the physical composition of the doodad. And the Federal Circuit agrees: Where, as here, "[t]he written description only depicts and describes how what is referred to as the [claim term] is connected to various parts of the system, how the [term] functions, and the potential—though not mandatory—functional components of the [term]," means-plus-function treatment is appropriate. *Media Rights*, 800 F.3d at 1372; *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991) ("[T]he structural description in the joining means clause merely serves to further specify the function of that means. The recited structure tells only what the means-for-joining *does*, not what it is structurally.") (emphasis in original).

Gamevice again relies on its collection of extrinsic patents to demonstrate that "confinement structures" is a term used in the art, but—as with "fastening mechanisms" and "retention mechanism"—these patents demonstrate exactly the opposite. For instance, in one patent, the "confinement structure" is "formed by pumping concrete, sand or gravel

---

[7] In the 1111 Investigation, the ITC construed "retention *member*," which was a term in a claim asserted in the 1111 Investigation but not asserted here, as a means-plus-function term. Gamevice appealed the ITC's construction of that term, and the Federal Circuit affirmed the ITC's construction, thereby affirming that "member" in "retention *member*" was a nonce term subject to construction under § 112(f).

into tubes, bags or the like," Ex. 10 at 28, while in another, the "confinement structure" is "fashioned out of spirally-rolled sheet material." *Id.* at 29. These patents demonstrate that "confinement structure" is not used in the pertinent art to describe a particular structure or class of structures. Instead, Gamevice's extrinsic patents demonstrate why "confinement structures" must be construed under § 112(f).

### 3.2. Element 316 is the corresponding structure.

Gamevice does not dispute that Nintendo's proposed functions are correct if the Court agrees that "confinement structures" should be construed under § 112(f). Nor does Gamevice dispute that element 316 is the proper corresponding structure for "confinement structures." Thus, if the Court agrees that "confinement structures" is a means-plus-function term, then the Court should also enter Nintendo's undisputed functions and corresponding structure.

### 3.3. Gamevice's construction is incorrect.

Gamevice says that "confinement structure" means "components that keep other components in place." That construction is wrong for a number of reasons. First, the construction is purely functional—it fails to describe what the "components" *are*, instead describing only what they *do*—they perform the function of keeping other components in place. Such functional constructions are routinely rejected by the Federal Circuit since they fail to adequately describe the relevant structure. *See, e.g.*, *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008). Second, the construction is so generic that it is indistinguishable from Gamevice's proposed constructions for other terms. For example, compare Gamevice's proposed construction for "confinement structures"—"components that keep other components in place"—with Gamevice's proposed construction for "retention mechanism"—"a machine or mechanical appliance that secures components in a particular relationship." How is a jury to determine if a component keeps another in place, and, therefore, is a "confinement structure" verses whether the same component secures the component in a particular relationship, and, therefore, is a "retention mechanism"? There is no meaningful distinction between these two constructions, as both are

1  effectively structureless. Thus, Gamevice's constructions fail to adequately distinguish be-

2  tween different recited elements of the supposed invention.

### III.    NON-MEANS-PLUS-FUNCTION TERMS

4.  **"computing device" ('713 patent, Claims 1–4, 6–8, 17–19; '498 patent, Claims 1, 2; '393 patent, Claims 1–4, 6–7).**

"Computing device" is used throughout the specification in its plain and ordinary way, it is a common term that a jury will have no trouble understanding, and the meaning and scope of the term is clear to skilled artisans and lay jurors alike. Stein Decl.  ¶ 177 [Ex. 11]. The Federal Circuit does not require that such terms be construed. As the Federal Circuit put it in *Phillips*, when "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent … claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*).[8]

Gamevice's proposed construction has two parts—(1) "plain and ordinary meaning, for example electronic equipment controlled by a CPU," and (2) "not limited to a complete, finished device." Neither portion reflects the plain and ordinary meaning of the term as understood by a skilled artisan in view of the specification. In fact, Gamevice does not point to the specification to support its construction, and, except for a misplaced claim-differentiation argument (addressed below), Gamevice does not cite the Asserted Patents at all as supporting its construction. Instead, Gamevice relies on extrinsic evidence to formulate a litigation-inspired construction that is inconsistent with the purported invention.

