UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMEVICE, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>NINTENDO CO., LTD., et al.,<br><br>    Defendants. | Case No. 18-cv-01942-RS<br><br>**ORDER CONSTRUING CLAIMS AND REQUESTING SUPPLEMENTAL BRIEFING RE: MOTION FOR SUMMARY JUDGMENT** |

**I. INTRODUCTION**

Plaintiff Gamevice, Inc. ("Gamevice"), filed this patent infringement suit against Nintendo Co., Ltd., and Nintendo of America, Inc. (collectively "Nintendo"). In the operative First Amended Complaint ("FAC"), Gamevice avers Nintendo has infringed three of its patents by importing and selling the Nintendo Switch, a handheld gaming console. Pursuant to the Local Patent Rules, the parties have presented the claim terms they contend should be construed by the Court under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc). Nintendo also brings a motion for summary judgment, which turns on the claim constructions.

This order sets out the constructions that will be adopted and the reasons therefor. Further, for the reasons discussed below, judgment is reserved on Defendant's motion for summary judgment, and the parties are requested to provide supplemental briefing.

///

## II. BACKGROUND

Founded in 2008, Gamevice describes itself as "a leading designer, developer and manufacturer of attachable handheld controllers for use with mobile devices such as mobile phones and tablets, including various generations of the Apple iPhone and Apple iPad." Dkt. 213 ("FAC") ¶ 16. Nintendo manufactures, imports, and sells the Nintendo Switch, a portable gaming console with detachable controllers. As described in the FAC, Gamevice asserts that Nintendo has infringed three of its patents — United States Patent Nos. 9,855,498 ("the '498 patent"), 9,808,713 ('the '713 patent"), and 10,391,393 ("the '393 patent") (collectively, the "Asserted Patents") — all of which have the same title: "Game Controller with Structural Bridge." *See* Dkt. 213-1 ("'498 Patent"); Dkt. 213-2 ("'713 Patent"); Dkt. 213-3 ("'393 Patent").[1] The immediate suit was preceded by two investigations before the U.S. International Trade Commission ("ITC"), each of issued claim construction orders: the "1111 investigation" order was issued in 2018, *see* Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof (*1111 Investigation*), Inv. No. 337-TA-1111 (USITC Dec. 7, 2018); and the "1197 investigation" order was issued in 2021, *see* Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof II (*1197 Investigation*), Inv. No. 337-TA-1197 (USITC July 2, 2021).[2]

## III. CLAIM CONSTRUCTION

### A. Legal Standard

Claim construction is a question of law to be determined by the court. *See Markman*, 52 F.3d at 979. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to

---

[1] Specifically, Gamevice avers infringement of claims 1–2 of the '498 patent; claims 1–4, 6–8, and 16–19 of the '793 patent; and claims 1–4, 6, 7, and 12 of the '393 patent. *See* Dkt. 230-3.

[2] The parties have submitted excerpts of slip opinions from both *Markman* orders. *See* Dkt. 232-4 (1111 investigation *Markman* order in full); Dkt. 231-5 (excerpts of initial determination in 1197 investigation order, including claim construction); Dkt. 232-6 (different excerpts of the same).

envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should be construed in a manner "most naturally align[ed] with the patent's description of the invention." *Id.*

The first step in claim construction is to look to the language of the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13. "[T]he context in which a term is used in the asserted claim can be highly instructive" in determining the claim's ordinary and customary meaning. *See id.* at 1314. The use of a term in other claims may also provide guidance regarding its proper construction. *See id.*

A claim term should also be construed in a manner consistent with the patent's specification. *See Markman*, 52 F.3d at 979. Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). In limited circumstances, the specification may be used to narrow the meaning of a claim term that otherwise would appear to be susceptible to a broader reading. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Precedent forbids, however, term construction imposing limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims."); *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir.

1985) ("It is the *claims* that measure the invention."). A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the U.S. Patent and Trademark Office regarding the scope of the invention. *See Markman*, 52 F.3d at 980.

Courts may also consider extrinsic evidence, such as expert testimony, dictionaries, or technical treatises, especially if such sources are "helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980). This is especially true where "claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Ultimately, while extrinsic evidence may aid the claim construction analysis, it cannot be used to contradict the plain and ordinary meaning of a claim term as defined within the intrinsic record. *See id.* at 1322–23.

