UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GAMEVICE, INC.,

    Plaintiff,

    v.

NINTENDO CO., LTD., et al.,

    Defendants.

Case No. 18-cv-01942-RS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Following briefing by both parties in this patent infringement action, an order issued construing ten claims pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). *See* Dkt. 241. Because Defendant Nintendo Co., Ltd. ("Nintendo"), had also filed a motion for summary judgment that turned on the construction of three of these terms, the order instructed the parties to file "supplemental briefing as to the disposition of the motion based on the adopted constructions." *Id.* at 18. This briefing having now been submitted, the motion is granted in part and denied in part. All of the asserted claims that incorporate the term "computing device" are not entitled to an earlier priority date, and they are thus invalid as anticipated by the Nintendo Switch.

## II. BACKGROUND

The background of this case is related in greater detail in prior orders. As relevant to this motion, Plaintiff Gamevice, Inc. ("Gamevice") asserts that Nintendo has infringed three of its patents (the "Asserted Patents"), all of which were filed between 2017 and 2019: U.S. Patent No.

9,808,713 ("the '713 patent"), filed on July 28, 2017; U.S. Patent No. 9,855,498 ("the '498 patent"), also filed on July 28, 2017; and U.S. Patent No. 10,391,393 ("the '393 patent"), filed on December 21, 2018. These patents were preceded by two other, related patents: U.S. Patent No. 9,126,119 ("the '119 patent"), filed on February 2, 2015; and U.S. Patent No. 9,592,453 ("the '453 patent"), filed on August 31, 2015. The parties agree that the Nintendo Switch, the accused infringing product, was first sold in the United States on March 3, 2017. *See* Dkt. 230 ("Motion"), at 9; Dkt. 233 ("Opp."), at 5.

Nintendo moved for summary judgment on two grounds, only one of which remains viable following the entry of the claim construction order.[1] Because the Switch indisputably predates the three Asserted Patents, Nintendo argues that it constitutes prior art and, therefore, that it is entitled to summary judgment because the asserted claims are all anticipated. Gamevice, in turn, argues that it is entitled to the priority filing date of the '119 patent — that is, February 2, 2015 — because the patent provides written description support for the asserted claims.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While the moving party has the initial burden of identifying the portions of the record which demonstrate the absence of a genuine issue of material fact, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'"

---

[1] Nintendo initially argued that it was entitled to summary judgment if its proffered construction of "fastening mechanisms" was adopted. *See* Motion, at 3–5. Since a different construction was adopted, this argument is moot. Nintendo's procedurally incorrect request for reconsideration included in its supplemental briefing, *see* Dkt. 243, at 18–20, need not be entertained. *See* Civ. L.R. 7-9.

*Matsushita*, 475 U.S. at 587, and "a scintilla of evidence in support of the [non-moving party's position] will be insufficient" for the case to withstand summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. DISCUSSION

Nintendo moves for summary judgment on the grounds that the claims of the Asserted Patents are invalid because they are all anticipated by prior art — that is, by the Nintendo Switch. Anticipation occurs when a single prior art reference "expressly or inherently describes each and every limitation set forth in the patent claim[s]." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). Nintendo here bears the "burden to prove facts establishing anticipation by clear and convincing evidence." *Mentor H/S, Inc. v. Med. Device All., Inc.*, 244 F.3d 1365, 1377 (Fed. Cir. 2001). However, once Nintendo establishes a "prima facie case of invalidity," its burden is met, and Gamevice is "obligated to come forward with evidence to the contrary." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305 (Fed. Cir. 2008) (quoting in part *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985)). For the purposes of this motion, Nintendo "pleads in the alternative and accepts Gamevice's allegations that the Nintendo Switch satisfies each limitation of the asserted claims." Dkt. 243, at 10. This suffices to establish a prima facie showing of invalidity. *See Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000); *IXYS Corp. v. Adv. Power Tech., Inc.*, No. C 02-03942 MHP, 2004 WL 540513, at *5 (N.D. Cal. Mar. 18, 2004) (rationalizing this principle because there is "no logical space between plaintiff's infringement allegation and defendant's invalidity defense; the facts [cannot] support one without identically buttressing the other").