---

[8] Nintendo does not believe that construction, beyond the observation that "computing device" has its plain and ordinary meaning, is necessary. Still, if the Court believes that non-limiting examples of what the term means would be helpful to the jury, the Court should use the examples provided by the specification itself—namely, "[t]he computing device 102 may take the form of a tablet computer, smart phone, notebook computer, or other portable computing device." '393 patent, 4:43–45. To be clear—and contrary to Gamevice's repeated representations to the Court—by suggesting the use of these examples, Nintendo is not contending that the claims are limited to them. They are just examples of the plain and ordinary meaning, which may be helpful to the jury.

But even the extrinsic evidence on which Gamevice relies does not support its proposed construction. Take, for instance, the first portion of Gamevice's proposed construction—"plain and ordinary meaning, for example electronic equipment controlled by a CPU." Gamevice derived this portion of its construction from PC Magazine's definition of "computing device." But Gamevice only offers the Court the portions of the definition that Gamevice likes and lops off the rest, giving the false impression that the definition supports its position. PC Magazine's definition of "computing device" reads in full:

> Any electronic equipment controlled by a CPU, including desktop and laptop computers, smartphones and tablets. It usually refers to a general-purpose device that can accept software for many purposes in contrast with a dedicated unit of equipment such as a network switch or router.

Dkt. 229-2.

The full PC Magazine definition—as opposed to the redlined version Gamevice offers—does not support Gamevice's proposed construction. Instead, the full PC Magazine definition is consistent with Nintendo's position that the term has a simple and clear plain and ordinary meaning that would be readily understandable to the jury.

The second portion of Gamevice's proposed construction—"not limited to a complete, finished device"—finds even less support. Gamevice first points to a Raspberry Pi as "indisputably [a] computing device." GVCC, 10:3. But it is not clear why this supports Gamevice's proposed construction, particularly in view of the fact that the specification does not describe anything like a Raspberry Pi. Instead, the only computing devices described in the specification are conventional smartphones and tablets, as shown in every single figure. Moreover, a Raspberry Pi is not an example of a non-complete, non-finished device. Instead, as even Gamevice's expert concedes, a Raspberry Pi is a complete, finished device; it is sold as a complete unit and functions as it is intended to function. Slocum Depo., 268:19–269:5 [Ex. 9]. Nor does Raspberry Pi refer to its product as a "computing device," using various terms instead, including "personal computer kit," Dkt. 229-7 at 1, "microcontroller board," *id.* at 2, "computers and microcontrollers," *id* at 3, and "complete personal computer," *id.* at 4.

Gamevice next points to the Common Platform Enumeration: Naming Specification Version 2.3 as supposedly supporting its construction. GVCC, 9:16–19. Gamevice tells the Court that this "dictionary," *id.* at 9:19, supports its construction. But that is false, as this document is neither a dictionary nor supportive of Gamevice's position. The document is a naming specification that "defines the logical structure of names for IT product classes and the procedures for binding and unbinding these names to and from machine-readable encodings." Dkt. 229-1 at iii. Gamevice does not—again because it cannot—explain why this document, whatever it purports to be, would be something within the knowledge of a skilled artisan or how it informs the understanding of a skilled artisan in view of the specification. Indeed, it clearly has no connection to the understanding of a skilled artisan, as even Gamevice's expert, Dr. Slocum, had never seen the document before receiving it from Gamevice's lawyers. Slocum Depo., 329:6–330:12 [Ex. 9]. Instead of being related to the technology at issue here, this document appears to simply be a document that Gamevice's lawyers happened upon while googling the phase "computing device."