Under 35 U.S.C. § 112(f), certain claim terms are subject to "means-plus-function" treatment, which limits the construction of the term. The absence of the word "means" to describe a claim limitation creates a rebuttable presumption that § 112(f) does not apply. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). The party seeking application of § 112(f) bears the burden of showing the claim term "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* The essential inquiry is whether a person of ordinary skill in the art would have understood the terms of the claim to have a sufficiently definite structural (as opposed to functional) meaning. *See id.* The disputed term need not be limited to a single structure "as long as the class of structures is identifiable by a person of ordinary skill in the art." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed. Cir. 2004). This analysis is conducted using traditional claim construction principles. *Zeroclick*, 891 F.3d at 1007. Once it is determined that § 112(f) applies, the claim term is limited "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015).

///

**B. Discussion**

The parties present ten disputed terms for construction, which are each used in at least one of the Asserted Patents and which are discussed below.[3]

    1. *"computing device"*

The term "computing device" appears in claim 1 of each of the Asserted Patents and in claim 17 of the '713 patent. Gamevice argues the term should be given its plain and ordinary meaning, "for example electronic equipment controlled by a CPU," and that further, "[t]o avoid confusion," the construction should specify the term is "not limited to a complete, finished device." Dkt. 228 ("Gamevice CC Brief"), at 8. Nintendo, meanwhile, contends the term should just be given its plain and ordinary meaning, full stop, since it is "a common term that a jury will have no trouble understanding." Dkt. 231 ("Nintendo CC Brief"), at 14.

While both parties agree that the term should be given its plain and ordinary meaning, their briefs belie a deeper dispute about what exactly this entails. Gamevice, through its multipart proffered construction, suggests a person of ordinary skill in the art would understand "computing device" to refer to "a broad array of devices with the ability to perform computing functions." Gamevice CC Brief, at 9. This construction seeks to preempt Nintendo from offering a "much narrower" plain and ordinary meaning. Dkt. 232 ("CC Reply Brief"), at 7–8. While Nintendo does not expressly offer such a narrow term, its expert, Dr. Jeffrey L. Stein, suggests the plain and ordinary meaning of "computing device" as used in the specifications should be understood as "namely a smartphone, tablet computer, notebook computer, or other portable computing device." Dkt. 231-12 ("Stein Decl.") ¶ 184. There does, then, appear to be a dispute as to the scope of the claims, even if posed indirectly, such that simply granting "computing device" its plain and ordinary meaning would be insufficient. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d

---

[3] The parties have also stipulated to the construction of two terms: (1) "adjacent," meaning "nearby but not necessarily next to," and (2) "contact adjacency," meaning "next to and touching."

1361, 1367 (Fed. Cir. 2004) (purpose of claim construction is "to assign a fixed, unambiguous, legally operative meaning to the claim"). The term will therefore be construed "to determine what claim scope is appropriate in the context of the patents-in-suit" and to prevent this question from being left to the jury. *O2 Micro*, 521 F.3d at 1361; *see id.* at 1362.

To this end, the first portion of Gamevice's proffered definition — "electronic equipment controlled by a CPU" — is the appropriate construction. The claims at issue, as well as the claim language in general, support each aspect of this construction: (1) claim 2 of each patent states that the computing device is associated with electronics, *see, e.g.*, '393 Patent, at 18:22–24; (2) claim 1 of each patent teaches that the computing device has sides, thus indicating it is tangible "equipment," *see, e.g.*, '498 Patent, at 17:50–55; and (3) figure 6 of each patent shows that the computing device includes "at least a CPU" and that it can control "attendant electronics," *see, e.g.*, '713 Patent fig.6. The ITC reached the same conclusion relying on very similar references. *See 1111 Investigation*, slip op. at 19–22. Nintendo's argument that Gamevice has selectively quoted from *PC Magazine* is unavailing because the full definition neither undercuts Gamevice's position nor exclusively supports Nintendo's unstated (but evident) position as to the plain and ordinary meaning of the term.[4] Further, the second portion of Gamevice's proffered definition — "not limited to a complete, finished device" — is both unwieldy for the reasons Nintendo suggests (namely, by introducing ambiguity as to what constitutes a "complete, finished device") and, moreover, unnecessary since additional features are often provided by the claim language. *See, e.g.*, '498 Patent, at 17:48–49 ("a computing device, comprising an electronic display screen"); '713 Patent, at 18:31–32 (claiming a computing device "further comprising a back"). Therefore, "computing device" is hereby construed as "electronic equipment controlled by a CPU."