The key question, then, is whether Gamevice is entitled to the priority filing date of the '119 patent. This question turns on whether the '119 patent provides written description support for the terms "computing device" and "structural bridge," as those terms are used in the asserted claims. Nintendo argues the '119 patent does not, while Gamevice argues it does, and that there are disputes of fact bound up in this inquiry that render summary judgment inappropriate.

///

### A. The Written Description Requirement

As the Federal Circuit has noted, it is "elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application." *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995). Not only is this an explicit requirement of federal law, *see* 35 U.S.C. § 112, it also simply makes sense as a way to "protect[] the quid pro quo between inventors and the public" that lies at the core of patent law: the public "receives meaningful disclosure" of the invention, and the inventor herself is granted the right to exclude the public "from practicing the invention for a limited period of time." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009) (internal quotation marks omitted) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 970 (Fed. Cir. 2002)). The written description requirement helps maintain this balance by "ensur[ing] that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).

To satisfy the written description requirement, the party seeking entitlement to the earlier filing date must be able to "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention," where "the invention" means "whatever is now claimed." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991) (emphasis omitted). The earlier patent "need not recite the claimed invention [verbatim] but must do more than merely disclose that which would render the claimed invention obvious." *ICU Med.*, 558 F.3d at 1377. In other words, the earlier patent "must describe the claimed invention with all its limitations." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) (citing *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)); *see Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987) ("It is not a question of whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure. . . . Rather, it is a question whether the application necessarily discloses that particular device." (internal quotation marks omitted)), *superseded on other grounds as recognized by Kubota v. Shibuya*, 999 F.2d 517 (Fed. Cir. 1993).

Whether the written description requirement is met in a particular case is a question of fact, but it is "amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis*, 522 F.3d at 1307.

A consistently thorny issue in applying this standard is determining whether an earlier patent discloses a "species" sufficient to support later claims within the "genus" of the earlier species — in other words, whether an early, narrow disclosure can support a later, broader one. As a general matter, "disclosure of a species may be sufficient written description support for a later claimed genus including that species," but the question ultimately depends, again, on what the disclosure reasonably conveys to a person skilled in the art. *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124–25 (Fed. Cir. 2004). For instance, in *Tronzo v. Biomet, Inc.*, the Federal Circuit reversed a jury finding that the plaintiff's patent, relating to artificial hip sockets and "cup implants," was entitled to the earlier filing date of its "parent application." 156 F.3d at 1158. The parties disputed whether the parent application disclosed a device that was "generic as to the shape of the cup," thus supporting the patent at issue, or whether it disclosed only a cup that was conical in shape. *Id.* Reviewing the patent specification, the Federal Circuit found the parent application referred to "*only* conical shaped cups and nothing broader," a conclusion bolstered by the fact that the specification "specifically distinguishe[d] the prior art as inferior and tout[ed] the advantages of the conical . . . cup." *Id.* at 1159. Expert testimony also supported this finding, and the Court held that the plaintiff's patent claims were invalid as anticipated by intervening prior art.

**B. The '119 Patent**

As noted above, both parties agree that the Nintendo Switch was on sale in the United States before the Asserted Patents were filed. In light of Gamevice's averments (and Nintendo's alternative pleading) that the Switch reads on the claims in the Asserted Patents, it is prior art, and Gamevice's claims are anticipated unless they are entitled to the filing date of the '119 patent.[2]

---

[2] It is no longer necessary to examine the '453 patent in light of the fact that claim 12 of the '393 patent was held indefinite (and thus invalid) in the claim construction order. *See* Dkt. 241, at 9.

Nintendo argues it is entitled to summary judgment because the '119 patent does not provide written description support for two of the claim terms as construed by the *Markman* order: (1) "computing device," meaning "electronic equipment controlled by a CPU," and (2) "structural bridge," meaning "a physical apparatus that secures two or more components to each other across a distance." Dkt. 241, at 19. In Nintendo's view, the '119 patent discloses far narrower versions of each; Gamevice, meanwhile, contends that the '119 patent provides sufficient support for each of these terms as they are used in the asserted claims.