Aside from the fact that Gamevice's cited extrinsic evidence fails to support its construction, it is not clear what "not limited to a complete, finished device" is even supposed to mean. Gamevice has not explained it. About the only thing Gamevice says for certain is that "not limited to a complete, finished device" is supposed to bring screenless, backless devices within the meaning of "computing device." GVCC, 10:6–11:13. Yet, nothing in the specification suggests that the inventors had backless, screenless devices in mind or in their possession. The Summary of the Invention says, "the computing device providing a plurality of sides, each of the plurality of sides are disposed between an *electronic display screen* of the computing device and *a back* of the computing device." '393 patent, 1:32–36 (emphasis added); *see also id.* at Abstract ("The computing device providing a plurality of sides, each of the plurality of sides are disposed between *an electronic display screen* and *a back* of the computing device.") (emphasis added). Every embodiment shown in the specification, shows a computing device with a screen and a back. *See id.* at Fig 1 (screen), Fig 2 (back), Fig. 8 (screen), Fig. 9 (back), Fig. 10 (screen), Figs. 12–13 (screen), Figs. 14–16, 25, 29

(back), Figs. 30, 32, 33, 34 (screen), Figs. 36, 39–40 (screen), Figs. 41–42 (back). Further-more, Gamevice's own expert, Dr. Slocum, admits that nothing in the specification de-scribes how the controller of the invention could even work with a backless, screenless device. Slocum Depo., 344:13–345:5 [Ex. 9] ("Q. … So in other words, [the specification] doesn't tell you how a backless or screenless computing device could work with the game controller by itself? A. Correct…."). In fact, Dr. Slocum went further, confirming that a backless, screenless device could not be combined with the controller of the invention, ex-cept by adding a back and a screen. *Id.* at 345:6–346:5.[9]

Gamevice dresses its "not limited to a complete, finished device" in the argot of claim construction, and threatens the Court with *O2 Micro* should the Court decline Gamevice's construction. GVCC, 9:1–11. But this is wrong for two reasons. First, Gamevice's "not limited to a complete, finished device" proposal has little to do with claim construction and more to do with Gamevice's position on infringement. But a dispute over whether a particular collection of parts is or is not a "computing device" is a question of fact, not a question of claim construction, which is what the ITC found in ruling against Gamevice on this point. ID at 115 [Ex. 4] ("[T]he issue is whether the identified parts meet the definition of 'electronic equipment controlled by a CPU' to be considered a 'computing device.'") (citations omitted) (cleaned up). Second, it is not a violation of *O2 Micro* for the Court to decline to elaborate on claim terms that have plain meanings requiring no con-struction. *See, e.g., Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (no *O2 Micro* error in declining to construe a term, which was "comprised of com-monly used terms; each is used in common parlance and has no special meaning in the art").

Finally, in its only nod to the Asserted Patents, Gamevice points to dependent Claims 3 and 6 of the '393 patent as supposedly requiring "computing device" in Claim 1 to be a

---

[9] If the Court enters Gamevice's proposed construction as the construction of the Court notwithstanding the lack of written description support for that construction, then the Court should also enter summary judgment as described in Nintendo's Motion for Sum-mary Judgment. Dkt. 230 at 9-21.

backless and screenless device under claim differentiation. GVCC, 10:11–21. Gamevice's claim-differentiation argument is wrong as a matter of law. Both claims 3 and 6 include other limitations that distinguish them from the independent claim, thus properly leaving them with "different scopes." *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1125–26 (Fed. Cir. 2014). Claim 3, for instance, recites a specific configuration for the back—"cooperat[ing] with the at least two opposing sides of the computing device"—that Claim 1 does not recite. Indeed, both experts agree that Claim 3 does not recite just a back, but rather, a particular type of back. Stein Decl. ¶¶ 195-96 [Ex. 11]; Slocum Depo., 356:4–12 [Ex. 9]. Similarly, Claim 6 includes numerous other limitations that distinguish it from Claim 1, not the presence or absence of a screen. Stein Decl. ¶ 197 [Ex. 11].

5. **"structural bridge" ('713 patent, Claims 1, 2, 4, 8, 16, 18, 19; '498 patent, Claims 1, 2; '393 patent, Claims 1, 2, 4, 7, 12).**

The main distinction between Nintendo and Gamevice's proposed constructions is that Nintendo's is consistent with the specification, which shows the structural bridge as the central component of the game controller joining the two sides together. Gamevice's construction, by contrast, has no specification support and describes a generic connective component.