///

---

[4] The full definition from *PC Magazine* is "[a]ny electronic equipment controlled by a CPU, including desktop and laptop computers, smartphones and tablets. It usually refers to a general-purpose device that can accept software for many purposes in contrast with a dedicated unit of equipment such as a network switch or router." Dkt. 229-2.

2. *"retention mechanism"*

"Retention mechanism" appears in claim 12 of the '393 patent. Gamevice argues the term should be construed as "a machine or mechanical appliance that secures components in a particular relationship." Nintendo, on the other hand, argues it is a means-plus-function term under 35 U.S.C. § 112(f), where its relevant function is "interacting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules," and its structure is indefinite.

The first, critical step is to determine whether § 112(f) applies. Because the term does not use the word "means," Nintendo bears the burden of rebutting the presumption against applying means-plus-function treatment. In support of this, Nintendo argues that, at least as used here, "mechanism" is a nonce term, and that "retention mechanism" does not refer to a recognized class of structures. Gamevice disagrees, proffering examples of "retention mechanism" being used in several other patents along with a declaration from its expert, Dr. Alexander Slocum, stating that a person of ordinary skill in the art would recognize the term. *See* Dkt. 229-3 ("Slocum Decl."), at 24–30.

Nintendo has satisfied its burden. As Nintendo notes, the Federal Circuit has recognized that "mechanism" is often (but not always) used as a generic, nonce term "in a manner that is tantamount to using the word 'means.'" *Williamson*, 792 F.3d at 1350. That is true here: the claim describes the term using largely functional language "without reciting sufficient structure for performing [its] function." *Id.* at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). For instance, though claim 12 describes the retention mechanism as "providing at least a boss," the claim goes on to recite only its function: it "couples the structural bridge to at least one of the first and second electronic game modules." '393 Patent, at 19:42–47. Gamevice's extrinsic evidence is unpersuasive, and its own construction would seem to encompass such a broad array of structures that a person of ordinary skill in the art could not readily identify what the term is

intended to refer to.[5] Finally, the fact that the ITC in the 1197 investigation concluded that "retention mechanism" is subject to means-plus-function treatment is persuasive here. *See 1197 Investigation*, slip op. at 51–54.

      Section 112(f) therefore applies, and the next step is to identify the relevant function. As noted above, Nintendo argues the function is "interacting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules." This stands in contrast to the function identified by the ITC in the 1197 investigation, and which Gamevice agreed to adopt in the alternative at oral argument: "securing the structural bridge to the control modules." *Id.* at 51; *see* Dkt. 240, at 24:10–25:3 (Brittingham). Nintendo argues the ITC erred by adopting a functional definition that was "not explicitly recited in [c]laim 12." Nintendo CC Brief, at 10 n.6. As a matter of law, Nintendo is correct: the Federal Circuit has, on several occasions, stated that § 112(f) "does not permit limitation of a means-plus-function claim by adopting a function different from that *explicitly recited* in the claim." *In re Teles AG Informationstechnologien*, 747 F.3d 1357, 1367–68 (Fed. Cir. 2014) (emphasis added) (quoting *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)). Nintendo's functional definition, which is expressly recited in claim 12, will therefore be adopted.

      The final step, then, is to identify the relevant structure. Nintendo asserts there is no corresponding structure that can perform the recited function, and therefore that the claim is indefinite as a matter of law. The only alternative structural definition that would seem to be available (though, again, this was embraced by Gamevice only at oral argument), would be the one the ITC adopted: "the mechanical arrangement, as shown in Figure 14, using a confinement boss 262 having a fastening detent 264 that interacts with a retention member 266 that is responsive to a catch 268 to secure the structural bridge 258 to the pair of control modules 252." *1197*

---

[5] Indeed, "securing components in a particular relationship" is not meaningfully different from Gamevice's proffered construction for "confinement structures," *see infra* section III.B.4, nor of Dr. Slocum's description of "fastening mechanisms," that is, "mechanical systems used to non-destructively mechanically hold together at least two items," *see* Slocum Decl. ¶ 52.