### *1. "Computing Device"*

Nintendo first argues that the '119 patent does not demonstrate that the inventors of the Asserted Patents had prior possession of a "backless, screenless computing device." Motion, at 14. Instead, every figure "shows a computing device with both a back and a screen," while the specification notes that the computing device "may take the form of a tablet computer, smartphone, notebook computer, or other portable computing device" — language that is repeated in the Asserted Patents. *Compare* Dkt. 230-11 ("'119 Patent"), at 3:17–197, *with* Dkt. 213-1 ("'498 Patent"), at 4:34–36, *and* Dkt. 213-2 ("'713 Patent"), at 4:34–36, *and* Dkt. 213-3 ("'393 Patent"), at 4:43–45. Gamevice contends that the '119 patent language is not so limited, and that it adequately supports the adopted construction of "computing device" such that "[a] person of skill in the art would . . . understand that disclosure to include many portable devices, such as the single-board computers of the day that had no backs and no screens." Dkt. 244, at 12. In other words, Gamevice argues that to the extent the '119 patent discloses only one species (a computing device with a back and a screen), it nevertheless discloses the "broader genus of 'computing devices.'" Opp., at 8.

Both parties acknowledge the salient differences here between the narrow and broad readings of "computing device." On the narrow end are "complete, finished devices," that include a back and a screen — picture an iPhone, an iPad, or an Amazon Kindle. The broad end includes a range of devices "with the ability to perform computing functions, i.e., devices with a CPU, a memory, and ways to input and output data from the CPU." *See* Motion, at 14–18; Opp., at 10–12.

A single-board computer, such as the Raspberry Pi, *see* Dkt. 229-7, would fit into the broad category but not the narrow one. The parties also both recognize that the '119 patent includes images of only "complete, finished" computing devices, but Gamevice contends these are merely preferred embodiments that should not be construed to limit the scope of the patent.

The claim language itself spells immediate trouble for Gamevice's argument. Claim 1 of the '119 patent describes the computing device as follows: "a computing device, the computing device providing a plurality of sides, each of the plurality of sides are disposed between an *electronic display screen of the computing device and a back of the computing device*." '119 Patent, at 9:64–67 (emphasis added). Compare this to how "computing device" is described in claim 1 of each Asserted Patent. The '713 patent defines it as "a computing device, the computing device providing an upper, lower, left and right side, collectively the sides of the computing device, and an electronic display screen, the electronic display screen having a corresponding side adjacent each of the sides of the computing device." '713 Patent, at 17:48–53. The '498 patent describes it as "a computing device, comprising an electronic display screen," while the '393 patent simply states that the invention includes "a computing device." '498 Patent, at 17:48–49; '393 Patent, at 17:54. The '119 patent is thus the only one of these patents that explicitly claims the computing device with reference to a screen and a back; those features are not added via subsequent dependent claims, as they are in the Asserted Patents.

The specification further supports the contention that the computing devices taught by the '119 patent are narrower than those in the Asserted Patents. As Nintendo observes, every depiction of a computing device in the '119 patent shows a device with a screen and a back. *See* '119 Patent figs. 1–4, 8–10, 12–16, 25. Gamevice cites to Figure 6 and its corresponding description as intrinsic evidence that the computing device need not include a back, but these are not to the contrary. Figure 6 is a "block diagram," which is simply a "functional diagram" that shows how the computing device interacts with other components of the invention via "hardware (a CPU and a screen), software (video game), firmware (device driver), and a communication protocol." Stein Decl. ¶ 301. The specification's statement that the computing device "may take the form of a