"Structural bridge" is a coined term with no plain and ordinary meaning. Stein Decl. ¶¶ 211, 213-14 [Ex. 11]; Dooley Depo., 78:2–22 [Ex. 12] (testimony of the patent prosecutor and named inventor: "Q. … [W]ho came up with the phrase 'structural bridge'? A. I did."). The Federal Circuit instructs that terms like "structural bridge," "coined by the inventor[,] are best understood by reference to the specification." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013). As the specification shows, the Asserted Patents use "structural bridge" to refer to a specific component of the game controller—the middle portion that connects the two sides of the game controller as described in Nintendo's construction. The Asserted Patents' history bears this out.

The Asserted Patents are continuations-in-part to an original patent, U.S. Patent No. 9,005,026 (the "'026 patent"). The '026 patent included the U-shaped embodiment (Figs.

1 5) as its only embodiment. That embodiment discussed a U-shaped controller with a

2 "*bridge structure* disposed between the pair of sides to form a three-sided structure." '026

3 patent, 2:10–13 [Ex. 13] (emphasis added). The '026 patent also recited "bridge structure"

4 in its claims. *Id.* at Claim 1. U.S. Patent No. 8,529,357 (the "'357 patent"), which was a

5 continuation-in-part of the '026 patent, first introduced the term "structural bridge" to the

6 common specification to describe a specific component of the embodiment shown in Figs.

7 14–15. Specifically, the '357 patent coined "structural bridge" as the name for the part of

8 the game controller that connects the two sides of the device together. As the Summary of

9 the Invention puts it, "[t]he computer game controller provides control modules adjacent

10 to and confining the tablet computer on at least two opposing sides of the tablet computer,

11 and a *structural bridge* joining the pair of control modules." '357 patent, 1:21–25 [Ex. 14]

12 (emphasis added). If "structural bridge" was just any connective component—as Gamevice

13 contends—the inventors would not have coined a new term for it. Instead, they would have

14 used a term they already had—"bridge structure." But they did not. Moreover, following

15 the '357 patent, all of the other continuations-in-part in the family that added embodiments

16 used the term "structural bridge" to describe the middle portion of the game controller;

17 none used the term "bridge structure"; none used "structural bridge" to refer to any other

18 type of connective component that was not part of the game controller.

19    The inventors' intentional use of "structural bridge" to describe a particular compo-

20 nent can even be seen in the title of each Asserted Patent: *Game Controller with Structural*

21 *Bridge.* '393 patent (54); '713 patent (54); '498 patent (54). And it can also be seen in each

22 embodiment in the specification of the Asserted Patents, all of which describe the structural

23 bridge as the central part of the game controller connecting its two sides. For example, the

24 embodiment of Fig. 14 shows a game controller comprising control modules connected by

25 a structural bridge in between. *Id.* at 8:31–36. Similarly, the embodiment of Figs. 16–25

26 shows a game controller made up of modules attached to confinement structures that are

27 secured "one to the other" by a structural bridge. *Id.* at 9:54–63. And the embodiment of

28 Figs. 26–44 shows a game controller made up of modules connected "one to the other" by

a central structural bridge. *Id.* at 11:42–44. In each case, the structural bridge is shown—not as a generic connective component—but rather, as the central component of the game controller connecting the two sides of the controller (whether confinement structures or control modules).[10] Similarly, every single figure in which a structural bridge is shown, shows the structural bridge as part of the game controller connecting its two sides. *See id.* at Fig. 14 (element 258), Fig. 17 (element 322), Figs. 26, 29, 31, 41, 42 (element 422), Figs. 35, 37, 43 (element 522).

Gamevice's construction fails to reflect the invention and is so generic that it would potentially cover components that are clearly not "structural bridges" as described in the specification. For instance, every spring, boss, or screw shown in Figs. 27–28 are "physical apparatus[es] that connect[] other components," as required by Gamevice's construction. Similarly, all of the retention-member components shown in Fig. 14 are "physical apparatus[es] that connect[] other components." *Id.* at 8:40–43. And so too is the "bridge structure" shown in Fig. 1. Yet, the inventors did not use "structural bridge" to describe any of these components. Instead, the inventors reserved "structural bridge" as the name for the central portion of the game controller that connects its two sides. Given that "structural bridge" is a coined term with no plain and ordinary meaning and is "best understood by reference to the specification," *3M Innovative Props.*, 725 F.3d at 1321, the Court should reject Gamevice's construction[11] and enter Nintendo's.