*Investigation*, slip op. at 51. Having closely reviewed the patent specification, there are no corresponding structures that fully embrace the function recited by the claim. Figures 14 and 27 both perform aspects of the function adopted here, but both are inconsistent with this function in crucial respects, as detailed by Nintendo. *See* Nintendo CC Brief, at 10–11. As there is thus no corresponding structure, claim 12 is indefinite.

### 3. *"fastening mechanisms"*

The term "fastening mechanisms" appears in claims 1 and 16 of the '713 patent and claim 1 of the '498 patent. Gamevice argues the term should be construed under its plain and ordinary meaning, namely, "a fastener or fasteners." Nintendo argues this term is also subject to means-plus-function treatment under § 112(f). It further notes that the ITC reached this conclusion in the 1111 investigation, and the Federal Circuit affirmed; thus, Nintendo argues, that path should be followed here as well.

Because the claim term does not use the word "means," Nintendo has the burden of rebutting the presumption against applying means-plus-function treatment. It has not done so. Unlike with "retention mechanism," Gamevice here has provided compelling evidence supporting its position that (1) "fastening mechanisms" and "fasteners" are synonymous, and (2) "fasteners" describes "a class of structures . . . namely mechanical systems used to non-destructively mechanically hold together at least two items." Slocum Decl. ¶ 52. This includes caselaw along with a number of other patents that equate the two terms. *See* Gamevice CC Brief, at 14–15 (citing, e.g., *Blackbird Tech LLC v. ELB Elecs.*, No. 15-cv-56 (RGA), 2016 WL 7451622, at *5 (D. Del. Dec. 28, 2016), *rev'd on other grounds*, 895 F.3d 1374 (Fed. Cir. 2018)). While this evidence is extrinsic to the patents themselves, this is to be expected. *See Phillips*, 415 F.3d at 1314 ("Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent . . . the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" (quoting *Innova/Pure Water*, 381 F.3d at 1116)). Neither the claim language nor the specifications describe "fastening mechanisms" as having a function broader, narrower, or otherwise different

than fasteners. Finally, although the claims use the word "mechanism" and speaks in terms of its function — that is, the fastening mechanisms "secure" the confinement structures to the structural bridge, *e.g.*, '713 Patent, at 18:4–8 — this does not *ipso facto* subject the term to means-plus-function treatment. *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341–42 (Fed. Cir. 2019).

Nintendo relies heavily on the argument that its construction should be adopted because the Federal Circuit summarily affirmed the ITC's ruling in the 1111 investigation, which had concluded the term was subject to § 112(f). It points out that district courts are obliged to follow the Federal Circuit absent "unusually compelling circumstances," and it argues none are present here. Nintendo CC Brief, at 3–4 (quoting *Alloc, Inc. v. Norman D. Lifton Co.*, No. 03 Civ. 4419(PAC), 2007 WL 2089303, at *10 (S.D.N.Y. July 18, 2007)). While this rule clearly applies when the Federal Circuit has issued a written opinion, Nintendo does not explain why it should apply where the Federal Circuit has issued only a *summary* affirmance. That is precisely what occurred here: the Federal Circuit upheld the ITC's opinion in its entirety, without indicating its views as to any specific aspect of it — including its conclusions about "fastening mechanisms." *See Gamevice, Inc. v. ITC*, 847 Fed. App'x 929, 929–30 (Fed. Cir. 2021) (per curiam). The decision itself clearly states, "This disposition is nonprecedential," *id.*, and the Federal Circuit has elsewhere noted that a Rule 36 affirmance "does not endorse or reject any specific part of the trial court's reasoning." *Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 750 (Fed. Cir. 2012). Indeed, none of the cases cited by Nintendo for this proposition involved summary affirmances by the Federal Circuit. The ITC's ruling is thus afforded whatever persuasive value is warranted. *See Tex. Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996). Here, Gamevice has proffered different evidence than was before the ITC in the prior investigation, which justifies departing from its conclusion. Nintendo has thus failed to carry its burden, and "fastening mechanisms" will be construed under its plain and ordinary meaning, that is, "a fastener or fasteners."

4. *"a pair of confinement structures" / "confinement structures"*

The terms "confinement structures" or "a pair of confinement structures" appear in claim 1

of each of the Asserted Patents, as well as claims 16 and 17 of the '713 patent. Gamevice proffers the construction "components that keep other components in place," while Nintendo asserts this is a means-plus-function term under § 112(f) with different proposed functions depending on the claim. Like several of the terms already discussed, the ITC also construed this term in both prior investigations, and it twice concluded that § 112(f) did not apply.