tablet computer, smart phone, notebook computer, or other portable computing device" further reinforces that the inventors possessed only computing devices with screens and backs. '119 Patent, at 3:17–19. The fact that this identical list of devices is included in each of the Asserted Patents is irrelevant: whereas these devices may just be preferred embodiments in the Asserted Patents, and thus should not necessarily limit how "computing device" should be read in those contexts, in the '119 patent they demonstrate the limited breadth of what the inventors possessed and what the patent discloses. Finally, Nintendo's expert, Dr. Stein, reviewed the '119 patent and concluded that a person of ordinary skill in the art "would understand that the computing device recited in claim 1 is a complete computing device, such as a smartphone, tablet computer, notebook computer, or other portable computing device." Dkt. 231-12 ("Stein Decl.") ¶ 302. Gamevice's expert, Dr. Slocum, did not address the '119 patent in his declaration.

Further, it is unclear how the invention described in the '119 patent would function with a screenless, backless computing device. As Nintendo points out, Dr. Slocum suggests it would not. In his deposition, Dr. Slocum was asked if the Gamevice invention would work with a "backless and screenless computing device." The following exchange occurred:

> Q. [counsel for Nintendo] So in order to make this invention work, you have to put a back and sides on the computing device right? And a screen?
>
> A. [Dr. Slocum] Because a single-board computer by itself in this invention, you'll drip sweat on it and you'll have a mess.
>
> Q. It won't work?
>
> A. It will work for a little bit before it shorts out.

Dkt. 233-4, at 345–346. While Dr. Slocum was expressly reviewing the specification of one of the Asserted Patents, there is no material difference between these specifications and the '119 specification that would support the notion that the earlier device *would* function with a backless, screenless computing device. This evidence is persuasive, as exemplified by *Rivera v. ITC*, 857 F.3d 1315 (Fed. Cir. 2017). There, the plaintiff, who had designed a "pod adapter assembly" to be used with a single-serve coffee brewer, accused the defendant of patent infringement based on the

defendant's "beverage capsules" that included an "integrated mesh filter." *Id.* at 1318. One of the relevant questions was whether the plaintiff's invention could accept loose coffee grounds, or whether it must accept coffee grounds contained in "pods." The Federal Circuit found persuasive an expert's statement that the plaintiff's invention "would not function, because inserting loose-grain coffee or loose-leaf tea into the containers shown in the embodiments would clog the brewing chamber." *Id.* at 1321. Likewise here, attempting to use a backless, screenless computing device would likely cause the invention not to function.

Gamevice insists at several points that, regardless of how the '119 patent discloses only computing devices with backs and screens, it should not be read to preclude the broader genus of computing devices since it was "well within the knowledge of a person of ordinary skill in the art that the claimed computing device need not be a complete, finished device," given what was known of single-board computers at the time. Opp., at 12. Thus, a person of ordinary skill in the art could simply "add[] either a back or a screen to a rudimentary computing device" to create the invention disclosed in the patent. However, the Federal Circuit has repeatedly stated that, while "[t]he knowledge of ordinary artisans may be used to inform what is actually in the specification," it may not "teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera*, 857 F.3d at 1322 (citing *Lockwood*, 107 F.3d at 1571). Thus, even if it would have concededly been "obvious" for a person of ordinary skill in the art to add a back or a screen, this does not suffice to show that the '119 patent inventors had possession of such a broad range of computing devices.

The immediate case bears a striking resemblance to *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, a case involving "medical valves used in the transmission of fluids to or from a medical patient." 558 F.3d at 1372. The plaintiff's patents claimed priority to a 1992 patent, which included only medical valves with a spike, while the infringement claims involved medical valves without a spike. The defendant argued the priority patent was limited only to medical valves with spikes, while the plaintiff argued the "specification's disclosure of valves with a spike support[ed] claims that [we]re neutral regarding whether the valve must include a spike." *Id.* at 1377. The

1   district court granted summary judgment of invalidity in favor of the defendant, and the Federal
2   Circuit affirmed. The Court noted that the specification, figures, and descriptions described "only
3   medical valves with spikes," *id.* at 1378, and the fact that it would have been "obvious" that the
4   valve could function without a spike was not enough to show that the inventors possessed
5   spikeless valves, *id.* at 1379. Analogously here, the specification reveals only computing devices
6   with backs and screens, and the "obviousness" of adding these features to a backless, screenless
7   computing device is not enough. Gamevice, perhaps tellingly, does not attempt to show why *ICU*
8   *Medical*'s logic should not apply equally in this case.