---

[10] The specification in places uses "input device" equivalently with the term "game controller." Nintendo suggests "game controller" in its proposed construction to avoid jury confusion—the Asserted Patents are titled *Game Controller with Structural Bridge*, and the specification sometimes uses "input device" to refer to other components on the game controller such as the joysticks and buttons. *E.g.,* '393 patent, 9:45-46. Nintendo has no objection, if the Court believes it would be appropriate, to use "game controller or input device" in place of "game controller" in Nintendo's proposed construction.

[11] As described in Nintendo's Motion for Summary Judgement, Gamevice's proposed construction is entirely unsupported by the specification of the supposed priority patents. As a result, if the Court enters Gamevice's generic construction, then the asserted claims will lack written-description support in the supposed priority patents, and the Court should

1    **6.    "communication link"** ('713 patent, Claims 1, 6–7, 16; '498 patent, Claim 1; '393
2        patent, Claims 1, 6).

3        Nintendo proposes that the term "communication link" be given its plain and ordi-
4    nary meaning in view of the specification. The specification makes it clear that the plain
5    and ordinary meaning for "communication link" as used by the patentees is "a component
6    for the reception and transmission of data between the control modules."

7        The invention described throughout the specification supports Nintendo's construc-
8    tion. The supposed invention is a game controller that can be attached to a smartphone or
9    tablet for gameplay and then be removed from it. The specification shows two modules—
10   one for either side of the device tethered together by a structural bridge. *See*, *e.g.*, '393
11   patent, Figs. 30–31. The modules need to send signals from the module on one side of the
12   game controller to the module on the other side, so that the received signals can be sent to
13   the smartphone or tablet. *See*, *e.g.*, *id.* at 10:21–29 (describing interface feature 338).

14       The communication link in this invention is, thus, a link between the two modules.
15   For instance, referring to Fig. 14, the specification says that "in a preferred embodiment,
16   the structural bridge 258 provides a communication link 270, which pass[es] signals be-
17   tween the pair of control modules." *Id.* at 8:46–49. The specification also refers to a wire-
18   less communication link that passes signals between the two modules: "[I]n a preferred
19   embodiment, the communication link 270, provides a communication module 272, and in
20   the alternative, provides a signal pathway 274, for use in passing signals between the pair
21   of control modules 252." *Id.* at 8:50–54. The same thing is shown for the embodiment in
22   Fig. 16. As shown there, communication link 314 is a wire running between the two control
23   modules. In the embodiment of Fig. 35, the specification again expressly says that the com-
24   munication link passes signals between the two modules: "In a preferred embodiment, as
25   shown in Fig. 35, a communication link 519, is provided by the input device 500, which

26

27   _____

28   also enter summary judgment that the asserted claims are anticipated by the accused de-
     vices. *See* Dkt. 230 at 9-13, 21-25.

facilitat[es] communication between the pair of control modules (502, 504) and the computing device 506…." *Id.* at 15:19–24.

Conversely, the specification uses different terminology when discussing components that send and receive information not necessarily between the two modules. For instance, in the embodiment of Fig. 16, the specification describes "signal input lands" that are used to receive signals from the individual modules, but which do not pass signals between the modules. *Id.* at 10:30–34. Similarly, the specification uses "computing device interface feature" to refer to the connection between the game controller and the smartphone or tablet. *Id.* at 10:25–29. The specification never describes either the "signal input lands" or "computing device interface feature" as "communication links," even though both are "component[s] for reception and transmission of data," as in Gamevice's proposed construction. As a consequence, the specification makes it clear that when it uses the term "communication link," it is referring to a component that "facilitates" communications between the two modules, and not as a general reference to any component that enables communication.