Gamevice's proffered construction must be dismissed out of hand. As Nintendo notes, the construction "components that keep other components in place" is "so generic that it is indistinguishable from Gamevice's proposed constructions for other terms." Nintendo CC Brief, at 13. Gamevice does not address this in its brief, nor explain how a jury could be expected to distinguish between a "confinement structure" and, for instance, a "fastening mechanism" (discussed above). Unlike with "fastening mechanisms," Gamevice's extrinsic evidence that the term refers to a commonly recognized class of structures is unavailing.

Nintendo once again bears the burden of rebutting the presumption against applying means-plus-function treatment to this term, since the term does not include the word "means." It argues that "structure" is another commonly recognized nonce term and that "confinement structures" does not refer to a particular class of structures within the art. Gamevice proffers some testimony to the contrary, though it is not particularly compelling and is contradicted by Nintendo's evidence. Still, the salient question is not whether the claim fails to identify a class of structures, per se, but whether it "fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349 (internal quotation marks omitted).

In both prior ITC investigations, the ITC concluded that the claim cleared this bar. After first concluding that the term "does not have a commonly understood meaning to one of ordinary skill in the art," the ITC observed that "the figures clearly depict a confinement structure, and the specification provides sufficient description of confinement structures." *1111 Investigation*, slip op. at 27–28; *accord 1197 Investigation*, slip op. at 40–41. In both investigations, the ITC found the descriptions of figures 16 and 17 to be particularly instructive, noting that they "inform the

reader, and a person of skill in the art, that a confinement structure is a component that holds the computing device." *1111 Investigation*, slip op. at 30; *accord 1197 Investigation*, slip op. at 40. Thus, both administrative law judges adopted the same construction: "components that hold a computing device." *1111 Investigation*, slip op. at 32; *accord 1197 Investigation*, slip op. at 41.

Having reviewed the claim language and specifications, it is clear this is a borderline case. However, in light of the ITC having reached the same conclusion in two different instances; the absence of good cause to depart from these conclusions; the presumption against applying means-plus-function treatment; and the sufficient (if not abundant) detail included in the patents, § 112(f) does not apply, and Nintendo's construction is rejected. Instead, the following construction, borrowed largely from the ITC, will be adopted: "physical component(s) that hold(s) a computing device."

     5.   *"passageway"*

The term "passageway" appears in claim 1 of each of the Asserted Patents, as well as claim 16 of the '713 patent. The parties offer constructions that differ by only one word. Gamevice proposes that the term be construed as "a space that accommodates a communication wire," while Nintendo proposes it be construed as "a *defined* space that accommodates a communication wire." Gamevice CC Brief, at 17 (emphasis added). Nintendo argues that adding "defined" gives meaning to the term since "all communication wires necessarily exist in space that accommodates them." Nintendo CC Brief, at 25; *see also id.* ("Where else could a communication wire be, except in space that accommodates it?").

This somewhat metaphysical argument is unconvincing. For one, Gamevice's proposed construction was initially crafted by the ITC, drawing from a careful review of the patent specifications. *See 1111 Investigation*, slip op. at 59–64. The word "defined," as Gamevice argues, does not add any meaningful clarity to what is otherwise a straightforward construction; in fact, it could lead to jury confusion by failing to define "defined" itself. Finally, at a granular, semantic level, the use of the article "a" in Gamevice's construction — that is "*a* space" rather than simply "space" — would seem to address Nintendo's concerns, in that it connotes a discrete space rather

1   than any free-floating and ambiguous zone through which a wire may pass. Gamevice's

2   construction, "a space that accommodates a communication wire," is therefore adopted.

3         6.  *"communication link"*

4   The term "communication link" appears in claim 1 of each of the Asserted Patents and in

5   claim 16 of the '713 patent. The parties agree the term should be construed as "a component for

6   [the] reception and transmission of data," but Nintendo's proposed construction adds that such

7   reception and transmission occurs "between the control modules."