9   Gamevice has therefore failed to show that there is a dispute of material fact as to whether
10  the '119 patent provides written description support for "computing device" in the Asserted
11  Patents. It does not. As such, the Asserted Patents are not entitled to the '119 patent's priority date,
12  and the motion is granted in this respect.

### 2.   "Structural Bridge"

Similar to its contentions regarding the use of the term "computing device," Nintendo argues that the '119 patent fails to provide written description support for the term "structural bridge" the way it is claimed in the Asserted Patents. More specifically it argues that the '119 patent "uses the term 'structural bridge' only with reference to a structural bridge that is external to the computing device and not as an internal part of a console." Dkt. 243, at 12. Thus, like with "computing device," this narrow disclosure of an external structural bridge cannot support the broader disclosure Gamevice ostensibly claims in the Asserted Patents. Gamevice disputes this, noting that nothing in the '119 patent requires "a specific positional relationship between the [structural] bridge and the computing device." Opp., at 17. As such, the external structural bridge is merely a preferred embodiment, and it should not be read to limit the scope of what was disclosed by the '119 patent.

While these arguments bear many similarities to the parties' dispute as to the breadth of the term "computing device," the '119 patent is not so limiting as to the term "structural bridge." Unlike with "computing device," which claim 1 of the '119 patent expressly requires to include a

United States District Court
Northern District of California

screen and a back, none of the claim language in the '119 patent requires the structural bridge to be "a physical apparatus that secures two or more components to each other across a distance *and which is external to the computing device*" or the like. Nor does the specification state that the structural bridge is even "preferably" external to the computing device. This is significant given that the claims disclose several types of structural bridge — claim 9 discloses a "ridged structure," claim 10 discloses a "removable rigid structure," claim 11 discloses a "flexible structure," and claim 12 discloses a "removable flexible structure" — but none of them require any specific physical or geometric relationship to the computing device. '119 Patent, at 10:56–63. Indeed, as Gamevice points out, the inventors did specify particular geometric relationships of different components in other portions of the '119 patent. *E.g.*, *id.* at 8:15–21.

Nintendo relies primarily on the fact that the diagrams depict only an external structural bridge, but this appears only to disclose a preferred embodiment, which need not be interpreted to pigeonhole the claimed structural bridge. *See Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("Although the patent drawings show only identical half-shells, that does not compel the conclusion that the written description of the [prior] patent is so narrowly tailored as to preclude [plaintiff] from claiming non-identical half-shells in the [instant] patent." (citations omitted)). Further, to the extent the parties and their experts disagree as to how a person of ordinary skill in the art would interpret the scope of a "structural bridge" as disclosed in the '119 patent specification, this raises a dispute of fact that precludes summary judgment. *Compare* Dkt. 244, at 9 ("A person of ordinary skill in the art would have reasonably understood that the inventor had possession of a structural bridge that is internal or partially internal to the computing device."), *with* Motion, at 24 ("Dr. Stein concluded . . . that '[a] person of ordinary skill in the art . . . would not understand that the inventors possessed a "structural bridge" that was other than part of the game controller as of the filing date of the '119 patent.'" (quoting Stein Decl. ¶ 282)). The motion is therefore denied in this respect.

## V. CONCLUSION

For the reasons discussed above, the asserted claims using the term "computing device" are

not entitled to the priority filing date of the '119 patent. The motion for summary judgment is granted in part, and these claims — i.e., all asserted claims except claim 16 of the '713 patent — are therefore invalid as anticipated by the Nintendo Switch. The motion is otherwise denied.

**IT IS SO ORDERED**.

Dated: March 14, 2023

_____
RICHARD SEEBORG
Chief United States District Judge