Gamevice says that Claim 1 of the '713 patent precludes Nintendo's construction because that claim requires communications with the computing device. GVCC, 19:13–17. But Gamevice is wrong since all Nintendo's construction requires is that the communication link provides communication between the modules. That does not preclude the case where there is *also* communication with the computing device, as in Claim 1.

7.    **"promotes," "communication," "electrical communication" / "electronic communication" ('713 patent, Claim 1, 16; '498 patent, Claim 1; '393 patent, Claim 1).**

"Promotes" needs no construction. "Promotes" is used in its plain and ordinary way; it is a common English word that the jury will readily understand. Gamevice's approach to "promote" attempts to write it out of the claims. So, Gamevice says that "simply providing a space in the structural bridge for a communication link is sufficient to 'promote' communication." GVCC, 21:27–22:1. But Gamevice also says that "passageway" means "a space that accommodates a communication wire." Reading these two constructions

together means that, according to Gamevice, every "passageway" necessarily "promotes" communication since every passageway, by definition, "provides a space" for a communication wire. That is incorrect because it conflates two different claim terms. The way to give "promotes" its proper scope is simply to allow it to have its plain and ordinary meaning in view of the specification, which the jury can readily understand and apply.

The plain and ordinary meaning of "communication"—which is how "communication" is indisputably used throughout the specification—is "the flow of information from the sender to the receiver." Stein Decl. ¶¶ 257-58 [Ex. 11], *see also* IEEE Dictionary [Ex. 15] (defining "communication" as "[t]he flow of information from one point, known as the source, to another, the receiver"). Gamevice disagrees with Nintendo's construction, claiming that "sender" and "receiver" are "unnecessary detail." GVCC, 22:21-26. But that is incorrect. A skilled artisan can easily determine what component is a sender and what is receiver. And Nintendo's construction resolves potential ambiguity in Gamevice's construction by capturing the directional flow of information. Stein Decl. ¶ 266 [Ex. 11].

The claims recognize a difference between "electrical communication," on the one hand, and "electronic communication" one the other. For instance, Claim 1 of the '393 patent recites that "each of the communication links [are] configured for *electronic* communication with the computing device" while "the passageway promotes *electrical* communication between the communication link of a first confinement structure of the pair of confinement structures…." Thus, "electronic communication" is necessarily different from "electrical communication."

Yet, Gamevice's constructions fail to reflect any difference between the terms. Gamevice says that "electrical communication" is the "flow of information between two components represented by the use of electricity" whereas "electronic communication" is the "flow of information between two components represented by the use of electrons." But electricity just is the flow of electrons. Stein Decl. ¶ 267 [Ex. 11]. As a result, there is no meaningful distinction between Gamevice's constructions of "electrical communication" and "electronic communication"—they are both the flow of electrons. *Id.*

Nintendo's construction, by contrast, properly reflects the difference between the terms as used in the specification and understood in the art. A skilled artisan understands that the key difference between "electrical communication" and "electronic communication" is that for "electronic communication," the sending and receiving devices can "understand" and "act" on information sent and received, whereas for mere "electrical communication" that is not necessarily so. *Id.* ¶ 260 (discussing the difference between RJ45 plug—"electrical communication"—and a modem—"electronic communication"). The way sending and receiving devices "understand" and "act" on electronic communication is by way of semiconductors.[12] *Id.* ¶ 261. A skilled artisan can distinguish components in *electrical* communication from those in *electronic* communication. *Id.* ¶ 260.

The Authoritative Dictionary of IEEE[13] Standards Terms recognizes these differences. Thus, the dictionary defines "electrical" as "related to, pertaining to, or associated with electricity, but not having its properties or characteristics." Ex. 15. It defines "electronic" as "of, or pertaining to, devices, circuits, or systems utilizing electron devices," and defines an "electron device" as a "device in which conduction is principally by electrons moving through a vacuum, gas, or semiconductor." *Id.* This difference—that electronic devices have semiconductors that can understand and act whereas electrical devices do not necessarily have them—is so well understood that even lay dictionaries reflect this difference. For instance, the American Heritage Dictionary defines "electrical" as "of, pertaining to, or operated by electricity," Ex. 16, and "electronic" as "of, pertaining to, based on,