8   The claim language, always the key starting point in this analysis, undercuts Nintendo's

9   argument right off the bat. Claim 1 of each patent includes the following language:

> the passageway promotes electrical communication between the communication link of a first confinement structure of the pair of confinement structures and the *computing device*, the passageway further promotes electrical communication between the communication link of a second confinement structure of the pair of confinement structures and the *computing device*.

14  *E.g.*, '393 Patent, at 17:66–18:6 (emphasis added). Granted, Nintendo's construction does

15  not preclude this arrangement — that is, the communication link may facilitate communication

16  "between the control modules" *and* from the control modules to the computing device. Yet its

17  construction certainly conveys this as an incidental function of the communication links, rather

18  than one specifically contemplated by the patentee.

19  The specifications further support a broader construction of the term. Nintendo points to

20  various portions of the specifications that reveal the communication links facilitate communication

21  between the two control modules. *See, e.g.*, '713 Patent, at 8:40–42 ("[T]he structural bridge 258

22  provides a communication link 270, which passing [sic] signals between the pair of control

23  modules 252."). Other parts of the specification, however, cut in Gamevice's favor, indicating the

24  communications links further facilitate communication between the control modules and the

25  computing device. *See, e.g.*, *id.* at 15:10–16 ("In a preferred embodiment, . . . a communication

26  link 519, is provided by the input device 500, which facilitating [sic] communication between the

27  pair of control modules (502, 504) and the computing device 506 . . . ."). The specifications go on

to discuss various modes of communication that the communication links may accommodate, including both wired (e.g., metallic wires or fiber optic conductors) and wireless (e.g., Bluetooth) signal transmission. *See, e.g.*, *id.* at 8:49–9:13. Finally, the summary of the invention in each patent describes the communication link broadly as "facilitating communication between the pair of control modules and the computing device." *Id.* at 1:33–35. As noted above, Nintendo's proffered construction does not necessarily preclude communication between the control modules and the computing device, but it would seem to require communication between the control modules in the first instance — a notion that is not adequately supported by the claim language. Gamevice's construction, "a component for reception and transmission of data," is thus adopted.

### 7. *"structural bridge"*

"Structural bridge" appears in claim 1 of each of the Asserted Patents, claim 12 of the '393 patent, and claim 16 of the '713 patent. Gamevice proposes the construction "a physical apparatus that connects other components," which it argues is consistent with the term's plain and ordinary meaning. Nintendo meanwhile proffers "a component of the game controller that connects its two sides." Gamevice notes that its construction was adopted by the ITC in both prior investigations. *See 1111 Investigation*, slip op. at 65–71; *1197 Investigation*, slip op. at 82–87.

The term "structural bridge" is indeed "a simple combination of two ordinary words," CC Reply Brief, at 12, yet its precise meaning is somewhat difficult to capture. The parties agree, and the claims themselves clearly indicate, that the structural bridge plays a central role in connecting different components of the claimed inventions. This is further reflected throughout the myriad references to the structural bridge in the specifications and in the fact that the term is included in the title of each patent. *See, e.g.*, '393 Patent, at 14:52–54 ("[W]hen joined together, by way of a structural bridge 522, the input device 500, and the computing device 506, form an electronic gaming system 511 . . . ."); *id.* at 15:5–7 ("[T]he structural bridge 522, secures the pair of control modules (502, 504) one to the other."); *id.* at 15:23–24 ("[T]he structural bridge 522, masks a mid-portion of the back of the computing device."); *id.* at 17:15–19 (game control apparatus provides the two control modules and the structural bridge, "which collectively secures [sic] the computing

device"). While the parties dispute whether the term carries any plain and ordinary meaning, the term certainly would be "readily understood by persons of ordinary skill in the mechanical arts, particularly given the examples and descriptions in the specification." CC Reply Brief, at 12. In fact, the term is almost straightforward enough for its meaning to be "readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. However, given the dispute between the parties, and the fact that this term will likely not be familiar to a jury (unlike "computing device," by contrast), construction is appropriate, even if it consists of "little more than the application of the widely accepted meaning of commonly understood words." *Id.*

Neither proffered construction seems like exactly the right fit. Gamevice's construction, as Nintendo notes, is overly broad and potentially unhelpful to the jury. As with Gamevice's proffered constructions for several other terms, "a physical apparatus that connects other components" could be read to describe a range of claim terms besides the structural bridge (like, for instance, "fastening mechanisms"). Moreover, Gamevice's construction appears to ignore the use and significance of the word "bridge" in the term. Although the ITC adopted Gamevice's construction in both prior investigations, its actual analyses were quite cursory, and they are of only limited persuasive value in this regard. On the other hand, Nintendo's construction would unnecessarily import the term "game controller," which is itself undefined and could tend to confuse the jury.