---

[12] As reflected in the IEEE Dictionary, electronic communication is possible through semiconductors as well as through vacuum or gas. Ex. 15. Nintendo's construction does not include vacuum or gas transmission because it is irrelevant to this case, as no one suggests that components in the accused devices are in electronic communication because they are transmitting through vacuums or gases. Stein Decl. ¶ 260 [Ex. 11]. But, if the Court believes that referencing these additional, albeit irrelevant, transmission media is appropriate, Nintendo has no objection to adding "vacuum or gas" to its proposed construction.

[13] The IEEE is the world's largest technical and professional organization for engineers. IEEE propagates standards in various technical fields. Both parties' experts have contributed articles to various IEEE publications.

1  operated by, or otherwise involving the controlled conduction of electrons or other charge

2  carriers, esp. in a vacuum, gas, or semiconducting material," *id.*; *see also*, ID at 151–52

3  [Ex. 4] (agreeing with this distinction between electrical and electronic).

4      Gamevice says that the concepts of a "sender," "receiver," and "semiconductor,"

5  "seems unnecessary, as long as it is established that the communication is in the form of

6  electrons." GVCC, 24:25–26. But this is nonsense. All forms of electricity involve electrons,

7  but the claims distinguish between "electronic communication" and "electrical communi-

8  cation." Thus, it is not enough for there be electrons. Instead, the claims make it plain that

9  there must be (1) communication—requiring a sender and a receiver—and (2) electronics—

10  requiring a semiconductor. Both requirements are represented in Nintendo's proposed con-

11  struction, but neither are in Gamevice's.

12  **8.    passageway ('713 patent, Claims 1, 16; '498 patent, Claim 1; '393 patent, Claim 1).**

13      Gamevice says that any space that accommodates a communication wire is a pas-

14  sageway. But all communication wires necessarily exist in space that accommodates them.

15  Where else could a communication wire be, except in space that accommodates it? Put

16  differently, Gamevice seeks to write "passageway" out of the claim by defining it coexten-

17  sively with "communication wire"—where one is, the other must be. This is incorrect.

18      Nintendo's construction adds "defined," because that gives "passageway" meaning

19  consistent with the specification. The specification never uses the term "passageway," but

20  one potential example of a passageway described in the specification is conduit 328. '393

21  patent, 9:67–10:8, Fig. 17. The ITC also found that signal pathway 274, which is shown in

22  Fig. 15, was an example of a "passageway." ID at 102 [Ex. 4]. In both cases—a conduit

23  and the signal pathway—wires run through defined spaces intended for the wires. If a "pas-

24  sageway" is not a defined space—that is, a space specifically designed for a communication

25  wire to run through—then "passageway" has no meaning, and since the only examples of

26  potential "passageways" in the specification are defined spaces, Nintendo's construction is

27  consistent with the specification and gives "passageway" meaning and scope, which is miss-

28  ing from Gamevice's proposed construction.

Dated: September 21, 2022

PERKINS COIE, LLP

By: /s/ *Grant E. Kinsel*

Grant E. Kinsel, Bar No. 172407
GKinsel@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067
Telephone: 310.788.9900
Facsimile: 310.788.3399

Ryan B. Hawkins, Bar No. 256146
RHawkins@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real
Suite 300
San Diego, CA 92130
Telephone: 858.720.5700
Facsimile: 858.720.5799

R. Tyler Kendrick, *pro hac vice*
RKendrick@perkinscoie.com
PERKINS COIE LLP
1201 Third Ave.
Suite 4900
Seattle, WA 98101
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for NINTENDO OF
AMERICA INC., and NINTENDO
CO., LTD.

1

## CERTIFICATE OF SERVICE

2

   I hereby certify that on September 21, 2022, I electronically filed the

3

foregoing document with the Clerk of the Court using the CM/ECF system,

4

which will send notification of such filing to all counsel of record for the

5

parties.

6

7

   */s/ Grant E. Kinsel*
   Grant E. Kinsel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28