Therefore, the term shall be construed as "a physical apparatus that secures two or more components to each other across a distance." This construction is consistent with the way the term is used throughout the claims and the specifications. Moreover, it captures the "bridge" concept that is lacking from Gamevice's construction, while also avoiding the introduction of new terms that would require further construction, unlike Nintendo's construction. Finally, it is worth noting that this construction is in line with that of the ITC Staff in the 1197 investigation. *See 1197 Investigation*, slip op. at 85–86.

8. *"promotes"*

"Promotes" is recited in claim 1 of each of the three Asserted Patents. The parties propose

very similar constructions: Gamevice suggests the term should be given its plain and ordinary meaning of "facilitates," and Nintendo argues the term should be given its plain and ordinary meaning with no further construction. It is unclear how Gamevice's construction meaningfully differs from Nintendo's, especially given that it explicitly notes its construction is "consistent with a lay definition of the word 'promote[s].'" Gamevice CC Brief, at 22 (alteration in original). Nintendo's argument that this is an ordinary term that "the jury can readily understand and apply" is compelling. Nintendo CC Brief, at 23. Since there is no apparent dispute as to the scope of the claims that include "promotes," the term need not and will not be construed. *See O2 Micro*, 521 F.3d at 1361.

9. *"electrical communication" / "electronic communication"*

"Electrical communication" appears in claim 1 of the '498 patent and the '393 patent, while "electronic communication" appears in claim 1 of all three Asserted Patents as well as claim 16 of the '713 patent. The parties again propose similar constructions for both terms. Gamevice suggests "electrical communication" should be construed as "flow of information between two components represented by the use of electricity," and that "electronic communication" should be construed as "flow of information between two components represented by the use of electrons." Nintendo suggests "electrical communication" should be construed as "the flow of information by electricity from the sender to the receiver," and "electronic communication" should be construed as "the flow of information by electricity through a semiconductor in the sender to a semiconductor in the receiver." There are therefore two main disputes: first, whether "the flow of information is between two components or between 'the sender' and 'the receiver,'" Gamevice CC Brief, at 22; and second, what distinction there is between "electric" and "electronic." These are discussed in turn.

First, Nintendo argues that communication necessarily entails the transmission of information between a source (or sender) and a receiver. In support of this, it cites a statement from Dr. Stein, who in turn points to the definition of "communication" from the IEEE Dictionary: "[t]he flow of information from one point, known as the source, to another, the receiver." Stein

Decl. ¶ 258 (alteration in original) (citing IEEE 100: THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) [hereinafter IEEE DICTIONARY]). However, this is only one of two definitions of "communication" that the IEEE Dictionary offers. The other (in fact, the first definition) is "[t]he transmission of information from one point to another by means of electromagnetic waves," which clearly supports Gamevice's position. IEEE DICTIONARY 197. Moreover, as Gamevice notes, figure 6 of each of the Asserted Patents includes bidirectional arrows when depicting the relevant components. While a given component could technically operate as both a "sender" and a "receiver," Nintendo's definition could confuse the jury by suggesting the terms are mutually exclusive.

Second, while "electrical" and "electronic" are closely related, the separate use of both terms in the Asserted Patents strongly suggests the terms have different meanings. *See, e.g.*, *Innova/Pure Water*, 381 F.3d at 1119. Gamevice's proffered constructions plainly do not reflect any difference between the two: as Nintendo correctly (and succinctly) notes, "electricity just is the flow of electrons." Nintendo CC Brief, at 23. The difference appears to lie in the role played by "electron devices," which mediate the flow of electrons. This is supported by numerous dictionary definitions, including those proffered by both parties. *See, e.g.*, Dkt. 231-16 (IEEE Dictionary defining "electronic" as "[o]f, or pertaining to, devices, circuits, or systems utilizing electron devices"); Slocum Decl. ¶ 97 (citing a definition of "electronic" from the Wiley Electrical and Electronics Engineering Dictionary as "[p]ertaining to components and devices which conduct electrons . . . through a vacuum, gas, or semiconductor"); *id.* ¶ 98 (citing a definition of "electronic" from the McGraw-Hill Dictionary of Electrical and Computer Engineering as "[p]ertaining to electron devices or to circuits or systems utilizing electron devices, including electron tubes, magnetic amplifiers, transistors, [etc.]"); *id.* ¶ 99 (citing a definition of "electronic" from The Free Dictionary by Farlex as "[o]f, based on, operated by, or otherwise involving the controlled conduction of electrons . . . , especially in a vacuum, gas, or semiconducting material); *cf.* OXFORD DICTIONARY OF ELECTRONICS AND ELECTRICAL ENGINEERING 186 (5th ed. 2018) (defining "electronic device" as "[a] device that utilizes the properties of electrons . . . moving in a

vacuum, gas, or semiconductor"). These stand in contrast to dictionary definitions of "electrical," which do not mention such devices. *See, e.g.*, *Electrical*, The Free Dictionary by Farlex, https://www.thefreedictionary.com/electrical (last visited Jan. 13, 2023) (defining "electrical" as "[o]f, relating to , producing, or operated by electricity"); OXFORD ENGLISH DICTIONARY (3d ed. 2008) (defining "electrical" as "[r]elating to or of the nature of electricity; involving electricity," though noting that "electric" is typically interchangeable or preferred); *cf*. IEEE DICTIONARY 358 (defining "electric" as "[c]ontaining, producing, arising from, actuated by, or carrying electricity, or designed to carry electricity and capable of so doing").

Based on these observations, "electrical communication" shall be construed using Gamevice's proposed construction: "the flow of information between two components represented by the use of electricity." "Electronic communication" shall be construed as "the flow of information between two components represented by the use of electricity controlled by and/or mediated through an electron device, such as a vacuum, gas, transistor, or semiconductor."

## IV. MOTION FOR SUMMARY JUDGMENT

Nintendo simultaneously filed a motion for summary judgment on two separate grounds, both of which turn on claim constructions. First, it argues that if the ITC's construction of "fastening mechanisms" is adopted, then it is entitled to summary judgment of noninfringement of the '713 and '498 patents. Second, it argues that if Gamevice's proposed constructions for either "computing device" or "structural bridge" are adopted, then it is entitled to summary judgment of invalidity for all three Asserted Patents, on the grounds that the asserted claims are anticipated.

For the reasons discussed above, none of the constructions contemplated by the motion will be adopted. However, many of the arguments outlined by the parties in their briefs on the motion for summary judgment would seem to apply to the adopted constructions as well. Judgment on the motion is therefore reserved, and the parties are requested to provide supplemental briefing as to the disposition of the motion based on the adopted constructions. The schedule for this supplemental briefing is discussed below.

///

## V. CONCLUSION

For the reasons discussed above, the following constructions will be adopted for the ten claims the parties have submitted:

- "computing device": electronic equipment controlled by a CPU.
- "retention mechanism": subject to 35 U.S.C. § 112(f). The function is "interacting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules," and the structure is indefinite.
- "fastening mechanism": plain and ordinary meaning, i.e., "a fastener or fasteners."
- "a pair of confinement structures / confinement structure": physical component(s) that hold(s) a computing device.
- "passageway": a space that accommodates a communication wire.
- "communication link": a component for reception and transmission of data.
- "structural bridge": a physical apparatus that secures two or more components to each other across a distance.
- "promotes": plain and ordinary meaning; no construction necessary.
- "electrical communication": the flow of information between two components represented by the use of electricity.
- "electronic communication": the flow of information between two components represented by the use of electricity controlled by and/or mediated through an electron device, such as a vacuum, gas, transistor, or semiconductor.

Furthermore, judgment on the pending motion for summary judgment is reserved. The parties are requested to submit supplemental briefing discussing how, if at all, their respective arguments are affected by the adopted constructions.  Nintendo's supplemental brief must be submitted within 21 days of the entry of this Order; Gamevice's supplemental brief must be submitted within 14 days of the filing of Nintendo's supplemental brief. Each brief is limited to a maximum of twenty (20) pages each, including memoranda of points and authorities. The motion will then be submitted for decision and an order will issue.

**IT IS SO ORDERED**.

Dated: January 19, 2023

_____
RICHARD SEEBORG
Chief United States District Judge